1  Geoffrey Gordon-Creed, SBN 136188
2  Jeremy Sugerman, SBN 146315
   Charlie Y. Chou, SBN 248369
3  **GORDON-CREED, KELLEY,**
   **HOLL & SUGERMAN, LLP**
4  222 Kearny Street, Suite 650
   San Francisco, CA 94108
5  Tel: (415) 421-3100
6  Fax: (415) 421-3150

7  Attorneys for Plaintiff
8  **CHRISTOPHER D. WHITE**



ORIGINAL
FILED

NOV - 6 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

9          **UNITED STATES DISTRICT COURT**
10        **NORTHERN DISTRICT OF CALIFORNIA**

11
                                                EDL

12  CHRISTOPHER D. WHITE, an individual,    CV 13 5169

13          Plaintiff,

14      v.
15                                          **VERIFIED INDIVIDUAL AND**
   RICHARD E. DEMARAY, an individual and   **SHAREHOLDER DERIVATIVE**
16  DEMARAY LLC, a Delaware Limited Liability  **COMPLAINT**
   Company,
17

18          -and-                          **DEMAND FOR JURY TRIAL**
19
   ANTROPY INCORPORATED, a Delaware
20  Corporation,

21          Nominal Defendant,

22          Defendants.
23

24

25

26

27

28

1        Christopher D. White ("White" or "Plaintiff"), by the undersigned attorneys, submits this

2  Verified Individual and Shareholder Derivative Complaint against the defendants named herein, and

3  alleges upon personal knowledge with respect to himself, and upon information and belief based

4  upon, *inter alia*, a review of corporate documents and reports, and an investigation

5  undertaken by Plaintiff's counsel, as to all other allegations herein, as follows.

6        **Statement of the Case**

7        1.     Plaintiff brings this action derivatively for the benefit of Antropy Incorporated

8  ("Antropy" or the "Company") against Antropy's current President and Chief Executive Officer,

9  Richard Ernest Demaray ("Demaray") seeking to remedy Demaray's usurpation of Antropy's corporate

10  opportunity, breach of fiduciary duty, constructive fraud, trade secret misappropriation, and tortious

11  interference with Antropy's prospective business relationship.

12        2.     Plaintiff also brings this action individually against Demaray alleging fraud, breach of

13  contract, negligent misrepresentation, declaratory relief, and breach of fiduciary duty – *de facto*

14  partnership.

15        3.     Plaintiff seeks to recover for Antropy the damages caused by Demaray's conduct

16  discussed herein, to compel defendants Demaray and Demaray LLC to disgorge to Antropy the

17  corporate opportunity Demaray and Demaray LLC misappropriated from Antropy, and to declare White

18  a shareholder, officer, and director of Antropy.

19        **Jurisdiction and Venue**

20        4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity) in

21  that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds

22  $75,000.00, exclusive of interests and costs.

23        5.     This Court also has jurisdiction over this action pursuant 28 U.S.C. § 2201 (Declaratory

24  Judgment Act).

25        6.     This action is not a collusive action designed to confer jurisdiction on a court of the

26  United States that it would not otherwise have.

27  //

28  //

1    7.    Venue is proper pursuant to 28 U.S.C. § 1391 because Demaray is a resident of San

2  Mateo County, California and Demaray LLC's principal place of business is in San Mateo County,

3  California.

4    8.    This Court has personal jurisdiction over Demaray and Demaray LLC because:  1)

5  Demaray and Demaray LLC have transacted and continue to transact business in California; 2) the

6  causes of action asserted in this case arose from or are connected with purposeful and tortious acts

7  committed by Demaray and Demaray LLC, in whole or in part, in California; 3) Demaray and Demaray

8  LLC have committed torts, directly and indirectly, in whole and in part, that caused substantial harm in

9  California; and/or 4) Demaray and Demaray LLC have had continuous and systematic contacts with

10  California by engaging in numerous activities that have had an effect in this State.

11  **Parties**

12    9.    Plaintiff Christopher D. White is a citizen of the State of Washington and has been a

13  shareholder of nominal defendant Antropy since at least October 2010.[1] *See* **Exhibit A** (December 17,

14  2009 Minutes of Action), attached hereto and made a part of this complaint.  White purchased his shares

15  of Antropy on or about October 2010.  Since December 15, 2009, White has been a Director of Antropy.

16  **Exhibit B** (December 15, 2009 Action of Incorporator of Antropy Incorporated), attached hereto and

17  made a part of this complaint.  Since December 17, 2009, White has been the Vice President, Treasurer,

18  and Secretary of Antropy.  **Exhibit A**.

19    10.    As a current holder of Antropy stock and a holder during the period of the wrongs alleged

20  herein, and pursuant to Fed. R. Civ. P. 23.1, White has standing to assert these claims on behalf of

21  Antropy and will fairly and adequately protect the interests of Antropy and its other shareholders, if any.

22    11.    Nominal defendant Antropy Incorporated is a Delaware corporation with its principal

23  place of business located at 190 Fawn Lane, Portola Valley, California 94028.  According to its

24  November 5, 2010 Private Placement Memorandum (relevant excerpts attached hereto as **Exhibit C** and

25  made part of this complaint), Antropy's business strategy was to purchase and then develop and

26

27 _____

28    [1] White was granted his interest in Antropy on December 17, 2009.  White purchased his interest in Antropy on or about October of 2010.

1  monetize the technologies underlying a portfolio of patents in the area of thin film energy conservation,

2  nanotechnology, light-emitting diode ("LED"), and solar technologies. **Exhibit C** at 6.

3      12.    Upon information and belief, defendant Richard Ernest Demaray, was and is at all

4  relevant times hereto, the President, Chief Executive Officer, Director, and majority shareholder of

5  Antropy. Upon information and belief, from February 28, 2013 through the present, Demaray was and

6  is the President and Managing Partner of Demaray LLC. Upon information and belief, Demaray is a

7  citizen of the State of California.

8      13.    Upon information and belief, Demaray LLC is a Delaware corporation with its principal

9  place of business at 190 Fawn Lane, Portola Valley, California 94028. According to its website,

10  "Demaray LLC is an R&D and IP development company focused on production [sic] vacuum thin film

11  deposition for advanced applications such as dielectric barrier coatings, high k dielectrics, electrical

12  conversion and storage devices, encapsulation and light extraction films for LEDs, laser diodes, OLED's

13  . . . ." Also according to its website, "Demaray LLC owns 65 patents related to thin film deposition that

14  improve efficiency in batteries, LED/OLED lighting, solar energy absorption and transfer with their sun

15  fiber, and thin film barriers that are flexible and highly impervious to pressure and water."

16      **Demaray's Fiduciary Duties and Obligations**

17      14.    By reason of Demaray's position as an officer and director of Antropy and because of his

18  ability to control the business and corporate affairs of Antropy, Demaray owed Antropy and its

19  shareholders (including White) the fiduciary obligations of good faith, trust, loyalty, and due care, and

20  was and is required to use his utmost ability to control and manage Antropy in a fair, just, honest, and

21  equitable manner. Demaray was and is required to act in furtherance of Antropy and its shareholders'

22  (including White's) best interests so as to benefit all shareholders equally and not in furtherance of

23  Demaray or any one shareholder's personal interest or benefit. Demaray also owes Antropy and its

24  shareholders (including White) the fiduciary duty to exercise good faith and diligence in the

25  administration of Antropy's affairs and in the use and preservation of its property and assets, and the

26  highest obligations of fair dealing.

27

28

15.     Demaray, because of his position of control and authority as director and officer of Antropy, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

16.     To discharge his duties, Demaray was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of Antropy.  By virtue of such duties, Demaray was required to, among other things:

a.     Exercise good faith in ensuring that the affairs of Antropy were conducted in an efficient, business-like manner so as to make it possible for Antropy to provide the highest quality performance of its business;

b.     Manage, conduct, supervise, and direct the employees, businesses, and affairs of Antropy in accordance with laws, rules, and regulations, and the charter and bylaws of the Company; and

c.     Refrain from wasting and/or usurping Antropy's assets or otherwise unduly benefitting himself at the expense of Antropy.

17.     As set forth herein, Demaray knowingly, intentionally, and/or extremely recklessly disregarded these above-listed duties by misappropriating Antropy's corporate opportunity for his own benefit, which then caused Antropy, White, and other Antropy shareholders, if any, to suffer damages.

**Factual Background**

18.     In 2003, Robert White, Christopher White's father, while working to acquire intellectual property and technology companies for the Petters Group Worldwide ("PGW"), was introduced to Demaray.

19.     Upon information and belief, in 2003, Demaray was President of Symmorphix, Inc. ("Symmorphix"), a thin film nanotechnology company that owned a large portfolio of patents and patent applications including patents and patent applications related to thin film energy conversion, nanotechnology, LED, and solar technologies (the "Symmorphix Patents").  A list of the patents and patent applications that constitute the Symmorphix Patents are attached hereto as **Exhibit D** (Executed Purchase Agreement of the Symmorphix Patents and other documents) at 12-17.  **Exhibit D**, in its entirety, is made a part of this Complaint.

20.     Upon information and belief, in 2005 or 2006, at Robert White's recommendation, PGW purchased Symmorphix (including the Symmorphix Patents), through Springworks LLC, PGW's investment arm formed to invest in technology companies.  Shortly after Springworks LLC's acquisition of Symmorphix, Robert White's involvement with both Springworks LLC and Symmorphix ended.

21.     Upon information and belief, Demaray's employment relationship with Symmorphix ended in August of 2007.  Simultaneously, Springworks LLC commenced the process whereby Symmorphix was liquidated and shutdown.

22.     Upon information and belief, in or around August of 2008 Demaray and Robert White reconnected.  Upon information and belief, Demaray sought Robert White's assistance with Antropy, a company Demaray had recently formed at that time.  Specifically and upon information and belief, Demaray sought Robert White's help with funding, acquiring a license to the Symmorphix Patents, and general business strategy for developing and manufacturing efficient solar panels.

23.     Antropy's business strategy focused on developing specific products that could be produced utilizing Antropy's native intellectual property (*e.g.*, trade secrets) along with the Symmorphix Patents.  As such, the Symmorphix Patents were critical for Antropy's business strategy.  In furtherance of its business strategy, Antropy acquired from Demaray an exclusive license to any and all patents that pertain to solar energy that were at any stage of development on December 20, 2009 at are issued at any future date. *See* **Exhibit E** (December 20, 2009 Minutes of Action) at 9.  **Exhibit E** is attached hereto and made a part of this complaint.

24.     Lacking sufficient time due to other business obligations, Robert White asked his son, Plaintiff Christopher White, to help Demaray with Antropy's business.  On September 3, 2008, Robert White introduced Demaray to Christopher White.

25.     On September 24, 2008, the Federal Bureau of Investigation raided PGW and the homes of its top executives, including Robert White.  As a result of the raid and subsequent convictions of PGW's founder and Chief Executive Officer for investment fraud, Springworks LLC and the Symmorphix Patents, among other PGW assets, were placed in possession of a court-appointed receiver, Douglas Kelley (the "Receiver").

26.   In October of 2008, Demaray and Christopher White met to discuss how to move forward with their business venture.  They planned to work together to obtain capital that would allow them to monetize Antropy's intellectual property and the Symmorphix Patents.  Subsequently, Demaray, who was, at that time, the sole shareholder in Antropy, agreed that he would be President, Chief Executive Officer, and a Director, and would retain 52% ownership of Antropy, while Christopher White would be appointed Vice President, Secretary, Treasurer, and a Director, and would purchase 48% of the outstanding shares in Antropy.  Demaray's agreement with White was subsequently memorialized in Antropy's December 17, 2009 Minutes of Action (**Exhibit A**) and December 15, 2009 Action of Incorporator of Antropy Incorporated (**Exhibit B**).

27.   Pursuant to Antropy's December 17, 2009 Minutes of Action (**Exhibit A**), White purchased his 48% ownership interest in Antropy on or about October 2010.

28.   White quickly went to work on Antropy's behalf.  White formulated and implemented Antropy's business strategy of raising the critical capital needed for Antropy to purchase the Symmorphix Patents from the Receiver and fund Antropy's solar panel manufacturing business.

29.   Between December 2009 through February 2011, White worked diligently as an officer and director of Antropy to secure the necessary financing to purchase the Symmorphix Patents and the necessary startup capital for Antropy to utilize the Symmorphix Patents after the purchase.  Many of the financing documents created during this time period reflected White's status as a director and officer with and White's ownership interest in Antropy.

30.   Upon information and belief, around late 2010 or early 2011, Demaray inherited several hundred thousand dollars from his mother's estate.

31.   Between February and March of 2011, while Antropy was finalizing its initial offer to purchase the Symmorphix Patents from the Receiver, White offered, on several occasions, to contribute money to help fund Antropy's purchase.  Demaray was noncommittal towards Whites' offers.

32.   On March 17, 2011, Antropy submitted its offer to the Receiver to purchase the Symmorphix Patents.  **Exhibit F** (Antropy's March 15, 2012 [sic] offer to purchase the Symmorphix Patents).

33.    Between the time of Antropy's initial offer to the Receiver to purchase the Symmorphix Patents and the finalization of the sale of the Symmorphix Patents (January 11, 2012), Demaray excluded White from the negotiation process.  Demaray provided only periodic updates consistent with the understanding that Antropy would be purchasing the Symmorphix Patents.  *See* **Exhibit G** (July 28, 2011 Demaray email to White), attached hereto and made a part of this complaint.

34.    On January 11, 2012, the purchase of the Symmorphix Patents was finalized. Unbeknownst to White, Demaray had excluded Antropy from the deal during the negotiation process, and instead had arranged to purchase the Symmorphix Patents for himself.  *See* **Exhibit D** at 4.

35.    On or about May 15, 2012, White received an email from Demaray indicating that Demaray had bought the Symmorphix Patents for himself.  **Exhibit H**, attached hereto and made a part of this Complaint.

36.    On August 16, 2012, White sent a letter to Demaray expressing his concerns regarding the purchase of the Symmorphix Patents.  **Exhibit I**, attached hereto and made a part of the complaint. Demaray never responded to this letter.

37.    On or about February 2013, White learns of Demaray's plans to abandon Antropy and to form a new company, Demaray LLC, to develop and monetize the Symmorphix Patents.

38.    On April 12, 2013, attorneys representing White (Fredrickson & Byron, P.A.) wrote attorneys representing Demaray (Haynes Boone) a letter setting forth, in detail, White and Antropy's allegations against Demaray and requesting that Demaray meet with White regarding a possible resolution.  *See* **Exhibit J**, attached hereto and made a part of the complaint.

39.    On August 9, 2013, Demaray's attorneys responded by denying: 1) White's status as a shareholder, officer, and director of Antropy and 2) Demaray's duty to White.

40.    Upon information and belief, in early 2013, Demaray transferred and/or assigned the Symmorphix Patents to Demaray LLC.

**Derivative Action and Demand Futility Allegations**

41.    White brings this action individually and derivatively in the right and for the benefit of Antropy to redress the injuries suffered, and to be suffered, by Antropy as a direct result of the wrongs alleged herein.  Antropy is named as a nominal defendant in a derivative capacity.

1       42.     White will adequately and fairly represent the interests of Antropy in enforcing and

2  prosecuting its rights.

3       43.     White is and has continuously been an owner of Antropy stock during the time period in

4  which the wrongful conduct alleged herein was committed.

5       44.     White did not make a demand on Antropy's Board of Directors to bring this action on

6  behalf of Antropy because such a demand would have been futile, wasteful, and useless for the

7  following reasons:

8          a.     Demaray, as a majority shareholder (52%) of Antropy and its President and Chief

9  Executive Officer, has a veto regarding any corporate action by Antropy.

10         b.     Demaray, as a majority shareholder (52%) of Antropy and its President and Chief

11  Executive Officer, authorized, approved, ratified, or has failed to rectify Antropy's decision to forego

12  the purchase of the Symmorphix Patents. Instead, Demaray purchased the Symmorphix Patents for

13  himself. Upon information and belief, Demaray then transferred and/or assigned the Symmorphix

14  Patents, along with other intellectual property and assets belonging to Antropy, to Demaray LLC.

15         c.     Demaray is incapable of making an independent and disinterested decision to

16  institute and vigorously prosecute this action because Demaray exclusively and unilaterally made the

17  decision to personally purchase the Symmorphix Patents instead of allowing Antropy to do so. Any

18  action to reverse the misappropriation of the Symmorphix Patents, along with other intellectual property

19  and assets belonging to Antropy, and transfer ownership of the Symmorphix Patents and additional

20  intellectual property and assets, back to Antropy would be 1) inconsistent with Demaray's previous

21  conduct and 2) subject to Demaray's veto as majority shareholder (52%) of Antropy and its President

22  and Chief Executive Officer.

23         d.     Demand is further excused because Demaray, as a majority shareholder (52%) of

24  Antropy and its President and Chief Executive Officer, has demonstrated a sustained and systematic

25  failure to properly perform his duties.

26         e.     Demand is further excused because on August 16, 2012, White sent a letter to

27  Demaray expressing his concerns regarding the purchase of the Symmorphix Patents. **Exhibit I.**

28  Demand is further excused because on April 12, 2013, White's attorneys sent Demaray's attorneys a

1   letter setting forth, in detail, White and Antropy's allegations against Demaray and requesting that

2   Demaray meet with White regarding a possible resolution.  **Exhibit J**.  Demaray's attorneys responded

3   on August 9, 2013 with a letter denying White's status as shareholder, officer, and director of Antropy

4   and asserting that Demaray owed no duty to White.

### DERIVATIVE CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Usurpation of Corporate Opportunity**

(Against Demaray)

9   45.   Plaintiff realleges the preceding paragraphs as if fully set forth herein.

10   46.   Demaray is a majority shareholder (52%) of Antropy and its President and Chief

11   Executive Officer.  As an officer and director of Antropy, Demaray owes Antropy a fiduciary duty not

12   to misappropriate Antropy's corporate opportunities.  As a result of White's position as an officer,

13   director, and shareholder of Antropy, Demaray owes White, a minority shareholder, a fiduciary duty not

14   to misappropriate Antropy's corporate opportunities.

15   47.   Demaray knowingly, willfully, and intentionally misappropriated business opportunities

16   that properly belonged to Antropy, namely the opportunities to purchase and subsequently develop and

17   monetize the Symmorphix Patents and their associated technologies, including but not limited to, LED

18   technologies.

19   48.   Antropy had a legitimate interest and expectancy in the misappropriated business

20   opportunities and has publicly acknowledged that its business model entailed obtaining, developing, and

21   monetizing the Symmorphix Patents and their associated technologies, including but not limited to, LED

22   technologies.

23   49.   Antropy's line of business entailed obtaining, developing, and monetizing the

24   Symmorphix Patents and their associated technologies, including but not limited to, LED technologies.

25   50.   Antropy had the financial resources, including resources offered by Demaray and White

26   and investment opportunities developed by White, to take advantage of the misappropriated business

27   opportunities.

28   //

51.     Upon information and belief, as a result of the Demaray's misappropriation of Antropy's business opportunity, Demaray has reaped financial benefit.

52.     As a result of Demaray's usurpation of these business opportunities, Antropy has suffered commercial damages in the form of lost sales, revenues, and profits.  Demaray misappropriated Antropy's corporate opportunity willfully, intentionally, and with malice, warranting the imposition of exemplary/punitive damages.  In addition, Demaray's conduct warrants the imposition of a constructive trust over the Symmorphix Patents, their associated technologies, including but not limited to, LED technologies, and other benefits gained by Demaray LLC and Demaray by way of their respective or cumulative access to and/or ownership of the Symmorphix Patents.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

(Against Demaray)

53.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

54.     Demaray is a majority shareholder (52%) of Antropy and its President and Chief Executive Officer.  As an officer and director of Antropy, Demaray owes Antropy certain fiduciary duties of full disclosure; open, honest, and fair dealing; candor; care; trust and loyalty; and utmost good faith to Antropy.  As a result of White's position as an officer, director, and shareholder of Antropy, Demaray owes certain fiduciary duties of full disclosure; open, honest, and fair dealing; candor; care; trust; and loyalty and utmost good faith to White.

55.     Demaray's failure to act in the best interest of Antropy in performing his duties as Antropy's majority shareholder, President, and Chief Executive Officer breached those fiduciary duties.

56.     Antropy has suffered significant damages as a result of Demaray's breach of his fiduciary duties.  Demaray breached his fiduciary duties willfully, intentionally, and with malice, warranting the imposition of exemplary/punitive damages.  In addition, Demaray's conduct warrants the imposition of a constructive trust over the Symmorphix Patents, their associated technologies, including but not limited to, LED technologies, and other benefits gained by Demaray LLC and Demaray by way of their respective or cumulative access to and/or ownership of the Symmorphix Patents.

//

**THIRD CAUSE OF ACTION**

**Constructive Fraud (Common Law Fraud)**

(Against Demaray)

57.    Plaintiff realleges the preceding paragraphs as if fully set forth herein.

58.    Demaray is a majority shareholder (52%) of Antropy and its President and Chief Executive Officer.  As such, Demaray was a trusted employee and fiduciary occupying positions of influence at Antropy.

59.    Demaray utilized those positions of trust to obtain confidential and proprietary information about Antropy and its business.

60.    Demaray violated the confidences bestowed upon him as a trusted employee and fiduciary of Antropy by using the information provided to him in confidence to: 1) purchase the Symmorphix Patents for himself and subsequently transfer the Symmorphix Patents and their associated technologies, including but not limited to, LED technologies to Demaray LLC and 2) create and operate a competing business – Demaray LLC – to the detriment of Antropy.

61.    Antropy suffered a loss as a result of Demaray's knowing, reckless, and intentional deception, warranting an award of actual and exemplary/punitive damages and the imposition of a constructive trust over the Symmorphix Patents, their associated technologies, including but not limited to, LED technologies, and other benefits gained by Demaray LLC and Demaray by way of their respective or cumulative access to and/or ownership of the Symmorphix Patents.

**FOURTH CAUSE OF ACTION**

**Trade Secret Misappropriation**

(Against Demaray and Demaray LLC)

62.    Plaintiff realleges the preceding paragraphs as if fully set forth herein.

63.    Demaray and Demaray LLC's actions in taking and using Antropy's confidential and proprietary information, including but not limited to, information regarding Antropy's potential investors and partners and the development and monetization of the Symmorphix Patents and their associated technologies, including but not limited to, LED technologies and retention of that information constitute a misappropriation of Antropy's trade secrets.

64.     Antropy gained a commercial advantage from its confidential and proprietary information and Demaray received that information in confidence as a result of his role as an officer, director, and majority shareholder of Antropy.  Demaray and breached that confidence when Demaray and Demaray LLC (via Demaray) took and used Antropy's confidential information and trade secrets without Antropy's authorization and consent and despite Antropy's efforts to ensure that its confidential information and trade secrets remained confidential.

65.     Antropy has suffered significant damages as a result of Demaray and Demaray LLC's misappropriation of its confidential, proprietary, and trade secret information.  Demaray and Demaray LLC's actions were willful, intention, and performed with malice and warrant the imposition of exemplary/punitive damages.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Prospective Business Relationships

(Against Demaray and Demaray LLC)

66.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

67.     There was a reasonable probability that Antropy would have entered into business relationships with others with respect to Antropy's prospective lines of business which included acquiring, developing, and monetizing the Symmorphix Patents and Antropy's intellectual property portfolio.

68.     Demaray and Demaray LLC interfered with these prospective relationships by misappropriating them for Demaray and Demaray LLC's benefit.

69.     Demaray and Demaray LLC performed the conduct described herein willfully and intentionally in order to interfere with Antropy's prospective business relationships with others.

70.     Demaray and Demaray LLC's conduct, as described herein, was independently tortious and/or wrongful.

71.     The result of Demaray and Demaray LLC's intentional and tortious interference with prospective business relationships between Antropy and others is the proximate cause of commercial damages to Antropy.

//

1    72.    By reason of the foregoing, Antropy is entitled to recover the damages that Demaray and

2    Demaray LLC have caused.  In addition, Demaray and Demaray LLC's actions warrant the imposition

3    of exemplary/punitive damages because they were willful, intentional, and performed with malice.

4                        **INDIVIDUALIZED CAUSES OF ACTION**

5                           **SIXTH CAUSE OF ACTION**

6                                    **Fraud**

7                              (Against Demaray)

8    73.    Plaintiff realleges the preceding paragraphs as if fully set forth herein.

9    74.    Pleading in the alternative, to the extent that White is not an officer, director, and/or

10   shareholder in Antropy, Demaray has defrauded White.

11   75.    Demaray has made material misrepresentations to White as to White's shareholder

12   interests in and status as an officer and director of Antropy.

13   76.    Specifically, Demaray executed the December 17, 2009 Minutes of Action (**Exhibit A**)

14   and the December 15, 2009 Action of Incorporator of Antropy Incorporated (**Exhibit C**) agreements,

15   which collectively make White a shareholder, officer, and director of Antropy.  White purchased his

16   shares in Antropy on or about October 2010. *See also* **Exhibit B**.

17   77.    Demaray executed the December 17, 2009 Minutes of Action and the December 15, 2009

18   Action of Incorporator of Antropy Incorporated agreements and represented to White that those two

19   documents were legally valid instruments.  However, Demaray at the time of the agreements' execution

20   or subsequently thereafter, believed and/or knew that the December 17, 2009 Minutes of Action and the

21   December 15, 2009 Action of Incorporator of Antropy Incorporated agreements were not legally valid

22   instruments and/or were defective but continued to misrepresent the agreements' legal validity to White.

23   Moreover, Demaray, during the relevant time period, falsely promised White the opportunity to join,

24   invest in, and share the profits of Antropy.

25   78.    Demaray made these intentional misrepresentations to White with the intent that White

26   rely on them and invest significant time and resources developing business plans and private placement

27   memorandums, obtaining potential investors, and otherwise working for Antropy's benefit from which

28   he reasonably expected profit.

79.     White's justifiable reliance on Demaray's misrepresentations caused White to suffer damages.

80.     Demaray's fraudulent conduct described herein warrants an imposition of exemplary/punitive damages.

## SEVENTH CAUSE OF ACTION

### Breach of Written Contract

(Against Demaray)

81.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

82.     Pleading in the alternative, to the extent that White is not an officer, director, and/or shareholder in Antropy, Demaray has breached his written contract with White.

83.     Valid and enforceable contracts exist between Demaray and White.

84.     All condition precedents to White's right to bring this action and to recover the requested relief have been performed, have occurred, or have been waived.

85.     By failing to acknowledge White's rights and privileges as a shareholder, officer, and director in Antropy, as set forth in the December 17, 2009 Minutes of Action (**Exhibit A**) and the December 15, 2009 Action of Incorporator of Antropy Incorporated (**Exhibit B**) agreements, Demaray breached the above referenced agreements.

86.     As a direct and proximate result of Demaray's breach of the written agreements, White has suffered, and will continue to suffer, damages.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation

(Against Demaray)

87.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

88.     Pleading in the alternative, to the extent that White is not an officer, director, and/or shareholder in Antropy, Demaray negligently misrepresented material facts to White.

89.     Demaray made misrepresentations to White to the effect that White was an officer, director, and/or shareholder in Antropy and that the December 17, 2009 Minutes of Action (**Exhibit A**)

and the December 15, 2009 Action of Incorporator of Antropy Incorporated (**Exhibit B**) agreements were valid and legally binding.

90.     Demaray did not exercise reasonable care in communicating this information to White.

91.     White justifiably relied on Demaray's misrepresentations in making his decisions as to his investment in and contribution to Antropy.

92.     Demaray's misrepresentations proximately caused White to suffer damages.

### NINTH CAUSE OF ACTION

#### Declaratory Relief

(Against Demaray)

93.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

94.     White has made a demand upon Demaray, seeking acknowledgement of White's status as a shareholder, officer, and director in Antropy.   **Exhibit I** and **Exhibit J**.

95.     Demaray has denied White's status as a shareholder, officer, and director in Antropy.

96.     An actual, present and justiciable controversy has arisen between White and Demaray concerning White's status as a shareholder, officer, and director in Antropy.

97.     White seeks declaratory judgment from this Court that he is a shareholder in and an officer and director of Antropy.

### TENTH CAUSE OF ACTION

#### Breach of Fiduciary Duty – *De Facto* Partnership

(Against Demaray)

98.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

99.     Pleading in the alternative, to the extent that White is not an officer, director, and/or shareholder in Antropy, White and Demaray formed and entered into a business partnership to purchase, develop, and monetize the Symmorphix Patents.

100.    As partners, a fiduciary relationship existed between Demaray and White.  As a result of such relationship, Demaray owed White a duty of utmost good faith and loyalty, as well as those duties set forth in California Corporations Code § 16404(b) and (c).

101.   Demaray breached his fiduciary duty by converting partnership assets and opportunities to his own use, by self dealing, and by stealing from the partnership.

102.   On information and belief, and thereupon alleged, Demaray competed with the partnership while he and White were still partners.

103.   Demaray knowingly, willfully, and intentionally misappropriated business opportunities that properly belonged to his partnership with White, namely the opportunities to purchase and subsequently develop and monetize the Symmorphix Patents and the associated technologies, defrauding his partner White by making promises he had no intention of performing, and by inducing his partner White to invest significant time and money in a business from which White could not profit, because Demaray was planning to convert partnership assets and opportunities to his own use and to the use of Demaray LLC.

104.   Demaray's actions were willful, oppressive, fraudulent, and malicious, and were performed with the intent to harm White.

105.   As a direct result of Demaray's breach of his fiduciary duty, White has suffered damages in an amount to be determined at the time of trial.

106.   Because Demaray has breached the partnership agreement and violated his duty to the partnership, White is entitled to equitable relief, including, but not limited to, an accounting as to corporate business, enforcement of White's rights under the oral and written partnership agreement, and enforcement of White's property rights in the partnership.

107.   Because Demaray's actions were willful, oppressive, fraudulent, and malicious, and were performed with the intent to harm White, White is entitled to an award of punitive damages, in an amount to be determined at time of trial.

## RELIEF REQUESTED

White respectfully requests that this Court enter judgment against the defendants as follows:

a.   Against Demaray and Demaray LLC and in favor of Antropy for the amount of damages sustained by Antropy as a result of Demaray and Demaray LLC's misappropriation of corporate opportunity, breach of fiduciary duties, fraud, trade secret misappropriation, and tortious interference of prospective business relationship;

1        b.      Against Demaray, individually, and in favor of White for the amount of damages

2    sustained by White as a result of Demaray's fraud, breach of contract, negligent

3    misrepresentation, and breach of fiduciary duty;

4        c.      Declaratory judgment from this Court that White is a shareholder in and an officer

5    and director of Antropy.

6        d.      Extraordinary equitable relief and/or injunctive relief as permitted by law, equity,

7    and state statutory provisions sued hereunder, including the imposition of a constructive trust

8    over the Symmorphix Patents and other benefits gained by Demaray LLC and Demaray by way

9    of their respective or cumulative access to and/or ownership of the Symmorphix Patents and their

10   associated technologies, including but not limited to, LED technologies so as to insure that White

11   on behalf of Antropy has an effective remedy;

12       e.      Awarding Antropy restitution from Demaray and Demaray LLC and ordering

13   disgorgement of all profits, benefits, and other compensation obtained by Demaray and Demaray

14   LLC as a result of the conduct alleged herein;

15       f.      Awarding the Plaintiff the costs of disbursement of the action, including

16   reasonable attorneys; fees, accounts' and experts' fees, costs, and expenses;

17       g.      Exemplary/Punitive damages; and

18       h.      Granting such other and further relief as the Court deems just and proper.

19   **JURY DEMAND**

20       Plaintiff demands a jury trial on all claims so triable.

21

22   Dated: November 5, 2013               GORDON-CREED, KELLEY,

23                                   HOLL & SUGERMAN, LLP

24

25                 By:    _____

26                         Geoffrey Gordon-Creed
                           Attorneys for Plaintiff
                           CHRISTOPHER D. WHITE

27

28

VERIFIED INDIVIDUAL AND SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Christopher D. White, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

No one induced me to file the Verified Individual and Shareholder Derivative Complaint (the "Complaint"). The statements and allegations in the Complaint are true to the best of my knowledge. With respect to the statements and allegations made upon information and belief and those made upon the investigation conducted by and through my counsel as to all other matters, including analysis of publicly available news articles and reports, review of various websites and Internet information sources, press releases, and other matters of public record, I rely upon my counsel's investigation thereof and I believe them in good faith to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 11/05/2013

Christopher D White   Christopher D. White

STATE OF Washington

COUNTY OF King :

Sworn to and subscribed before me, this the 5th day of November, 2013.

XIN CHEN   NOTARY PUBLIC

My Commission Expires:

11-13-2016



EXHIBIT A

# MINUTES OF ACTION
## IN LIEU OF
## MEETING OF BOARD OF DIRECTORS
## OF
## ANTROPY INCORPORATED

The undersigned, being all of the members of the Board of Directors of ANTROPY INCORPORATED, a Delaware corporation (the Corporation"), acting pursuant to the laws of the state of Delaware, do hereby adopt the following resolutions effective as of the 17th day of December 2009:

### Resolutions Electing Officers

WHEREAS, the Bylaws of the Corporation permit the Board of Directors, from time to time, to elect officers of the Corporation;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the following individuals are elected as all of the officers of the Corporation to the offices set forth after their names below, and such individuals shall hold such offices until their successors are duly elected and qualified or until the earlier of their death, resignation or removal from office:

| NAME | OFFICE |
|------|--------|
| Richard E. Demaray | President and CEO |
| Christopher D. White | Vice President Treasurer and Secretary |

### Resolutions Authorizing Issuance of Shares

WHEREAS, the Corporation has received an offer from Richard Demaray to acquire 2,600,000 common shares of the Corporation (the "shares"); and

NOW THEREFORE, IT IS HEREBY

RESOLVED, that in consideration of the payment in cash, to or on behalf of, the Corporation of $260.00 or $.0001 per share, the sufficiency of which is hereby expressly acknowledged, the Corporation is authorized and shall issue to Richard Demaray 2,600,000 common shares of the Corporation (the "shares"); and

### Resolutions Authorizing Issuance of Shares

WHEREAS, the Corporation has received an offer from Christopher D. White to acquire 2,400,000 common shares of the Corporation (the "shares"); and

NOW THEREFORE, IT IS HEREBY

RESOLVED, that in consideration of the payment in cash, to or on behalf of, the Corporation of $240.00 or $.0001 per share, the sufficiency of which is hereby expressly acknowledged, the Corporation is authorized and shall issue to Christopher D. White 2,400,000 common shares of the Corporation (the "shares").

Resolutions Authorizing Adoption of Trade Name

WHEREAS, the Corporation desires to adopt the trade name of "Antropy Solar" in order to conduct business under a name other than its legal name;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the Corporation is hereby authorized to adopt the trade name "Antropy Solar" in order to conduct business under a name other than its legal name; and

FURTHER RESOLVED, that the President is hereby authorized and directed to execute a Registration of Trade Names Certificate and to cause such Registration of Trade Names Certificate to be filed with the Kent County Prothonotary where the principle place of business is located.

Resolution Authorizing Adoption of
Amended and Restated Articles of incorporation

WHEREAS, it is in the best interest of the corporation to amend and fully restate the Corporation's Articles of Incorporation;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the Articles of Incorporation of the Corporation, and all amendments thereto, if any, shall be and hereby are amended, restated and superseded by the Amended and Restated Articles of Incorporation attached herto as Exhibit A, which is incorporated herein by reference; and

FURTHER RESOLVED, that the President of this Corporation is hereby authorized and directed, for and on behalf of the Corporation, to (i) execute Articles of Amendment attesting to the adoption of the foregoing resolution adoption Amended and Restated Articles of Incorporation, (ii) cause such Articles of Amendment to be filed in the office of the Delaware Secretary of State, and (iii) pay any fees and take any other actions necessary to effect such Articles of Amendment; and

FURTHER RESOLVED, that the officers of the Corporation are, and each of them is, authorized to execute such other documents and take any other actions as they deem necessary or appropriate in connection with the adoption of the attached Amended and Restated Articles of Incorporation; and

FURTHER RESOLVED, that these Minutes of Action may be executed in one or more counterparts, each of which shall be deemed part of the original document, but all of which shall constitute one and the same instrument.

Done effective as of the day and year first above written.

DIRECTORS:                                SHAREHOLDERS:


Richard E. Demaray                        Richard E. Demaray


Christopher D. White                      Christopher D. White

## EXHIBIT A

## AMENDED AND RESTATED
## ARTICLES OF INCORPORATION
## OF
## ANTROPY INCORPORATED

### ARTICLE 1.

### NAME

The name of the Corporation is ANTROPY INCORPORATED.

### ARTICLE 2.

### REGISTERED OFFICE

The address of the registered office of the Corporation is 9 East Loockerman Street, Suite 3A, Dover, Delaware 19901.

### ARTICLE 3.

### PURPOSES AND TERM

The Corporation shall have general business purposes and shall have perpetual existence.

### ARTICLE 4.

### SHARES

The shares of capital stock of the Corporation shall be subject to the following:

(a)    The Corporation is authorized to issue Ten Million (10,000,000) shares of capital stock, to be held, sold, and paid for at such times and in such manner as the Board of Directors may from time to time determine, in accordance with the laws of the State of Delaware. All shares of the Corporation shall be without par value, except that such shares shall be deemed to have a par value of $.0001 per share solely for the purpose of a statute or regulation imposing a tax or fee based upon the capitalization of a corporation, and a par value fixed by the Board of Directors for the purpose of a statute or regulation requiring the shares of a corporation to have a par value.

(b)    Unless otherwise established by the Board of Directors, all shares of the Corporation are common shares entitled to vote and shall be of one class and one series having equal rights and preferences in all matters. Unless otherwise provided in these

Articles, the Bylaws of the Corporation, or the terms of the shares, a common shareholder has (1) vote for each share held.

(c)     The Board of Directors shall have the power to establish more than one class or series of shares and to fix the relative rights and preferences of any such different classes or series.

(d)     The shareholder of the Corporation shall not have preemptive rights, unless with respect to some or all of the authorized and unissued shares, the Board of Directors grants preemptive rights.

(e)     Cumulative voting for directors is not permitted.

(f)     Notwithstanding the powers granted to the Board of Directors expressed above or otherwise provided by law, at any time following the filings of an election to be treated as an S corporation under the Internal Revenue Code, as amended from time to time, and prior to the revocation or termination of the S corporation election without the prior express written consent of the holders of a majority of the voting power of the shares entitled to vote. Any such action taken without such consent shall be null and void and shall not affect the beneficial ownership of the shares.

ARTICLE 5.

DIRECTORS' ACTION

Any action, other than an action requiring shareholder approval, may be taken by written action signed, or consented to by authenticated electronic communication, by the numbers that would be required to take the action at a meeting at which all directors were present.

ARTICLE 6.

SHAREHOLDERS ACTION

Any action which may be taken at a meeting of the shareholders may be taken without a meeting by written action signed, or consented to by authenticated electronic communication, by shareholders having voting power equal to the voting power that would be required to take the same action at a meeting of the shareholders at which all shareholders are present.

ARTICLE 7.

DIRECTORS' LIABILITY

A director of the Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director;

provided, however, that this Article 7 shall not eliminate or limit the liability of a director to the extent provided by applicable law (i) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (iii) for any transaction from which the director derived an improper personal benefit, or (iv) for liability for any act or omission occurring prior to the effective date of this Article 7. If Delaware law is hereafter amended to authorize the further elimination or limitation of the liability of directors, then the liability of a director of the Corporation, in addition to the limitation on personal liability provided herein, shall be limited to the fullest extent permitted by the amended Delaware law. Any repeal or modification of this Article 7 by the shareholders of the Corporation shall be prospective only and shall not adversely affect any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE 8.

### AMENDMENT OF ARTICLES

The shareholder vote required for adoption of an amendment to these Articles of Incorporation shall be the affirmative vote of the holders of a majority of the voting power of the shares present and entitled to vote at a shareholders' meeting.

## ARTICLE 9.

### FUNDAMENTAL CHANGES

In any of the following types of actions or transactions with respect to which the law requires a vote of the outstanding shares of the Corporation, the affirmative vote of two-thirds (2/3) of the shares entitled to vote shall be required to authorize the following action or transaction:

(a)  A merger with any other corporation or corporations, other than a merger or consolidation which would result in the voting securities of the corporation outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 50% of the total voting power represented by the voting securities of the Corporation or such surviving entity outstanding immediately after such merger or consolidation;

(b)  An exchange of one or more classes or series of the shares of the Corporation for the shares of one or more classes or series of one or more other corporations, other than an exchange which would result in the voting securities of the Corporation outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into) voting securities at least 50% of the total voting power represented by the

voting securities of the Corporation outstanding immediately after such exchange;

(c)     The sale, lease, transfer, or other disposition of all, or substantially all, of the Corporation's property and assets, including its goodwill, not in the usual and regular course of business;

(d)     The voluntary dissolution of the Corporation."



# EXHIBIT B

ACTION OF INCORPORATOR
OF
ANTROPY INCORPORATED


The undersigned, being the sole Incorporator of the above-referenced corporation, pursuant to the authority vested in the Incorporator by the Delaware General Corporation Law, does hereby approve and adopt the following resolutions:

ADOPTION OF BYLAWS:

RESOLVED, that the Bylaws of this corporation in the form attached hereto as Exhibit A, are adopted as the Bylaws of this corporation.

ELECTION OF DIRECTORS:

RESOLVED, the following persons are elected as the initial directors of this corporation:


Richard E. Demaray

Christopher D. White


Richard E. Demaray

DATED: December 15, 2009

EXHIBIT A

**BYLAWS**
**OF**
**ANTROPY INCORPORATED**

**ARTICLE I**
**SHAREHOLDERS**

**Section 1. Annual Meeting.** An annual meeting shall be held once each calendar year for the purpose of electing directors and for the transaction of such other business as may properly come before the meeting. The annual meeting shall be held at the time and place designated by the Board of Directors from time to time.

**Section 2. Special Meetings.** Special meetings of the shareholders may be requested by the President, the Board of Directors, or the holders of a majority of the outstanding voting shares.

**Section 3. Notice.** Written notice of all shareholder meetings shall be provided under this section or as otherwise required by law. The Notice shall state the place, date, and hour of meeting, and if for a special meeting, the purpose of the meeting. Such notice shall be mailed to all shareholders of record at the address shown on the corporate books, at least 10 days prior to the meeting. Such notice shall be deemed effective when deposited in ordinary U.S. mail, properly addressed, with postage prepaid.

**Section 4. Place of Meeting.** Shareholders meetings shall be held at the corporation's principal place of business unless otherwise stated in the notice.

**Section 5. Quorum.** A majority of the outstanding voting shares, whether represented in person or by proxy, shall constitute a quorum at a shareholders meeting. In the absence of a quorum, a majority of the represented shares may adjourn the meeting to another time without further notice. If a quorum is represented at an adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally scheduled. The shareholders present at a meeting represented by a quorum may continue to transact business until adjournment, even if the withdrawal of some shareholders results in representation of less than a quorum.

**Section 6. Informal Action.** Any action required to be taken, or which may be taken, at a shareholders meeting, may be taken without a meeting and without prior notice if a consent in writing, setting forth the action so taken, is signed by the shareholders who own all of the shares entitled to vote with respect to the subject matter of the vote.

## ARTICLE III
## OFFICERS

**Section 1. Number of Officers.** The officers of the corporation shall be a President, one or more Vice-Presidents (as determined by the Board of Directors), a Secretary, and a Treasurer. Two or more offices may be held by one person.

**Section 2. Election and Term of Office.** The officers shall be elected bi-annually by the Board of Directors at the first meeting of the Board of Directors following the annual meeting of the shareholders. Each officer shall serve a two year term or until a successor has been elected and qualified.

**Section 3. Removal or Vacancy.** The Board of Directors shall have the power to remove an officer or agent of the corporation. Any vacancy that occurs for any reason may be filled by the Board of Directors.

## ARTICLE IV
## CORPORATE SEAL, EXECUTION OF INSTRUMENTS

The corporation shall not have a corporate seal. All instruments that are executed on behalf of the corporation which are acknowledged and which affect an interest in real estate shall be executed by the President or any Vice-President and the Secretary or Treasurer. All other instruments executed by the corporation, including a release of mortgage or lien, may be executed by the President or any Vice-President. Notwithstanding the preceding provisions of this section, any written instrument may be executed by any officer(s) or agent(s) that are specifically designated by resolution of the Board of Directors.

## ARTICLE V
## AMENDMENT TO BYLAWS

The bylaws may be amended, altered, or repealed by the Board of Directors or the shareholders by a two-thirds majority of a quorum vote at any regular or special meeting; provided however, that the shareholders may from time to time specify particular provisions of the bylaws which shall not be amended or repealed by the Board of Directors.

## ARTICLE VI
## INDEMNIFICATION

Any director or officer who is involved in litigation by reason of his or her position as a director or officer of this corporation shall be indemnified and held harmless by the corporation to the fullest extent authorized by law as it now exists or may subsequently be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights).



EXHIBIT C

Memorandum Number: _____

Offeree Name: _____

# Antropy Incorporated
## An IP Management & Development Company



### PRIVATE PLACEMENT MEMORANDUM
### 10 Investment Units
### each consisting of:
### 312,500 Shares Common Stock ($.001 Par Value)[1]

Participation is open to Accredited Investors.

The price of each Unit is $250,000[2]

There are no brokerage fees or commissions when purchasing these Units.

**These securities are highly speculative, involve a high degree of risk and substantial dilution. They should only be purchased by investors who can afford to lose their entire investment (see Risk Factors).**

**The Securities offered hereby have not been registered with or approved or disapproved by the United States Securities and Exchange Commission, nor has the Commission of any State Securities Commission passed upon the accuracy or adequacy of this Memorandum. Any representation to the Contrary is a criminal offense.**

**November 5, 2010**

---

[1]  This offering will be conducted continuously on a best efforts basis by the Company's officers and directors, who will not be paid a commission for their efforts; however, the Company reserves the right to enter into selling with Member firms of the National Association of Securities Dealers, Inc. ("NASD") to assist in the sale of part or all of the Units, in accordance with the rules of the NASD that permit commissions up to 10% and other consideration. Company may also elect to enter into agreements with individual finders who will be compensated for introducing potential investors to us. No person is under any obligation to purchase any of the Unites offered hereby. Company may extend and/or expand this offering with no notice required.

[2]  The offering price has been determined arbitrarily. No public or other trading market exists for the Unites. There is no representation, actual or implied that the Unites can be resold. The sum of $250,000 is payable by check or wire transfer upon execution of the Subscription Agreement (attached hereto as Exhibit A) by the prospective investor.

## Executive Summary

Antropy Incorporated is seeking funding in order to purchase a portfolio of patents (see Selected Symmorphix Patent List). Through the sale of equity, Antropy will purchase the portfolio of 54 basic and applied patents, recently allowed worldwide in the area of thin film energy conversion and nanotechnology products. Once purchased, Antropy will monetize and further develop the technologies protected by these patents.

The subject portfolio was developed at Symmorphix (SI) a company that operated between 1998 and 2007 in Sunnyvale, California. The portfolio is currently available from a receivership due to the failure of the Petters Group Worldwide (PGW), a conglomerate that purchased SI in 2005. All combined, more than $80 million was put into the development of these patents. The liquidation of PGW, and its assets, has become a long drawn out affair and embroiled in many law suites. The assets are now being sold.

Symmorphix invented this process in order to develop a wave amplifier film. It was then realized, working with customers, that the same process could produce films for other high value applications. A number of these customers took licenses and purchased custom equipment from Symmorphix to enable energy storage, barrier films, and other products that could not be made any other way.  Now that these patents are fully allowed and available as a portfolio for purchase, other products such as the solid oxide fuel cell, advanced batteries and capacitors, protective coatings, durable front surface mirrors and films for micro mechanical devices can be developed in the near future. More importantly, these films and devices will be protected by US and international patents, and form a basis for future IP which will build on and depend on the SI portfolio.

Prior to the closing of Springworks and Symmorphix, in late 2007, an appraisal was commissioned in preparation to sell the SI portfolio. Ocean Tomo, a well-respected firm specializing in patent portfolio assessment and arbitrage, assessed the SI portfolio's value at $16.8 million at that time (see Ocean Tomo Report). This assessment was carried out prior to the allowance of several of the key patents. Another third party evaluation was carried out by Pagemill Partners, a premier investment bank focused on providing merger and acquisition advisory (see Pagemill Partners Report). After discussions with the current federal court receivership, we believe that we can purchase the SI portfolio for a small fraction of its development cost or the previously assessed value. This is because of unusual circumstances; a lack of understanding of the patents by the sellers, the previous uncertain state of several key patents, and the lack of product and market capability for specific new products and technologies.

Dr. R. Ernest Demaray, one of the two founders of SI, was the lead inventor and product development team leader and was the author or co-author of all the SI patents. Ernest Demaray's career is one of exceptional invention for major industrial problems that appear to have no solution since his first patent for "Adherent Ceramic Coatings" for turbine engine blades and vanes in 1987. In 2007, when SI shut down, Dr. Demaray formed a new company, Antropy Incorporated. Antropy has focused on further development of specific new thin film products that can be produced and building new IP in cooperation with universities and other thin film process and equipment companies.  Antropy has a number of new patents, authored by Dr. Demaray, in development for several of the future products noted above.



EXHIBIT D

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

                Plaintiff,

                                                  Civil No. 08-05348 ADM/JSM

v.

Thomas Joseph Petters; Petters Company,
Inc., a/k/a PCI; Petters Group Worldwide, LLC;
Deanna Coleman, a/k/a Deanna Munson;
Robert White;
James Wehmhoff;
Larry Reynolds, and/or dba Nationwide International
Resources, aka NIR;
Michael Catain and/or dba Enchanted
Family Buying Company;
Frank E. Vennes, Jr., and/or dba Metro Gem
Finance, Metro Gem, Inc., Grace Offerings
Of Florida, LLC, Metro Property Financing,
LLC, 38 E. Robinson, LLC, 55 E. Pine, LLC,
Orlando Rental Pool, LLC, 100 Pine Street
Property, LLC, Orange Street Tower, LLC,
Cornerstone Rental Pool, LLC, 2 South
Orange Avenue, LLC, Hope Commons, LLC,
Metro Gold, Inc.,

                    Defendants.

Douglas A. Kelley,

                    Receiver,

Gary Hansen,

                    Receiver.

---

## AMENDED DECLARATION OF JEFFREY D. SMITH IN SUPPORT OF MOTION TO AUTHORIZE AND CONFIRM THE SALE OF CERTAIN INTELLECTUAL PROPERTY ASSETS OF SPRINGWORKS, LLC

---

DOCS-#3592072-v2

I, Jeffrey D. Smith, state as follows:

1.      I am an attorney with the law firm of Lindquist & Vennum, P.L.L.P., counsel for Receiver Douglas A. Kelley.  I make this declaration in support of the Receiver's motion to approve and authorize the sale of certain intellectual property assets of Springworks, LLC.

2.      Attached as Exhibit A is a true and correct copy of the Purchase Agreement entered into by and between Douglas A. Kelley, as the Court-appointed Receiver of Springworks, LLC, and Dr. R. Ernest Demaray dated November 11, 2011, as amended to reflect certain corrections to paragraph 4(b) of the Agreement, which changes have been initialed by the Buyer.  The corrections clarify that that the security interest being granted by the Buyer is in favor of the Seller, not the Buyer, and that it is the Seller's, not the Buyer's, security interest  in the Patent Portfolio and the Investment Account that will terminate upon the payment in full of the Deferred Payments.

DATED:  January 11, 2012

LINDQUIST & VENNUM P.L.L.P.

By      /s/ Jeffrey D. Smith
        James A. Lodoen, #0173605
        jlodoen@lindquist.com
        Jeffrey D. Smith, #0387035
        jsmith@lindquist.com

        4200 IDS Center
        80 South 8th Street
        Minneapolis, MN 55402
        (612) 371-3211
        (612) 371-3207 (facsimile)

ATTORNEYS FOR RECEIVER
DOUGLAS A. KELLEY

# Exhibit A

11/10/2011

# PURCHASE AGREEMENT

This Purchase Agreement (the "Agreement") is entered into as of this **16** day of November, 2011, by and between R. Ernest Demaray, an individual ("Buyer") and SPRINGWORKS, LLC, a Delaware limited liability company ("Seller"), by and between DOUGLAS A. KELLEY ("Receiver"), as Receiver for Seller appointed and acting pursuant to the Appointment of Receiver dated December 8, 2008, as same may at any time be modified, entered in the United States District Court for the District of Minnesota, Civil Case No. 08-CV-5348 (ADM/JSM) (the "Receivership Case").

WHEREAS, Seller owns certain patents and patent applications related to thin-film technologies, as further described on Exhibit A hereto (the "Patent Portfolio");

WHEREAS, the parties mutually desire that Seller shall sell to Buyer the Patent Portfolio upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.    Purchase.  To the extent such exist and are in the possession and control of the Receiver, Seller agrees to, at the Closing provided below, sell and assign to Buyer (and Buyer agrees to purchase at the Closing), Seller's entire right, title, interest, and ownership in: (i) the Patent Portfolio, the inventions covered thereby, and any patents arising therefrom, including any divisions, continuations, continuations-in-part, re-exams, or reissues relating to the inventions claimed in the Patent Portfolio, and the right to sue for pre-transfer infringements, if any, related to any Letters Patents issued or that issue from the Patent Portfolio, and (ii) the Amended and Restated License Agreement dated as of July 31, 2006 (the "License Agreement") with Infinite Power Solutions, Inc., a Delaware corporation ("IPS"), a copy of which License Agreement has been delivered to Buyer's legal counsel.  At the Closing the Buyer shall assume the License Agreement and Seller will assign title (subject to the Security Agreement referred to below) to the Patent Portfolio to the Buyer.  To the extent there are patents, patent applications, or inventions owned or held by Seller or Receiver that are not listed on Exhibit A, such are not part of the Patent Portfolio and therefore are not sold or assigned to Buyer.

2.    Purchase Price.  (a) Total.  As and for the total "Purchase Price" of the Patent Portfolio and License Agreement sold and assigned by Seller to Buyer hereunder, Buyer shall at the Closing assume the License Agreement and shall pay to the Receiver, either by check or electronic funds transfer:

(i)    Fifty Thousand Dollars ($50,000) (the "Initial Payment") upon execution of this Agreement;

(ii)    Two Hundred Fifty Thousand Dollars ($250,000) (the "Closing Payment") upon the fulfillment of the conditions precedent to closing referred to in Section 5 of this Agreement;

RED 1/14

(iii)    Three Hundred Thousand Dollars ($300,000), which is due and payable to the Receiver in three installments of One Hundred Thousand Dollars ($100,000) each, without interest, on the dates that are twelve (12), eighteen (18) and twenty four (24) months after the Closing Date (as defined below) (each a "Deferred Payment" and collectively the "Deferred Payments"); provided, however, that if the Buyer fails to make any Deferred Payment on the date that it is due, then all Deferred Payments that have not been paid shall become immediately due and payable, and the unpaid amount of all Deferred Payments shall bear interest from the date of such failure until the date of payment, at an interest rate equal to the lower of (x) one and one-half percent (1-1/2%) per month, compounded monthly on the last day of each month, or (y) the highest rate permitted by applicable law; and provided further, that at the Buyer's option, it may prepay any or all of the Deferred Payments, but any partial prepayment shall be applied to the Deferred Payments in the inverse of the order in which they are due (i.e. last to first); and

(iii)    Twenty percent (20%) of the Net Revenue (as defined below) derived by Buyer directly or indirectly from the Patent Portfolio or the License Agreement, or any part thereof, that is received or receivable on or before December 31, 2013, and ten percent (10%) of the Net Revenue derived by Buyer directly or indirectly from the Patent Portfolio or the License Agreement, or any part thereof, that is received or receivable during the twelve months ending December 31, 2014 (in each case, the "Revenue Share").

All payments by Buyer under this Agreement shall be made by wire or electronic bank transfer, and unless the Receiver gives the Buyer written notice as to change in Receiver's account, shall be paid to Receiver's account as follows:

| | |
|---|---|
| Bank: | US Bank National Association |
| | Minneapolis, Minnesota |
| ABA Routing No.: | 091000022 |
| Account Number: | ███████4582 |
| Account Name: | Springworks LLC in Receivership |
| | Douglas A Kelley, Receiver |
| Account Address: | 431 S. Seventh St., Suite 2530 |
| | Minneapolis, MN 55415 |

(b)    Deposit of Initial Payment.  Upon execution of this Agreement, Buyer shall deposit the Initial Payment into a non-interest bearing escrow with the Receiver, to be held in escrow until the Closing Date or termination of this Agreement as set forth below.  If the conditions precedent set forth below are satisfied, the Initial Payment shall be released to the Seller at the Closing.  If the conditions precedent are not met, the Initial Payment shall be instead refunded to Buyer without interest.

(c)    Certain Definitions.  For purposes of the Revenue Share, the following terms have the meanings indicated:

"Net Revenue" shall mean the gross amount that is directly or indirectly received or receivable by Buyer or its licensees from any of the patents and patent applications that are

RChl 2/14

included in the Patent Portfolio, including (i) the sale or license of any patent or patent application that is included in the Patent Portfolio, and (ii) the gross amount invoiced by Buyer or any of its licensees as to for any Product, less (w) transportation charges or allowances, if any, included in such amount, (x) sales commissions actually paid to independent representatives and agents respecting such sales, (y) sales or excise taxes on such receipts which are absorbed by Buyer on such sales, and (z) credits or allowances given or made on account of rejection or return of Products previously delivered. Where a Product is sold or licensed as part of a bundle of goods or services in addition to a Product, a fair and reasonable allocation shall be made between the revenue that is attributable to the Product, and that which is attributable to the other goods or services, and an explanation of the same shall be included in each report to Seller that accompanies a payment to Seller in which such an allocation is made.

"Product" means any product that is covered by (i) the claims in any issued patent that is a part of the Patent Portfolio, or (ii) the claims in any patent that is issued on the basis of a patent application that is a part of the Patent Portfolio. A Product shall be considered to be sold: (x) if sold on open account when delivered to the purchaser or to a common carrier and consigned to the purchaser; (y) when paid for, if paid for in advance of delivery; or (z) if sold on consignment, when paid for or when released from consignment, whichever shall first occur.

(d)     Payment of Revenue Share. Buyer shall pay Seller the Revenue Share on a quarterly basis for each calendar quarter ending March 31, June 30, September 30 and December 31, beginning December 31, 2011 and continuing to and including December 31, 2014, payable within thirty (30) days after the end of the quarter. With each quarterly Revenue Share payment Buyer shall submit to Seller a written report setting forth (i) the total Net Revenue and the Net Revenue for each Product, including a description of the number and type of units sold or licensed by Product during the quarter, and (ii) the computation of the Revenue Share for such quarter in U.S. dollars by or certified by an independent Certified Public Accountant. Whenever the date that any payment or report is due under this Agreement falls on a Saturday, Sunday or other date on which banks in the State of Minnesota are authorized to be closed, that payment and report shall instead be due on the following day.

(e)     Record Keeping and Inspection. Buyer shall keep full and accurate records containing all information reasonably required for the computation and verification of the Revenue Share payable hereunder, which records shall at all reasonable times during business hours be open for periodic inspection by Seller and the Receiver. If any such inspection reveals an underpayment of the Revenue Share by more than five percent (5%) in any period of four consecutive quarters, then Buyer shall pay to Seller on demand (i) the Seller's estimated internal costs and any out-of-pocket expense incurred by Seller in conducting any inspection during that period, and (ii) interest on each underpayment during that period from the date when it was originally due until the date it is paid at an interest rate equal to the lower of eighteen percent (18%) per annum or the highest rate allowed by law.

(f)     Maintenance and Marketing Undertaking. Beginning on the Closing Date, and continuing until the earlier of the termination of this Agreement or the expiration of all of the patents included in the Patent Portfolio, the Buyer shall:

REd 3/14

      (i)     actively maintain, and pay any required maintenance fees and other charges that are necessary or appropriate to keep in force, the patents that are included in the Patent Portfolio, and prosecute the patent applications included in the Patent Portfolio; and

      (ii)    make its commercially reasonable best efforts to commercialize the intellectual property included in the Patent Portfolio, including entry into licenses and other arrangements to make commercially reasonable best efforts to maximize amounts received or receivable by Buyer that are subject to the Revenue Share.

    3.    "As-Is" Transaction.  Buyer is purchasing the Patent Portfolio in an "AS-IS" condition and basis, with all faults, with no express or implied representations or warranties of any kind, including but not limited to the warranty of title, and subject to the rights of IPS under the License Agreement.  Buyer acknowledges for Buyer and its successors and assigns that Buyer has been given a reasonable opportunity to inspect and investigate the Patent Portfolio. Seller in no way shall be liable or responsible to Buyer for any claims or losses relating to the Patent Portfolio, and Buyer waives all such claims and losses, whether known or unknown, now existing or hereafter arising.

    4.    Closing.  (a)  Assignment and Assumption Agreement and Closing Payment.  The sale and purchase under this transaction shall occur (the "Closing") on the first business day that is ten (10) days after the Receiver gives Buyer written notice that the U.S. District Court in the Receivership Case has entered the Order referred to in Section 5(a)(ii) below.  The date of the Closing is referred to herein as the "Closing Date."  At the Closing (i) Buyer shall deliver the Closing Payment to the Receiver, (ii) the Seller and Buyer shall sign and deliver to Buyer the Assignment and Assumption Agreement attached hereto as Exhibit B, and (iii) the Initial Payment being released from escrow to Seller.  Promptly after the Closing, the Buyer shall be entitled to file to record with the U.S. Patent and Trademark Office ("USPTO") an assignment to Buyer of the Patent Portfolio and Seller shall be entitled to file to record with the USPTO the Seller's security interest therein referred to below.

    (b)    Security Agreement and Pledge Agreement.  At the Closing the Buyer shall also execute and deliver to Seller to secure Buyer's obligation to make the Deferred Payments (i) a Security Agreement, in form reasonably acceptable to Buyer, granting Buyer a security interest in all of the rights and property being assigned by Seller to Buyer at the Closing, and (ii) a Pledge Agreement in the form attached hereto as Exhibit C granting Seller a security interest in Buyer's Fidelity Investments account no. ████████949 (the "Investment Account"), which account Buyer shall cause to maintain at all times a balance of not less than $150,000 until all of the Deferred Payments have been made.  The Security Agreement and the Pledge Agreement, and the security interests granted under each of them, shall terminate upon the payment in full of the Deferred Payments.  Promptly after the last Deferred Payment has been made, the Seller shall execute and deliver to Buyer such documents as Buyer may reasonably request (i) for filing with the USPTO to record the termination of Buyer's security interest in the Patent Portfolio, and (ii) for filing with Fidelity Investments to terminate Buyer's security interest in the Investment Account.

5.   Conditions Precedent to Closing.  (a)  Closing Conditions. The Closing of this Agreement is subject to the conditions precedent that:

(i)     IPS fails to exercise in accordance with its terms the right of first refusal provided in Section 5 of the Settlement Agreement and Mutual Release dated December 18, 2007 between Seller and IPS; and

(ii)    the U.S. District Court in the Receivership Case enters an order approving this Agreement and authorizing the Receiver to close and consummate this Agreement (the "Order").

(b)     IPS Right of First Refusal. As promptly and practical after the full execution of this Agreement, the Receiver shall deliver to IPS (i) a copy of this signed Agreement, (ii) a separate form of this Purchase Agreement that names IPS as the Buyer and is otherwise the same as this Agreement, except for deletion of the condition precedent referring to IPS, and (iii) a notice offering to enter into that Purchase Agreement with IPS if IPS executes and delivers the Purchase Agreement and pays the Initial Payment to the Receiver within forty five (45) days of such delivery, and stating that if IPS fails to do so it will constitute a failure by IPS to exercise its right of first refusal.  If IPS executes and delivers the Purchase Agreement and pays the Initial Payment to the Receiver within such 45 day period, the Receiver shall so notify the Buyer, return to the Buyer its Initial Payment and this Agreement shall terminate without further liability of the Buyer to the Seller or the Receiver, or of the Seller or the Receiver to the Buyer.

(c)     Application for Court Approval. Within ten (10) days after the execution of this Agreement, the Receiver shall file a motion in the Receivership Court for entry of the Order approving the sale to Buyer or (if IPS exercises its right of first refusal) to IPS.  If the Receivership Court does not approve the sale to Buyer, or approves a sale to IPS, then the Receiver shall promptly refund the Initial Payment to Buyer without interest and this Agreement shall terminate without further liability of the Buyer to the Seller or the Receiver, or of the Seller or the Receiver to the Buyer.

6.   Documents. Within forty-five (45) days of the Closing Date, Seller shall make available (and instruct Seller's legal counsel to make available) to Buyer, at locations within Seller's sole discretion, the patent prosecution files (if any), inventor's notebooks, files and miscellaneous materials (if any), in each case relating to the Patent Portfolio that are in the Receiver's or Seller's legal counsel's possession for inspection and copying as Buyer desires, and at Buyer's sole expense, thereby effecting delivery to Buyer to the extent possible of physical possession of the intellectual property constituting the Patent Portfolio.

7.   Indemnification and Defense. Notwithstanding anything to the contrary herein, following the Closing of the sale of the Patent Portfolio to Buyer, Buyer shall indemnify, defend, and hold Seller, the Receivership, the Receiver, and the entities for which the Receiver has been appointed as receiver or trustee (the "Indemnified Parties"), harmless from all losses and expenses incurred after the Closing Date and arising from, in connection with, or based on any allegation, demand, claim, action, or proceeding by any third party alleging that this Agreement or any of its terms, or any of the assets, documents, or information transferred via this Agreement, infringes (directly or indirectly, contributorily, via inducement, or otherwise),

RaQ 5/14

violates, unlawfully discloses, or misappropriates, any patent, trademark, copyright, trade secret, or other right of any person or entity, and from any other claims asserted by such third party in the same or a related action. This paragraph applies to allegations, demands, claims, actions, or proceedings whether now known or unknown, rightful or not, or existing or hereafter arising. To the extent any Indemnified Party remains in control of witnesses or other information relevant to the defense of a claim, it agrees to reasonably provide such information to Buyer upon Buyer's request and at Buyer's expense.

        8.    Notices. All notices, requests, demands or other communications pursuant to this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient, sent to the recipient by reputable overnight courier service (charges prepaid), mailed to the recipient by certified or registered mail (return receipt requested and postage prepaid) or transmitted by facsimile or e-mail (with request for immediate confirmation of receipt in a manner customary for communications of such type and with physical delivery of the communication being made by one of the other means specified in this Section as promptly as practicable thereafter). Such notices, demands and other communications shall be addressed as follows:

        If to the Buyer, to :

        R. Ernest Demaray
        190 Fawn Lane
        Portola Valley, CA 94028

        If to the Receiver or the Seller, to:

        Douglas A. Kelley, Esq.
        Kelley, Wolter & Scott, P.A.
        2530 Centre Village Offices
        431 South 7th Street
        Minneapolis, MN  55415

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party (provided that notice of a change of address shall be effective only upon receipt thereof).

        9.    Counterparts. This Agreement may be executed in counterparts and by different parties on different counterparts and by facsimile signatures with the same effect as if the signatures thereto were on the same instrument. This Agreement shall be effective and binding upon all parties hereto at such time as all parties have executed and delivered (either physically or electronically) a signed counterpart of this Agreement.

        10.    Expenses. Each party shall pay for its own costs and expenses incurred by it or on its behalf in connection with the transactions contemplated hereby, including, without limitation, all fees and disbursements of attorneys, accountants, and financial consultants. Further, upon exchange of the Assignments and Purchase Price on the Closing Date, Seller shall

Re& 6/14

have no obligations of any kind for any fees, costs, or other expenses, including past due amounts, related to the prosecution, maintenance, or other preservation of the Patent Portfolio and Buyer assumes all such obligations and responsibilities therefore.

11.    Entire Agreement. This Agreement, together with its Exhibits, represents the only agreement among the parties concerning the subject matter hereof and supersedes all prior agreements whether written or oral, relating thereto. No purported amendment, modification, or waiver of any provision hereof shall be binding unless set forth in a written document signed by all parties.

12.    Governing Law, Jurisdiction and Venue. This Agreement shall be deemed to be made and entered into in the State of Minnesota, which State the parties agree has a substantial relationship to the parties and to the underlying transaction. This Agreement shall in all respects be construed and enforced under the internal laws of the State of Minnesota. Any cause of action arising out of the execution or performance of this Agreement, or any alleged breach of this Agreement, shall be venued in a court of competent jurisdiction in the State of Minnesota, to which Buyer hereby irrevocably submits and consents to jurisdiction. Buyer agrees to accept service by mail and waive any defenses with respect to jurisdiction and venue that may otherwise be available, including but not limited to any argument that venue in such forum is not convenient.

13.    Jury Trial Waiver. EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OF IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. FURTHER, EACH PARTY HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS IN ANY WAY REPRESENTED, EXPRESSLY OR OTHERWISE, THAT IN THE EVENT OF SUCH LITIGATION IT WOULD NOT SEEK TO ENFORCE THIS PROVISION.

14.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns.

15.    Recitals Incorporated. The Recitals set forth at the beginning of this Agreement constitute part of this Agreement and are specifically incorporated herein.

16.    No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by all of the parties hereto to express their mutual intention and no rule of strict construction will be applied against any party.

*[Signatures are on following page]*

ReQ 7/14

IN WITNESS WHEREOF, the parties hereto have executed this Purchase Agreement as of the date above written.

SPRINGWORKS, LLC                    BUYER:

By: _____       _____
Douglas A. Kelley, Receiver         R. Ernest Demaray (individually)

11/10/2011

Exhibit A

# SpringWorks LLC - Docket Summary
## (details of pending/issued matters)

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00003 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 7/27/05 Appl. No. 11/191,643 **PENDING** | Response to Final OA due 10/11/2011 |
| 00017 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 3/16/02 Appl. No. 10/101,863 Patent No. 7,378,356 **ISSUED - 5/27/08** | **ISSUED** - 4th year maintenance fee due 11/29/2011 |
| 00019 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 9/16/05 Appl. No. 11/228,834 Patent No. 7,544,276 **ISSUED - 6/09/09** | **ISSUED** - 4th year maintenance fee due 12/10/2012 |
| 00020 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 9/16/05 Appl. No. 11/228,717 Patent No. 7,413,998 **ISSUED - 8/19/08** | **ISSUED** - 4th year maintenance fee due 2/21/2012 |
| 00021 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 10/01/04 Appl. No. 10/954,182 Patent No. 7,381,657 **ISSUED - 6/03/08** | **ISSUED** - 4th year maintenance fee due 12/6/2011 |
| 00004 | T. Pan, R. Demaray, Y. Chen, Y. Xie, R. Pethe | Mode size converter for a planar waveguide | US 4/06/05 Appl. No. 11/100,856 **ALLOWED** | **ALLOWED** - Notice of Allowance mailed 6/2/2011; Issue Fee due 9/2/2011 |
| 00015 | T. Pan, R. Demaray, Y. Chen, Y. Xie, R. Pethe | Mode size converter for a planar waveguide | US 03/16/02 Appl. No. 10/101,492 Patent No. 6,884,327 **ISSUED - 4/26/05** | **ISSUED** - 8th year maintenance fee due 10/28/2012 |
| 00005 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | US 5/20/04 Appl. No. 10/850,968 **PENDING** | Response to OA due 9/14/2011 |
| 00040 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | China 5/21/04 Appl. No. 200480020874.8 **ALLOWED** | **ALLOWED** - Registration fee and 8th year annuity due 9/14/2011 |

Rcd 9/14

| Matter Number *43668* | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00041 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | EPO 5/21/04 Appl. No. 04751753.7 **PENDING** | Response to first Examination Report due 9/27/2011; next annuity due 5/31/2012 |
| 00042 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | Taiwan 5/21/04 Appl. No. 93114517 **ALLOWED** | **ALLOWED** - Sealing fee and 1st year annuity due 11/21/2011 |
| 00043 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides | PCT 5/21/04 Appl. No. PCT/US2004/014523 **COMPLETED** | |
| 00006 | R. Demaray, V. Milonopoulou | Low temperature zirconia based thermal barrier layer by PVD | US 11/08/02 Appl. No. 10/291,179 Patent No. 7,404,877 **ISSUED** - 7/29/08 | **ISSUED** - 4th year maintenance fee due 1/30/2012 |
| 00008 | R. Demaray, K. Wang, R. Mullapudi, D. Stadler, H. Zhang, R. Pethe | Planar optical devices and methods for their manufacture | US 07/10/01 Appl. No. 09/903,050 Patent No. 6,506,289 **ISSUED** - 1/14/03 | **ISSUED** – 12th year maintenance fee due 7/14/2014 |
| 00009 | R. Demaray, K. Wang, R. Mullapudi, D. Stadler, H. Zhang, R. Pethe | Planar optical devices and methods for their manufacture | US 11/14/00 Appl. No. 10/288,278 Patent No. 6,827,826 **ISSUED** - 12/07/04 | **ISSUED** - 8th year maintenance fee due 6/8/2012 |
| 00013 | R. Demaray, J. Shan, K. Wang, R. Mullapudi | Method of Producing amorphous silicon for hard mask and waveguide applications | US 01/19/01 Appl. No. 09/766,463 Patent No. 6,533,907 **ISSUED** - 3/18/03 | **ISSUED** - 12th year maintenance fee due 9/18/2014 |
| 00014 | R. Demaray, K. Wang, R. Mullapudi, Q. Zhu, H. Zhang, H. Ackler, J. Egermeier, R. Pethe | As-deposited planar optical waveguides with low scattering loss and methods for their manufacture | US 07/10/01 Appl. No. 09/903,081 Patent No. 7,469,558 **ISSUED** - 12/30/08 | **ISSUED** - 4th year maintenance fee due 7/2/2012 |
| 00022 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | US 8/27/03 Appl. No. 10/650,461 Patent No. 7,826,702 **ISSUED** - 11/2/10 | ISSUED - 4th year maintenance fee due 5/2/2014 |

R8L 10/14

| Matter Number *43668* | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00023 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | Taiwan<br>8/27/03<br>Patent No. 1274199<br>ISSUED - 2/21/07 | ISSUED -- Next annuity due 2/21/2012 |
| 00024 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | PCT<br>8/27/03<br>Appl. No. PCT/US2003/024809<br>COMPLETED | |
| 00025 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | US<br>2/26/04<br>Appl. No. 10/789,953<br>Patent No. 7,205,662<br>ISSUED - 4/17/07 | ISSUED - 8th year maintenance fee due 10/17/2014 |
| 00026 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | China - 2/26/04<br>Appl. No. 200480005515.5<br>ALLOWED | ALLOWED - Registration fee and 8th year annuity paid 8/12/2011; next annuity due 2/26/2012<br><br>Awaiting issued letters patent |
| 00027 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | EPO<br>2/26/04<br>Appl. No. 04715009.9<br>PENDING | Response to first Examination Report filed 3/8/2011; next annuity due 2/28/2012<br><br>Awaiting next action |
| 00028 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Korea - 2/26/04<br>Appl. No. 10-2005-7016055<br>Patent No. 0691168<br>ISSUED | ISSUED -<br>6th year annuity due 2/28/2012 |
| 00029 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Singapore<br>2/26/04<br>Appl. No. WO 2004/077519<br>Patent No. 114328<br>ISSUED - 9/28/07 | ISSUED -<br>9th year annuity due 2/26/2012 |
| 00030 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Taiwan<br>5/21/04<br>Appl. No. 93114493<br>Patent No. 1334194<br>ISSUED – 12/1/10 | ISSUED - 2nd annuity due 11/30/2011 |
| 00031 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | PCT<br>2/26/04<br>Appl. No. PCT/US2004/005531<br>COMPLETED | |

DOCS-#3550876-v9

REW 11/14
11-11-11-11

| *Matter Number* *43668* | *Inventors* | *Patent Title* | *Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued* | *Status* |
|---|---|---|---|---|
| 00032 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | US 9/16/05 Appl. No. 11/228,805 Patent No. 7,262,131 **ISSUED - 8/28/07** | **ISSUED – 8th** year maintenance fee due 3/2/2015 |
| 00033 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Film | Taiwan 2/27/04 Appl. No. 93105204 **PENDING** | Response to OA filed 5/24/2011 Awaiting next action |
| 00034 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | US 5/20/04 Appl. No. 10/851,542 Patent No. 7,238,628 **ISSUED - 7/3/07** | **ISSUED – 8th** year maintenance fee due 1/5/2015 |
| 00035 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | China 1/20/06 Appl. No. 200480021078.6 **PENDING** | Appeal to Rejection Decision with Request for Re-Examination filed 5/18/2010 Awaiting next action |
| 00036 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | EPO 5/21/04 Appl. No. 04751754.5 **PENDING** | Response to first Examination Report filed; next annuity due 5/31/2012 |
| 00037 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | Taiwan 5/21/04 Appl. No. 93114518 Patent No. I338338 **ISSUED – 3/1/11** | **ISSUED – 3rd** Annuity due 2/28/2013 |
| 00038 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | PCT 5/21/04 Appl. No. PCT/US2004/014524 **COMPLETED** | |
| 00039 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | US 3/22/07 Appl. No. 11/726,972 **ALLOWED** | **ALLOWED** – Issue fee and Publication fee due 11/8/2011 |
| 00044 | H. Zhang, R. Demaray, M. Shao | Low Temperature, High Rate Deposition | US 12/07/05 Appl. No. 11/297,057 **PENDING** | RCE filed 8/8/2011 Awaiting next action |
| 00049 | H. Zhang, R. Demaray | Low Temperature, High Rate Deposition | Taiwan 12/07/05 Appl. No. 94143175 **ALLOWED** | **ALLOWED** - Sealing fee and 1st year annuity due paid 7/1/2011 Awaiting patent certificate |

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00045 | H. Zhang, R. Demaray | Deposition of LiCO2 | China 12/07/05 Appl. No. 200580042305.8 Patent No. ZL200580042305.8 **ISSUED** – 9/22/10 | **ISSUED** - 7th year annuity due 12/7/2011 |
| 00077 | H. Zhang, R. Demaray | Deposition of LiCO2 | China 5/11/10 Appl. No. 201010161517.0 **PENDING** | Response to 1st OA due 10/17/2011 |
| 00046 | H. Zhang, R. Demaray | Deposition of LiCO2 | EPO 12/07/05 Appl. No. 05853649.1 **COMPLETED** | **COMPLETED** |
| 00073 | H. Zhang, R. Demaray | Deposition of LiCO2 | France | Annuity due 12/31/2011 |
| 00074 | H. Zhang, R. Demaray | Deposition of LiCO2 | Germany | Annuity due 12/31/2011 |
| 00075 | H. Zhang, R. Demaray | Deposition of LiCO2 | Italy | Annuity due 12/31/2011 |
| 00076 | H. Zhang, R. Demaray | Deposition of LiCO2 | Great Britain | Annuity due 12/31/2011 |
| 00047 | H. Zhang, R. Demaray | Deposition of LiCO2 | Japan 6/06/07 Appl. No. 2007-545692 **PENDING** | Request for Examination filed 5/1/2008 Awaiting next action |
| 00048 | H. Zhang, R. Demaray | Deposition of LiCO2 | Korea 6/26/07 Appl. No. 10-2007-7014536 Patent No. 10-1021536 **ISSUED** – 3/4/11 | **ISSUED** - 4th year annuity due = 3/4/2014 |
| 00050 | H. Zhang, R. Demaray | Deposition of LiCO2 | PCT 12/7/05 Appl. No. PCT/US2005/044781 **COMPLETED** | |
| 00053 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | US 9/02/05 Appl. No. 11/218,652 Patent No. 7,838,133 **ISSUED** – 11/23/10 | **ISSUED** - 4th year maintenance fee due = 5/23/2014 |
| 00054 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | China 8/24/06 Appl. No. 200680039671.2 **PENDING** | Proposed amendments for response to 1st OA forwarded to FC on 8/4/2011 |
| 00055 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | EPO 8/24/06 Appl. No. 06790009.2 **PENDING** | Next annuity due = 8/24/2012 Awaiting next action |

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00056 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | Singapore 8/24/06 Appl. No. 2008017493 Patent No. 140421 **ISSUED – 8/31/10** | ISSUED - Next annuity due = 8/24/2012 |
| 00057 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | Taiwan 8/24/06 Appl. No. 95131196 **PENDING** | Request for Examination filed 8/24/2009

Awaiting next action |
| 00058 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | PCT 8/24/06 Appl. No. PCT/US2006/033315 **COMPLETED** | |
| 00061 | R. Demaray | Monolithic Sputter Target Backing Plate with Integrated Cooling Passages | PCT 8/02/06 Appl. No. PCT/US2006/030020 **COMPLETED** | |

R8L 14/14 q.e.d.

11/10/2011

Exhibit B

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement is made as of _____, 20__ pursuant to the terms of a Purchase Agreement dated as of _____, 2011 (the "Purchase Agreement") between SpringWorks, LLC, a Delaware limited liability company ("Seller") and R. Ernest Demaray, an individual ("Buyer").

WHEREAS, Seller and Buyer is desirous of consummating the Purchase Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises set forth below, the parties agree as follows:

1. Assignment. Seller hereby sells and assigns to Buyer, without warranty or recourse, all of Seller's right, title and interest in (i) the patents and patent applications indentified on the attached Schedule A (the "Patent Portfolio"), including the right to sue for past, present and future infringements, if any, and to recover damages or profits arising from infringement of any such patents, whether occurring prior to or after this date, and (ii) the Amended and Restated License Agreement dated as of July 31, 2006 (the "License Agreement") with Infinite Power Solutions, Inc., in each case to have and to hold forever, to Buyer and its successors and assigns. Seller hereby constitutes and appoints Buyer and its successors and assigns as the attorney in fact of Seller with full power of substitution, to institute and prosecute, in the name of and for the benefit of Buyer, and at Buyer's expense, all proceedings which Buyer may deem desirable in connection with the Patent Portfolio and License Agreement. Seller agrees that, at any time and from time to time after the delivery hereof, Seller will, upon the reasonable request of Buyer and at Buyer's expense, take all action and execute and deliver all documents, instruments and conveyances of any kind that may be reasonably requested by Buyer to carry out the provisions of this Assignment and Assumption Agreement.

2. Assumption of License. Buyer hereby assumes, and agrees to perform in accordance with its terms, the License Agreement. Buyer agrees that Seller shall have no further rights or obligations under the License Agreement and agrees to defend an indemnify Seller with respect to any claims, demands or actions arising on or after the date hereof under or in connection with the License Agreement.

3. General. This Assignment and Assumption Agreement is delivered pursuant to the Purchase Agreement and is subject in all respects to the terms of the Purchase Agreement.

*[Signatures are on following page]*

REd 15/31

IN WITNESS WHEREOF, Seller and Buyer have executed this Assignment and Assumption Agreement as of the date first written above.

**SPRINGWORKS, LLC**                        · **BUYER:**

By:_____        _____
    Douglas A. Kelley, Receiver              R. Ernest Demaray (individually)

RED 16/31