IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER D WHITE,<br><br>    Plaintiff,<br><br>  v.<br><br>RICHARD E DEMARAY, et al.,<br><br>    Defendants.<br>_____/ | No. C -13-05169 EDL<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO STRIKE** |

In this shareholder derivative action, Defendants move to dismiss the derivative claims in Plaintiff's complaint and to strike portions of the complaint on the grounds that because Plaintiff is not a shareholder, he lacks standing to maintain this action. Plaintiff opposed Defendants' motions, and Defendants filed replies. On January 7, 2014, the Court held a hearing on Defendants' motion. On January 14, 2014, the parties filed supplemental briefing. For the reasons stated at the hearing and in this Order, Defendants' Motion to Dismiss and Motion to Strike are granted.

**Allegations from the complaint**

In 2003, Defendant Richard Demaray was the President of Symmorphix, Inc., a thin film nanotechnology company that owned a large portfolio of patents and patent applications including patents and patent applications related to thin film energy conversion, nanotechnology, LED, and solar technologies. Compl. ¶ 19. Also in 2003, Plaintiff's father, Robert White, while working to acquire intellectual property and technology companies for the Petters Group Worldwide ("PGW"), was introduced to Demaray. Compl. ¶ 18. In 2005 or 2006, at Robert White's suggestion, PGW purchased Symmorphix, including its patents. Compl. ¶ 20. Demaray's involvement with Symmorphix ended in August 2007. Compl. ¶ 21.

In August 2008, Demaray sought Robert White's assistance with obtaining a license to the

Symmorphix patents and creating a business plan for developing and manufacturing solar panels for Antropy, a company that Demaray had recently formed. Compl. ¶ 22. The Symmorphix patents were critical to Antropy's business strategy. Compl. ¶ 23. Antropy acquired from Demaray an exclusive license to any and all patents that pertain to solar energy that were at any stage of development on December 20, 2009 or any future date. Compl. ¶ 23. Robert White asked his son, Plaintiff Christopher White, to help Demaray with Antropy's business. Compl. ¶ 24.

On September 24, 2008, the FBI raided PGW and the homes of its top executives, including Robert White. Compl. ¶ 25. As a result of the conviction of PGW's founder and CEO for investment fraud, the Symmorphix patents, among other assets, were placed in possession of a court-appointed receiver. Compl. ¶ 25.

In October 2008, Plaintiff and Demaray agreed to work together to obtain capital that would allow them to monetize Antropy's intellectual property and the Symmorphix patents. Compl. ¶ 26. Demaray, who was the sole shareholder of Antropy, agreed that he would be the President, CEO and a Director of Antropy, and would retain a 52% ownership of Antropy. Compl. ¶ 26. Plaintiff would be appointed Vice President, Secretary, Treasurer, and a Director of Antropy, and would purchase 48% of the outstanding shares of the company. Compl. ¶ 26. This agreement was memorialized in Antropy's December 17, 2009 Minutes of Action and in the December 15, 2009 Action of Incorporator of Antropy International. Compl. ¶ 26; Ex. A, Ex. B. Pursuant to the December 17, 2009 Minutes of Action, Plaintiff alleges that he purchased his 48% ownership interest in Antropy in October 2010. Compl. ¶ 27; Ex. A. Without this amendment, Antropy's Certificate of Incorporation only authorized the corporation to issue 3,000 shares, (which it had issued to Demaray upon incorporation in 2007. Defs.' RJN Ex. A.

Between December 2009 and February 2011, Plaintiff worked as an officer and director of Antropy to secure the necessary financing to purchase the Symmorphix patents and the necessary start up capital for Antropy to utilize the Symmorphix patents after the purchase. Compl. ¶ 29. Between February 2011 and March 2011, Plaintiff offered on several occasions to contribute money to help fund Antropy's purchase of the Symmorphix patents. Compl. ¶ 31. Demaray did not commit to take any money from Plaintiff. Id.

2

On March 17, 2011, Antropy submitted an offer to the Receiver to purchase the Symmorphix patents. Compl. ¶ 32; Ex. F. Between the time of the initial offer and the sale of the Symmorphix patents in January 2012, Demaray excluded Plaintiff from the negotiation process. Compl. ¶ 33. Unbeknownst to Plaintiff, Demaray had excluded Antropy from the purchase during the negotiation process and purchased the Symmorphix patents for himself. Compl. ¶ 34; Ex. D at 4. In May 2012, Demaray told Plaintiff in an email that Demaray had purchased the Symmorphix patents for himself. Compl. ¶ 35; Ex. H. In August 2012, Plaintiff sent a letter to Demaray expressing concern regarding the purchase of the Symmorphix patents. Compl. ¶ 36; Ex. I.

In February 2013, Plaintiff learned of Demaray's plans to abandon Antropy and to form a new company, Demaray LLC, to develop and monetize the Symmorphix patents. Compl. ¶ 37. In early 2013, Demaray transferred and/or assigned the Symmorphix patents to Demaray LLC. Compl. ¶ 40. On November 6, 2013, Plaintiff brought this shareholder derivative action against Demaray and his company, Demaray, LLC.

**Legal standard**

A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)). The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch LTD v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 129 S. Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950. Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

Courts must then determine whether the factual allegations in the complaint "plausibly give rise to an entitlement of relief." Id. Though the plausibility inquiry "is not akin to a probability requirement," a complaint will not survive a motion to dismiss if its factual allegations "do not

3

permit the court to infer more than the mere possibility of misconduct . . . ." Id. at 1949 (internal quotation marks omitted) & 1950. That is to say, plaintiffs must "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Additionally, a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f).

**Discussion**

Under Delaware law, which governs, "[i]n any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law." 8 Del.C. § 327; see also Fed. R. Civ. P. 23.1 (complaint must "allege that the plaintiff was a shareholder or member at the time of the transaction" and retained ownership of the stock for the duration of the lawsuit).

Plaintiff does not dispute that he is not a legal shareholder of Antropy stock. Instead, Plaintiff relies on the December 17, 2009 Minutes of Action to establish that he is entitled to bring this derivative action on three grounds: (1) as an equitable owner of Antropy stock; (2) as the holder of a constructive trust; and (3) as a Director of Antropy. Among other things, those Minutes indicate that Antropy intended to amend its Certificate of Incorporation to authorize the issuance of 10 million shares. Compl. Ex. A. In connection with the proposed amendment to the Articles of Incorporation, Plaintiff and Demaray, as the directors of Antropy, resolved to sell 2.4 million of the new shares to Plaintiff. Id. Without the amendment, Antropy's Certificate of Incorporation only authorized the corporation to issue 3,000 shares. Defs.' Request for Judicial Notice Ex. A.[1]

Under Delaware law, an amendment to the Certificate of Incorporation must be "executed,

---

[1] In support of the motion to dismiss, Defendants filed a request for judicial notice of certain documents. Under Federal Rule of Civil Procedure 201(b), a "judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Furthermore, a court "shall take judicial notice if requested by a party and supplied with the necessary information." See Fed. R. Civ. P. 201(d); Mullis v. United States Bank, 828 F.2d 1385, 1388 n. 9 (9th Cir. 1987). A court may also take judicial notice of matters of public record. Lee v. City of L.A., 250 F.3d 668, 689 (9th Cir.2001). Here, Plaintiff does not challenge the authenticity of the documents contained in Request for Judicial Notice, and they are judicially noticeable under Federal Rule of Evidence 201.

4

acknowledged and filed . . . in accordance with § 103 of this title." 8 Del. C. §§ 241(b), 242(b)(1); RJN Ex. B. Section 103(c) states that: "Whenever any instrument is to be filed . . . such requirement means that" among other things, a signed instrument must be delivered to the Secretary of State, and the Secretary of State must record the date and time of its delivery. 8 Del. C. § 103(c); RJN Ex. B. Delaware has no record of any amendment to Antropy's Certificate of Incorporation, and the only record on file with the Secretary of State is the original Certificate of Incorporation from 2007. RJN Ex. A.

**1. Plaintiff lacks standing as an equitable owner of Antropy stock**

Under Delaware law, for purposes of a derivative action, the term "stockholder" includes an equitable owner. See, e.g., Rosenthal v. Burry Biscuit Corp., 60 A.2d 106, 111 (Del. Ch. 1948) ("It places no undue burden on a corporation to permit an equitable owner to sue in such a situation [derivative lawsuit] because he must prove his ownership in order to maintain the action, and the need for the same certainty which prompted the courts to recognize only registered stockholders in other situations is therefore not apparent."). In Pennington v. Neukomm, 1873 WL 463 (Del. Ch. Oct. 7, 1973), the court found that the plaintiff was an equitable owner of stock for purposes of maintaining a derivative action. The defendant was the majority shareholder of Deltech Engineering and was the beneficial owner of voting trust certificates for 21,600 shares of the corporate stock. In the marriage separation agreement between the plaintiff and the defendant, they agreed that if the shares were sold or if other shares were received in return as the result of a merger, the plaintiff would receive one-half of the consideration obtained. It was further agreed that if the defendant did not dispose of the stock within six years from the date of the agreement, he would transfer to the plaintiff one-half of his stock or cash equivalent and the defendant's yearly support to the plaintiff would be reduced. The court stated:

> . . . in one sense of the word Arlene has already purchased the stock by entering into the separation and property settlement agreement with Neukomm. In return for the consideration given by her under this agreement, one of the considerations she received in return was one-half of Neukomm's stock in Deltech subject to his right to retain it for six years unless he saw fit to dispose of it during that time by sale or merger of the corporation. If he elects to hold it for six years, she must then accept legal title to it and suffer an $8,000 reduction in support at the same time. She has no choice. Unlike Gamble, whether or not she actually receives the shares is not left to her discretion but rather is up to Neukomm, and Neukomm is obligated to eventually deliver it to her if neither of the other possibilities occur. To say that Arlene has no

5

> equitable interest in the Deltech stock at this time with full knowledge that it is within Neukomm's power as legal owner, as corporate director and executive, and as controlling stockholder, to eventually make her take it, is inconsistent. I am therefore of the opinion that under the terms of the agreement, as they have been presented to me, Arlene does qualify as having at this time an equitable interest in the Deltech stock. As such, she may maintain a derivative action to prevent the alleged dissipation of corporate assets. Rosenthal v. Burry Biscuit Corporation, supra.

Id. at *3.

In Jones v. Taylor, 348 A.2d 188 (Del. Ch. 1975), the court found that the plaintiff was an equitable owner of stock for purposes of maintaining a derivative suit. There, the plaintiff entered into an agreement in 1938 with her mother under which the plaintiff and her brother conveyed all interest and title to 700 shares of corporate stock to the mother. The agreement further provided that the mother would execute a will bequeathing the stock back to the plaintiff and her brother in equal shares upon the mother's death. The mother executed such a will, and later died. The court stated:

> I am of the opinion that the plaintiff was possessed of a sufficient equitable ownership interest in the Taylor Auto stock in 1972 so as to permit her to maintain the action now, even though her mother was still alive at the time. I hasten to add, however, that it is the contract to make the will which establishes this status, and not merely the existence of a will in 1972, prior to the death of the testatrix, which designated plaintiff as a legatee of the stock. The instant case presents situation similar to that in Pennington v. Neukomm, No. 4172, 1973, 1973 WL 463 (Del.Ch., October 3, 1973), Aff'd mem., No. 26, 1974 (Del.Supr., January 3, 1975) upon which plaintiff relies.
>
> * * *
>
> Similarly here, plaintiff and her brother had bargained for the eventual ownership of the stock, subject to the right of their mother to retain uncontested ownership of all of it during her lifetime. Her mother's death, though uncertain as to date, was an inevitable event and plaintiff's interest was enforceable after her mother's death. Equitable Trust Co. v. Hollingsworth, supra. Although she released all possessory interest in the stock at the time of the agreement, the consideration plaintiff received in return was the right upon her mother's death to receive one-half of the stock or its equivalent in proceeds. I am of the opinion that this, as in Pennington, qualifies as the necessary equitable interest to maintain a derivative suit.
>
> I reach this conclusion based not only upon the aforementioned rationale, but also upon considerations of fairness to the parties involved as well as the policy behind the statute. Application of the rule of s 327 here so as to defeat plaintiff's right to sue on behalf of the corporation would lead to an inequitable result since there are apparently no other shareholders of Taylor Auto who would be willing to sue. Obviously, the individual defendants who are the only other shareholders will not bring suit against themselves. And it is also significant that plaintiff did not purchase her shares in order to instigate litigation, the precise evil at which the statute was aimed.

6

Id. at 191-92.

In Graeser v. Phoenix Fin. Co. of Des Moines, 254 N.W. 859, 861 (Iowa 1934), the court found that the plaintiff was an equitable owner for purposes of maintaining a derivative lawsuit even though the plaintiff's alleged ownership of the stock was not recorded on the corporate register and the company's articles of incorporation forbade equitable ownership. The court stated:

> It is a rule so well recognized as to require the citation of no authority that, even though the statutes and the articles of incorporation require a transfer of the stock to be made upon the books of the corporation before it will be binding upon the corporation, this does not prevent the assignee of certificates of stock from becoming the equitable owner. It is equally well settled that the equitable owner of stock, by assignment of the certificate without transfer on the corporate records, cannot demand dividends, cannot, in the case of voting stock, exercise a right to vote at a stockholders' meeting, and cannot exercise many other rights of a stockholder. The question here involved, however, is whether the plaintiff, as such equitable owner, without having acquired the legal title by the transfer of the certificates of stock upon the books of the corporation, has the right to maintain these actions against the defendant corporations.
>
> From the above it appears that the assignee of certificates of stock which have not been transferred upon the books of the corporation does have the right, as against the corporation, to sue to establish and protect his rights in the corporate property. . . . The certificates for the shares of stock involved in this case were never presented to the proper officers for transfer on the books of the corporation. Upon the trial of the case, the attorney for the appellant tendered such certificates to the attorney for the appellees. Appellees contend that this tender, not being to the proper officer of the corporation, was not sufficient to entitle appellant to a transfer on the corporation records, and that, in any event, the plaintiff did not have the right to maintain the action until the transfer actually had been made upon the books of the corporation. We are not prepared to say that the contentions of the appellees are altogether without merit. Under the authorities above quoted, there are undoubtedly some causes of action which the appellant could not maintain against the defendant corporations until the shares of stock which she claims to own were transferred to her name on the corporate records. But, under these authorities, even without such transfer to her on the corporate records, she can maintain a suit to establish and protect her rights in the corporate property. Even if there may be some doubt as to whether the actions at bar involve such rights in the corporate property, we would not feel justified in dismissing them without a consideration on the merits.

Id. at 862-63.

Plaintiff relies on these cases to establish his equitable ownership. However, each of these cases involved a contract regarding existing stock from which the courts could readily determine that the plaintiffs were equitable owners of specific property. Here, Plaintiff asks the Court to determine that he is the equitable owner of stock that was not issued.

At the hearing, the Court ordered further briefing on the legal significance of the December

7

17, 2009 Minutes. In the supplemental briefing, the parties generally agree that corporate minutes memorialize the events that take place at corporate meetings. See Del. C. § 224. However, no party cited authority to support the argument that Demaray's failure to abide by a direction in the Minutes to file the appropriate documents with the Secretary of State constitutes a breach of a duty to the corporation or would support a derivative lawsuit.[2] Further, the stock that was purportedly issued to Plaintiff never existed because the amendment to the Minutes that included the issuance of the stock was never recorded with the Secretary of State, and there was no other contract for the transfer of specific stock. Therefore, there was no contract between the parties under which Demaray failed to perform. Plaintiff has cited no analogous case supporting the argument that he is an equitable owner of Antropy stock.

## 2. Plaintiff lacks standing based on a constructive trust theory

Plaintiff also argues that he has derivative standing as a result of his constructive trust in a percentage share of the 3,000 shares originally owned by Demaray. See Provence v. Palm Beach Tavern, 676 So.2d 1022, 1025 (Fla. 1996) ("A constructive trust is one raised by equity in respect to property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it. . . . Thus, a constructive trust is a remedial device with dual objectives: to restore property to the rightful owner and to prevent unjust enrichment.") (internal citations omitted). Delaware law is essentially in accord. See Sannini v. Casscells, 401 A.2d 927, 931 (Del. 1979) ("The equitable remedy proceeds on the theory that title to the property lies in the plaintiffs and that the defendants simply hold the property as constructive trustees for the plaintiffs; the legal remedy for damages proceeds on the assumption that title to the property is in the defendants."): Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393-94 (Del. Ch. 1999) ("A constructive trust is proper when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty.")

---

[2] In his supplemental brief, Plaintiff also argues that the Minutes themselves authorize his derivative lawsuit because he was elected as a director on December 15, 2009 and the Minutes state that directors are: "authorized to execute such other documents and take any other actions as they deem necessary or appropriate in connection with the adoption of the attached Amended and Restated Articles of Incorporation." Compl. Ex. B. However, it is not plausible that a derivative lawsuit brought nearly four years later was an action "necessary or appropriate in connection with the adoption" of the Amended Articles of Incorporation.

8

(internal citation omitted).

Plaintiff argues that the 2009 Minutes granted him a right to purchase Antropy shares, and that he exercised this right in October 2010. Plaintiff argues that his ownership in Antropy was thwarted by Defendant's failure to file the amendment to Antropy's Articles of Incorporation. At the time of the failure, Defendant owned 3,000 shares of Antropy. Therefore, Plaintiff alleges that he has a constructive trust over 48% of the 3,000 shares.

However, Plaintiff's constructive trust argument is not plausible. First, a constructive trust is designed to transfer fraudulently obtained or retained title from the legal title holder to the equitable title holder. Plaintiff has not alleged that there was any fraudulent transfer or retention of title to any of the 3,000 shares, and Plaintiff has not alleged that he had any opportunity to obtain any interest in the 3,000 shares; therefore, he could not have been defrauded of any interest in them. Even if Demaray had properly filed the amendment pursuant to the 2009 Minutes, he would have retained title to the 3,000 preexisting shares. Further, because Plaintiff has an available legal remedy, an equitable theory based on constructive trust is inappropriate. Plaintiff argues that his legal remedies are inadequate because only a derivative lawsuit will permit him to recover his equitable expectancy interest in utilizing the licensed intellectual property from Demaray and his company to monetize the Symmorphix patents. However, Plaintiff fails to cite any authority for his expectancy interest argument that would support standing in this case.

### 3. Plaintiff lacks standing as a director of Antropy

The Court has discretion under appropriate circumstances to extend equitable standing to a director to bring a derivative action. See Schoon v. Smith, 953 A.2d 196, 203 (2008) (stating that the equitable doctrine of standing was adopted to "prevent a complete failure of justice on behalf of the corporation."). The Schoon court declined to extend equitable standing to a director in that case where, among other things, a shareholder had already commenced a derivative lawsuit. Plaintiff argues that because Plaintiff and Defendant are the only two directors and shareholders of Antropy, there are no other shareholders to bring a derivative lawsuit, there would be a complete failure of justice if Plaintiff could not sue derivatively.

Here, Plaintiff has not shown that there would be a complete failure of justice as to Antropy

if Plaintiff is not permitted to bring this lawsuit. Plaintiff has other claims that could support redress. Extending standing to Plaintiff as a director would be an unwarranted extension of the law, particularly where the amendments to the Articles of Incorporation naming Plaintiff as a director and issuing shares to him were not properly filed with the Secretary of State.

**Conclusion**

Plaintiff has failed to plead a viable theory to support his standing to bring shareholder derivative claims, and has failed to show that he could amend the complaint to do so. Therefore, Defendants' Motion to Dismiss and Motion to Strike are granted without leave to amend.

**IT IS SO ORDERED.**

Dated: January 27, 2014

ELIZABETH D. LAPORTE
United States Magistrate Judge