1  Geoffrey Gordon-Creed, SBN 136188
2  Jeremy Sugerman, SBN 146315
   Charlie Y. Chou, SBN 248369
3  **GORDON-CREED, KELLEY,**
   **HOLL & SUGERMAN, LLP**
4  222 Kearny Street, Suite 650
   San Francisco, CA  94108
5  Tel:  (415) 421-3100
6  Fax:  (415) 421-3150

7  Attorneys for Plaintiff
8  **CHRISTOPHER D. WHITE**

9  Glenn E. Westreich, SBN 100457
   Jason M. Gonder, SBN 257522
10 **HAYNES AND BOONE, LLP**
   2033 Gateway Place, Suite 300
11 San Jose, CA  95110
   Tel:  (408) 660-4120
12 Fax:  (408) 660-4121

13

14 Attorneys for Defendant
   **RICHARD E. DEMARAY**

15

16              **UNITED STATES DISTRICT COURT**

17            **NORTHERN DISTRICT OF CALIFORNIA**

18               **SAN FRANCISCO DIVISION**

19

20 CHRISTOPHER D. WHITE, an individual,    Case No. 3:13-cv-5169 EDL

21           Plaintiff,                    **STIPULATION AND [PROPOSED] ORDER**
                                           **ALLOWING PLAINTIFF CHRISTOPHER D.**
22      v.                                 **WHITE'S TO FILE FIRST AMENDED**
                                           **COMPLAINT**
23 RICHARD E. DEMARAY, an individual,

24           Defendant.

25

26

27

28

1       **WHEREAS** on November 6, 2013, Plaintiff Christopher D. White ("Plaintiff") filed his

2   Complaint alleging both derivative and individualized causes of action against Defendants Richard E.

3   Demaray, Demaray LLC and Antropy, Inc. (nominal defendant) (collectively "Defendants").

4       **WHEREAS** Defendants filed and the Court granted Defendants' Motions to Dismiss and Strike

5   Plaintiff's derivative causes of action, thus leaving only Plaintiff's individualized causes of action

6   remaining in the case.

7       **WHEREAS** Plaintiff seeks to file his First Amended Complaint, which adds a breach of oral

8   contract cause of action and a constructive trust prayer for relief.

9       **WHEREAS** a copy of the Plaintiff's proposed First Amended Complaint is attached hereto as

10   **Exhibit A**.

11       **IT IS HEREBY STIPULATED**, by and between Plaintiff and Defendant, by and through their

12   respective counsel, that:

13       1. Plaintiff should be granted leave to amend to file his First Amended Complaint, a copy of

14   which is attached hereto as **Exhibit A.**

15       2. This stipulation does not prejudice or preclude any future claims or defenses by Defendant

16   against any new or pre-existing causes of action or requests for relief contained in the complaint as

17   amended.

18

19   Dated: February 11, 2014            **GORDON-CREED, KELLEY,**

20                                        **HOLL & SUGERMAN, LLP**

21

22                   By:         */s/ Charlie Y. Chou*

23                                Charlie Y. Chou
                             Attorneys for Plaintiff

24                                CHRISTOPHER D. WHITE

25   Dated: February 11, 2014            **HAYNES AND BOONE, LLP**

26

27                   By:         */s/ Glenn E. Westreich*

28                                Glenn E. Westreich
                             Attorneys for Defendant
                             RICHARD E. DEMARAY

1    I, Charlie Y. Chou, am the ECF User whose ID and password are being used to file this

2    Stipulation.  In compliance with General Order 45, X.B., I hereby attest that Glenn E.

3    Westreich, Hayne and Boone, LLP, counsel for Defendant has concurred in this filing.

4

5    Dated: February 11, 2014                    /s/ *Charlie Y. Chou*_____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## <u>ORDER</u>

3      The Court having reviewed the foregoing Stipulation, and good cause appearing therefore:

4      **IT IS HEREBY ORDERED** that Plaintiff Christopher D. White is granted leave to amend to

5 file his First Amended Complaint, a copy of which is attached hereto as **Exhibit A**.

6      **IT IS FURTHER ORDERED** that the First Amended Complaint is deemed filed as of the date

7 this Order is transmitted via the CM/ECF system.

8

9 IT IS SO ORDERED.

10

11 Dated: _February 11, 2014_

12                                        ELIZABETH D. LAPORTE
                                         United States Magistrate Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



EXHIBIT A

Geoffrey Gordon-Creed, SBN 136188
Jeremy Sugerman, SBN 146315
Charlie Y. Chou, SBN 248369
**GORDON-CREED, KELLEY,**
**HOLL & SUGERMAN, LLP**
222 Kearny Street, Suite 650
San Francisco, CA  94108
Tel:  (415) 421-3100
Fax:  (415) 421-3150

Attorneys for Plaintiff
**CHRISTOPHER D. WHITE**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER D. WHITE, an individual, | Case No. 3:13-cv-5169 EDL |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| RICHARD E. DEMARAY, an individual, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Christopher D. White ("White" or "Plaintiff"), by the undersigned attorneys, submits this First Amended Complaint against Richard E. Demaray ("Demaray" or "Defendant") and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of corporate documents and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

**Statement of the Case**

1.      Plaintiff brings this action against Defendant alleging fraud, breach of written contract, breach of oral contract, negligent misrepresentation, and breach of fiduciary duty – *de facto* partnership.

2.      Plaintiff seeks to recover, among other things, compensatory damages, consequential damages, punitive damages, and the imposition of a constructive trust over the Symmorphix Patents or any consideration (monetary, equity in an organization, or otherwise) Demaray has received for the Symmorphix Patents.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity) in that Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

4.      Venue is proper pursuant to 28 U.S.C. § 1391 because Demaray is a resident of San Mateo County, California.

5.      This Court has personal jurisdiction over Demaray because:  1) Demaray has transacted and continues to transact business in California; 2) the causes of action asserted in this case arose from or are connected with purposeful and tortious acts committed by Demaray, in whole or in part, in California; 3) Demaray has committed torts, directly and indirectly, in whole and in part, that caused substantial harm in California; and/or 4) Demaray has had continuous and systematic contacts with California by engaging in numerous activities that have had an effect in this State.

**Parties**

6.      Plaintiff Christopher D. White is a citizen of the State of Washington.

7.      Upon information and belief, Demaray, was and is at all relevant times hereto, the President, Chief Executive Officer, Director, and majority shareholder of Antropy.  Upon information

and belief, from February 28, 2013 through the present, Demaray was and is the President, owner, and Managing Partner of Demaray LLC.  Upon information and belief, Demaray is a citizen of the State of California.

**Factual Background**

8.      In 2003, Robert White, Christopher White's father, was introduced to Demaray while Robert White was working to acquire intellectual property and technology companies for the Petters Group Worldwide ("PGW").

9.      Upon information and belief, in 2003, Demaray was President of Symmorphix, Inc. ("Symmorphix"), a thin film nanotechnology company that owned a large portfolio of patents and patent applications including patents and patent applications related to thin film energy conversion, nanotechnology, LED, and solar technologies (the "Symmorphix Patents").  A list of the patents and patent applications that constitute the Symmorphix Patents are attached hereto as **Exhibit A** (Executed Purchase Agreement of the Symmorphix Patents and other documents) at 12-17.  **Exhibit A**, in its entirety, is made a part of this Complaint.

10.      Upon information and belief, in 2005 or 2006, at Robert White's recommendation, PGW purchased Symmorphix (including the Symmorphix Patents), through Springworks LLC, PGW's investment arm formed to invest in technology companies.  Shortly after Springworks LLC's acquisition of Symmorphix, Robert White's involvement with both Springworks LLC and Symmorphix ended.

11.      Upon information and belief, Demaray's employment relationship with Symmorphix ended in August of 2007.  Simultaneously, Springworks LLC commenced the process whereby Symmorphix was liquidated and shutdown.

12.      Upon information and belief, in or around August of 2008, Demaray and Robert White reconnected.  Upon information and belief, Demaray sought Robert White's assistance with Antropy Inc. ("Antropy"), a company Demaray had recently formed at that time.  Specifically and upon information and belief, Demaray sought Robert White's help with Antropy's funding, acquiring a license to the Symmorphix Patents, and general business strategy for developing and manufacturing efficient solar panels.

1      13.     Antropy's business strategy focused on monetizing its native intellectual property along
2 with the Symmorphix Patents by developing products and new intellectual property rights.  As such, the
3 Symmorphix Patents were critical for Antropy's business strategy.  In furtherance of its business
4 strategy, Antropy acquired from Demaray an exclusive license to any and all patents that pertain to solar
5 energy that were at any stage of development on December 20, 2009 or are issued at any future date.
6 *See* **Exhibit B** (December 20, 2009 Minutes of Action) at 9.  **Exhibit B** is attached hereto and made a
7 part of this complaint.

8      14.     Lacking sufficient time due to other business obligations, Robert White asked his son,
9 Plaintiff Christopher White, to help Demaray with Antropy's business.  On September 3, 2008, Robert
10 White introduced Demaray to Christopher White.

11      15.     On September 24, 2008, the Federal Bureau of Investigation raided PGW and the homes
12 of its top executives, including Robert White.  As a result of the raid and subsequent convictions of
13 PGW's founder and Chief Executive Officer for investment fraud, Springworks LLC and the
14 Symmorphix Patents, among other PGW assets, were placed in possession of a court-appointed receiver,
15 Douglas Kelley (the "Receiver").

16      16.     In October of 2008, Demaray and Christopher White met to discuss how to move forward
17 with their business venture.  They agreed to work together to obtain capital that would allow them to
18 purchase and then monetize the Symmorphix Patents.  Subsequently, Demaray, who was, at that time,
19 the sole shareholder in Antropy, entered into a business agreement with White wherein Demaray would
20 be President, Chief Executive Officer, and a Director, and would retain 52% ownership of Antropy,
21 while Plaintiff would be appointed Vice President, Secretary, Treasurer, and a Director, and would
22 purchase 48% of the outstanding shares in Antropy.  Consistent with Antropy's business strategy, the
23 acquisition and subsequent monetization of the Symmorphix Patents were critical components of White
24 and Demaray's business relationship.  Demaray's business relationship with White was subsequently
25 memorialized, in part or in whole, in Antropy's December 17, 2009 Minutes of Action and December
26 15, 2009 Action of Incorporator of Antropy Incorporated.  See **Exhibit C** (December 17, 2009 Minutes
27 of Action), attached hereto and made a part of this complaint and **Exhibit D** (December 15, 2009 Action
28 of Incorporator of Antropy Incorporated), attached hereto and made a part of this complaint.

17.     Plaintiff's ownership in Antropy required an amendment to Antropy's Articles of Incorporation so as to permit Antropy to issue additional stock for Plaintiff to purchase.  Indeed, the December 17, 2009 Minutes of Action specifically directs Demaray, as Antropy's President, to file the amended articles of incorporation (which was attached as Exhibit A to the December 17, 2009 Minutes of Action).  *See* **Exhibit C** at 2 (Demaray's direction) and 4-7 (Amended Articles).

18.     Pursuant to the terms of his business relationship with Demaray and as memorialized in the December 17, 2009 Minutes of Action (**Exhibit C**), White attempted to purchase his 48% ownership interest in Antropy on or about October 2010.  Unbeknownst to White at that time, Demaray had purposefully failed to file Antropy's Amended Articles of Incorporation.  As a result, Antropy never issued additional shares for White to purchase.

19.     Despite failing to file Antropy's Amended Articles of Incorporation, Demaray allowed White to work on behalf of their business relationship and benefited therefrom.  For example, White formulated and implemented a business strategy for raising the critical capital needed to purchase the Symmorphix Patents from the Receiver and fund their solar panel manufacturing business.

20.     Between December 2009 through February 2011, White worked diligently, with the understanding that he was an officer, director, and shareholder of Antropy, to secure the financing necessary to purchase the Symmorphix Patents and utilize the Symmorphix Patents.  Many of the financing documents created during this time period reflected White's status as a director and officer with and White's ownership interest in Antropy.

21.     Upon information and belief, around late 2010 or early 2011, Demaray inherited several hundred thousand dollars from his mother's estate.

22.     Between February and March of 2011, while White and Demaray's business venture (*e.g.*, Antropy) was finalizing its initial offer to purchase the Symmorphix Patents from the Receiver, White offered, on several occasions, to contribute money to help fund the purchase.  Demaray was noncommittal towards White's offers.

23.     On March 17, 2011, Antropy submitted its offer to the Receiver to purchase the Symmorphix Patents.  **Exhibit E** (Antropy's March 15, 2012 [sic] offer to purchase the Symmorphix Patents).

24.     Between the time of Antropy's offer to the Receiver to purchase the Symmorphix Patents and the finalization of the sale of the Symmorphix Patents (January 11, 2012), Demaray excluded White from the negotiation process.  Demaray provided only periodic updates consistent with the understanding that Antropy would be purchasing the Symmorphix Patents.  *See* **Exhibit F** (July 28, 2011 Demaray email to White), attached hereto and made a part of this complaint.

25.     On January 11, 2012, the purchase of the Symmorphix Patents was finalized.  Unbeknownst to White, Demaray had excluded Antropy and White from the deal during the negotiation process, and instead had arranged to purchase the Symmorphix Patents for himself.  *See* **Exhibit A** at 4.

26.     On or about May 15, 2012, White received an email from Demaray indicating that Demaray had bought the Symmorphix Patents for himself.  **Exhibit G**, attached hereto and made a part of this Complaint.

27.     On August 16, 2012, White sent a letter to Demaray expressing his concerns regarding the purchase of the Symmorphix Patents.  **Exhibit H**, attached hereto and made a part of the complaint.  Demaray never responded to this letter.

28.     On or about February 2013, White learned of Demaray's plans to abandon his business relationship with White and to form a new company, Demaray LLC, to develop and monetize the Symmorphix Patents.

29.     On April 12, 2013, attorneys representing White (Fredrickson & Byron, P.A.) wrote attorneys representing Demaray (Haynes and Boone) a letter setting forth, in detail, White's allegations against Demaray and requesting that Demaray meet with White regarding a possible resolution.  *See* **Exhibit I**, attached hereto and made a part of the complaint.

30.     On August 9, 2013, Demaray's attorneys responded by denying: 1) White's status as a shareholder, officer, and director of Antropy and 2) Demaray's duty to White.

31.     Upon information and belief, in early 2013, Demaray transferred and/or assigned the Symmorphix Patents to Demaray LLC and, in consideration for said transfer and/or assignment, Demaray received shares (*i.e.*, equity interest) in Demaray LLC.

//

//

1

**FIRST CAUSE OF ACTION**

2

**Fraud**

3       32.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

4       33.     Demaray defrauded White by failing to honor their business relationship.

5       34.     Demaray has made material representations to White as to White's shareholder interests

6   in and status as an officer and director of Antropy.

7       35.     Specifically, Demaray executed the December 17, 2009 Minutes of Action and the

8   December 15, 2009 Action of Incorporator of Antropy Incorporated agreements, which collectively

9   should have made White a shareholder, officer, and director of Antropy.

10      36.     Demaray executed the December 17, 2009 Minutes of Action and the December 15, 2009

11  Action of Incorporator of Antropy Incorporated agreements and represented to White that those two

12  documents were legally valid instruments.  However, Demaray at the time of the agreements' execution

13  or subsequently thereafter, believed and/or knew that the December 17, 2009 Minutes of Action and the

14  December 15, 2009 Action of Incorporator of Antropy Incorporated agreements were not legally valid

15  instruments, were defective, and/or had no intention of effectuating those documents but continued to

16  misrepresent the agreements' legal validity to White.

17      37.     Demaray also made repeated representations, during the relevant time period, that White

18  and Demaray were partners in a business relationship wherein Demaray was 52% owner and White was

19  48% owners and that they would jointly acquire and then subsequently jointly monetize and develop the

20  Symmorphix Patents.

21      38.      Demaray, during the relevant time period, also falsely promised White the opportunity to

22  join, invest in, and share the profits of Antropy and/or their business relationship.

23      39.      Demaray made these intentional misrepresentations to White with the intent that White

24  rely on them, forego his own venture to purchase the Symmorphix Patents by himself, invest significant

25  time and resources developing business plans and private placement memorandums, obtaining potential

26  investors, and otherwise working for the benefit of White and Demaray's business relationship.

27      40.     White's justifiable reliance on Demaray's misrepresentations caused White to suffer

28  damages.

41.     Demaray's fraudulent conduct described herein warrants an imposition of exemplary/punitive damages and a constructive trust over the Symmorphix Patents or any consideration (monetary, equity in an organization, or otherwise) Demaray has received for the Symmorphix Patents.

## SECOND CAUSE OF ACTION

### Breach of Written Contract

42.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

43.     Demaray has breached his written contract with White.

44.     Valid and enforceable contracts exist between Demaray and White.

45.     All condition precedents to White's right to bring this action and to recover the requested relief have been performed, have occurred, or have been waived.

46.     By 1) failing to acknowledge White's rights and privileges as a shareholder, officer, and director in Antropy and Demaray and White's business relationship, as set forth in the December 17, 2009 Minutes of Action and the December 15, 2009 Action of Incorporator of Antropy Incorporated agreements and by 2) purchasing the Symmorphix Patents for himself, Demaray breached his written contracts with White.

47.     As a direct and proximate result of Demaray's breach of the written agreements, White has suffered, and will continue to suffer, damages.

## THIRD CAUSE OF ACTION

### Breach of Oral Contract

48.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

49.     Demaray has breached his oral contract with White.

50.     A valid and enforceable oral contract exists between Demaray and White.

51.     All condition precedents to White's right to bring this action and to recover the requested relief have been performed, have occurred, or have been waived.

52.     In October of 2008, White and Demaray entered into an oral contract.  The terms of the oral contract were that Demaray and White would start a business/partnership wherein the business/partnership would raise capital to purchase and then subsequently develop and monetize the

1  Symmorphix Patents.  The parties agreed that Demaray would be 52% owner and White would be 48%

2  owner of the business/partnership.

3      53.    Demaray, by 1) failing to acknowledge White's rights and privileges as a member/owner

4  of the business/partnership and 2) by purchasing the Symmorphix Patents for himself, has breached his

5  oral contract with White.

6      54.    As a direct and proximate result of Demaray's breach of the oral contract, White has

7  suffered, and will continue to suffer, damages.

8                          **FOURTH CAUSE OF ACTION**

9                          **Negligent Misrepresentation**

10                         (Against Demaray)

11     55.    Plaintiff realleges the preceding paragraphs as if fully set forth herein.

12     56.    Demaray negligently misrepresented material facts to White.

13     57.    Demaray made misrepresentations to White to the effect that White was an officer,

14  director, and/or shareholder in Antropy and that the December 17, 2009 Minutes of Action and the

15  December 15, 2009 Action of Incorporator of Antropy Incorporated agreements were valid and legally

16  binding.

17     58.    Demaray also made repeated representations, during the relevant time period, that White

18  and Demaray were partners in a business relationship wherein Demaray and White would acquire and

19  then subsequently monetize the Symmorphix Patents.

20     59.     Demaray, during the relevant time period, also represented to White that White

21  possessed the opportunity to join, invest in, and share the profits of Antropy and/or their business

22  relationship.

23     60.    Demaray did not exercise reasonable care in communicating this information to White.

24     61.    White justifiably relied on Demaray's misrepresentations in making his decisions as to

25  his investment in and contribution to Antropy and/or their business relationship.

26     62.    Demaray's misrepresentations proximately caused White to suffer damages.

27  //

28  //

1

**FIFTH CAUSE OF ACTION**

2

**Breach of Fiduciary Duty – *De Facto* Partnership**

3

63.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

4

64.     White and Demaray formed and entered into a business partnership to purchase, develop,

5

and monetize the Symmorphix Patents.

6

65.     As partners, a fiduciary relationship existed between Demaray and White.  As a result of

7

such relationship, Demaray owed White a duty of utmost good faith and loyalty, as well as those duties

8

set forth in California Corporations Code § 16404(b) and (c).

9

66.     Demaray breached his fiduciary duty by converting partnership assets and opportunities

10

to his own use, by self dealing, and by stealing from the partnership.

11

67.     On information and belief, and thereupon alleged, Demaray competed with the

12

partnership while he and White were still partners.

13

68.     Demaray knowingly, willfully, and intentionally misappropriated business opportunities

14

that properly belonged to his partnership with White, namely the opportunities to purchase and

15

subsequently develop and monetize the Symmorphix Patents and the associated technologies, defrauding

16

his partner White by making promises he had no intention of performing, and by inducing his partner

17

White to invest significant time and money in a business from which White could not profit, because

18

Demaray was planning to convert partnership assets and opportunities to his own use and to the use of

19

Demaray LLC.

20

69.     Demaray's actions were willful, oppressive, fraudulent, and malicious, and were

21

performed with the intent to harm White.

22

70.     As a direct result of Demaray's breach of his fiduciary duty, White has suffered damages

23

in an amount to be determined at the time of trial.

24

71.     Because Demaray has breached the partnership agreement and violated his duty to the

25

partnership, White is entitled to equitable relief, including, but not limited to, an accounting as to

26

corporate business, enforcement of White's rights under the oral and written partnership agreement, and

27

enforcement of White's property rights in the partnership.

28

72.     Because Demaray's actions were willful, oppressive, fraudulent, and malicious, and were performed with the intent to harm White, White is entitled to an award of punitive damages, in an amount to be determined at time of trial and the imposition of a constructive trust over the Symmorphix Patents or any consideration (monetary, equity in an organization, or otherwise) Demaray has received for the Symmorphix Patents.

## RELIEF REQUESTED

White respectfully requests that this Court enter judgment against the Defendant as follows:

a.      Against Demaray, individually, and in favor of White for the amount of damages sustained by White as a result of Demaray's fraud, breach of written contract, breach of oral contract, negligent misrepresentation, and breach of fiduciary duty;

b.      Extraordinary equitable relief and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including the imposition of a constructive trust over the Symmorphix Patents or any consideration (monetary, equity in an organization, or otherwise) Demaray has received for the Symmorphix Patents;

c.      Awarding Plaintiff restitution from Demaray and ordering the disgorgement of all profits, benefits, and other compensation obtained by Demaray as a result of the conduct alleged herein;

d.      Awarding the Plaintiff the costs of disbursement of the action, including reasonable attorneys; fees, accounts' and experts' fees, costs, and expenses;

e.      Exemplary/Punitive damages; and

f.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.

Dated: February 12, 2014

GORDON-CREED, KELLEY,
HOLL & SUGERMAN, LLP

By:     _____
Charlie Y. Chou
Attorneys for Plaintiff
CHRISTOPHER D. WHITE



# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

                    Plaintiff,

                                            Civil No. 08-05348 ADM/JSM

v.

Thomas Joseph Petters; Petters Company,
Inc., a/k/a PCI; Petters Group Worldwide, LLC;
Deanna Coleman, a/k/a Deanna Munson;
Robert White;
James Wehmhoff;
Larry Reynolds, and/or dba Nationwide International
Resources, aka NIR;
Michael Catain and/or dba Enchanted
Family Buying Company;
Frank E. Vennes, Jr., and/or dba Metro Gem
Finance, Metro Gem, Inc., Grace Offerings
Of Florida, LLC, Metro Property Financing,
LLC, 38 E. Robinson, LLC, 55 E. Pine, LLC,
Orlando Rental Pool, LLC, 100 Pine Street
Property, LLC, Orange Street Tower, LLC,
Cornerstone Rental Pool, LLC, 2 South
Orange Avenue, LLC, Hope Commons, LLC,
Metro Gold, Inc.,

                    Defendants.

Douglas A. Kelley,

                    Receiver,

Gary Hansen,

                    Receiver.

---

## AMENDED DECLARATION OF JEFFREY D. SMITH IN SUPPORT OF MOTION TO AUTHORIZE AND CONFIRM THE SALE OF CERTAIN INTELLECTUAL PROPERTY ASSETS OF SPRINGWORKS, LLC

---

I, Jeffrey D. Smith, state as follows:

      1.    I am an attorney with the law firm of Lindquist & Vennum, P.L.L.P., counsel for Receiver Douglas A. Kelley.  I make this declaration in support of the Receiver's motion to approve and authorize the sale of certain intellectual property assets of Springworks, LLC.

      2.    Attached as <u>Exhibit A</u> is a true and correct copy of the Purchase Agreement entered into by and between Douglas A. Kelley, as the Court-appointed Receiver of Springworks, LLC, and Dr. R. Ernest Demaray dated November 11, 2011, as amended to reflect certain corrections to paragraph 4(b) of the Agreement, which changes have been initialed by the Buyer.  The corrections clarify that that the security interest being granted by the Buyer is in favor of the Seller, not the Buyer, and that it is the Seller's, not the Buyer's, security interest  in the Patent Portfolio and the Investment Account that will terminate upon the payment in full of the Deferred Payments.

DATED:  January 11, 2012

**LINDQUIST & VENNUM P.L.L.P.**

By   /s/ Jeffrey D. Smith
     James A. Lodoen, #0173605
     jlodoen@lindquist.com
     Jeffrey D. Smith, #0387035
     jsmith@lindquist.com

     4200 IDS Center
     80 South 8th Street
     Minneapolis, MN 55402
     (612) 371-3211
     (612) 371-3207 (facsimile)

**ATTORNEYS FOR RECEIVER
DOUGLAS A. KELLEY**

# Exhibit A

11/10/2011

# PURCHASE AGREEMENT

This Purchase Agreement (the "Agreement") is entered into as of this **11** day of November, 2011, by and between R. Ernest Demaray, an individual ("Buyer") and SPRINGWORKS, LLC, a Delaware limited liability company ("Seller"), by and through DOUGLAS A. KELLEY ("Receiver"), as Receiver for Seller appointed and acting pursuant to the Appointment of Receiver dated December 8, 2008, as same may at any time be modified, entered in the United States District Court for the District of Minnesota, Civil Case No. 08-CV-5348 (ADM/JSM) (the "Receivership Case").

WHEREAS, Seller owns certain patents and patent applications related to thin-film technologies, as further described on Exhibit A hereto (the "Patent Portfolio");

WHEREAS, the parties mutually desire that Seller shall sell to Buyer the Patent Portfolio upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.  Purchase. To the extent such exist and are in the possession and control of the Receiver, Seller agrees to, at the Closing provided below, sell and assign to Buyer (and Buyer agrees to purchase at the Closing), Seller's entire right, title, interest, and ownership in: (i) the Patent Portfolio, the inventions covered thereby, and any patents arising therefrom, including any divisions, continuations, continuations-in-part, re-exams, or reissues relating to the inventions claimed in the Patent Portfolio, and the right to sue for pre-transfer infringements, if any, related to any Letters Patents issued or that issue from the Patent Portfolio, and (ii) the Amended and Restated License Agreement dated as of July 31, 2006 (the "License Agreement") with Infinite Power Solutions, Inc., a Delaware corporation ("IPS"), a copy of which License Agreement has been delivered to Buyer's legal counsel. At the Closing the Buyer shall assume the License Agreement and Seller will assign title (subject to the Security Agreement referred to below) to the Patent Portfolio to the Buyer. To the extent there are patents, patent applications, or inventions owned or held by Seller or Receiver that are not listed on Exhibit A, such are not part of the Patent Portfolio and therefore are not sold or assigned to Buyer.

2.  Purchase Price. (a) Total. As and for the total "Purchase Price" of the Patent Portfolio and License Agreement sold and assigned by Seller to Buyer hereunder, Buyer shall at the Closing assume the License Agreement and shall pay to the Receiver, either by check or electronic funds transfer:

   (i)   Fifty Thousand Dollars ($50,000) (the "Initial Payment") upon execution of this Agreement;

   (ii)  Two Hundred Fifty Thousand Dollars ($250,000) (the "Closing Payment") upon the fulfillment of the conditions precedent to closing referred to in Section 5 of this Agreement;

DOCS-#3550876-v9

*RED 1/14*

(iii)   Three Hundred Thousand Dollars ($300,000), which is due and payable to the Receiver in three installments of One Hundred Thousand Dollars ($100,000) each, without interest, on the dates that are twelve (12), eighteen (18) and twenty four (24) months after the Closing Date (as defined below) (each a "Deferred Payment" and collectively the "Deferred Payments"); provided, however, that if the Buyer fails to make any Deferred Payment on the date that it is due, then all Deferred Payments that have not been paid shall become immediately due and payable, and the unpaid amount of all Deferred Payments shall bear interest from the date of such failure until the date of payment, at an interest rate equal to the lower of (x) one and one-half percent (1-1/2%) per month, compounded monthly on the last day of each month, or (y) the highest rate permitted by applicable law; and provided further, that at the Buyer's option, it may prepay any or all of the Deferred Payments, but any partial prepayment shall be applied to the Deferred Payments in the inverse of the order in which they are due (i.e. last to first); and

(iii)   Twenty percent (20%) of the Net Revenue (as defined below) derived by Buyer directly or indirectly from the Patent Portfolio or the License Agreement, or any part thereof, that is received or receivable on or before December 31, 2013, and ten percent (10%) of the Net Revenue derived by Buyer directly or indirectly from the Patent Portfolio or the License Agreement, or any part thereof, that is received or receivable during the twelve months ending December 31, 2014 (in each case, the "Revenue Share").

All payments by Buyer under this Agreement shall be made by wire or electronic bank transfer, and unless the Receiver gives the Buyer written notice as to change in Receiver's account, shall be paid to Receiver's account as follows:

| | |
|---|---|
| Bank: | US Bank National Association<br>Minneapolis, Minnesota |
| ABA Routing No.: | 091000022 |
| Account Number: | ████4582 |
| Account Name: | Springworks LLC in Receivership<br>Douglas A Kelley, Receiver |
| Account Address: | 431 S. Seventh St., Suite 2530<br>Minneapolis, MN 55415 |

(b)   Deposit of Initial Payment.   Upon execution of this Agreement, Buyer shall deposit the Initial Payment into a non-interest bearing escrow with the Receiver, to be held in escrow until the Closing Date or termination of this Agreement as set forth below.   If the conditions precedent set forth below are satisfied, the Initial Payment shall be released to the Seller at the Closing.   If the conditions precedent are not met, the Initial Payment shall be instead refunded to Buyer without interest.

(c)   Certain Definitions.   For purposes of the Revenue Share, the following terms have the meanings indicated:

"Net Revenue" shall mean the gross amount that is directly or indirectly received or receivable by Buyer or its licensees from any of the patents and patent applications that are

*RCW 2/14*

included in the Patent Portfolio, including (i) the sale or license of any patent or patent application that is included in the Patent Portfolio, and (ii) the gross amount invoiced by Buyer or any of its licensees as to for any Product, less (w) transportation charges or allowances, if any, included in such amount, (x) sales commissions actually paid to independent representatives and agents respecting such sales, (y) sales or excise taxes on such receipts which are absorbed by Buyer on such sales, and (z) credits or allowances given or made on account of rejection or return of Products previously delivered. Where a Product is sold or licensed as part of a bundle of goods or services in addition to a Product, a fair and reasonable allocation shall be made between the revenue that is attributable to the Product, and that which is attributable to the other goods or services, and an explanation of the same shall be included in each report to Seller that accompanies a payment to Seller in which such an allocation is made.

"Product" means any product that is covered by (i) the claims in any issued patent that is a part of the Patent Portfolio, or (ii) the claims in any patent that is issued on the basis of a patent application that is a part of the Patent Portfolio. A Product shall be considered to be sold: (x) if sold on open account when delivered to the purchaser or to a common carrier and consigned to the purchaser; (y) when paid for, if paid for in advance of delivery; or (z) if sold on consignment, when paid for or when released from consignment, whichever shall first occur.

(d)  Payment of Revenue Share.  Buyer shall pay Seller the Revenue Share on a quarterly basis for each calendar quarter ending March 31, June 30, September 30 and December 31, beginning December 31, 2011 and continuing to and including December 31, 2014, payable within thirty (30) days after the end of the quarter.  With each quarterly Revenue Share payment Buyer shall submit to Seller a written report setting forth (i) the total Net Revenue and the Net Revenue for each Product, including a description of the number and type of units sold or licensed by Product during the quarter, and (ii) the computation of the Revenue Share for such quarter in U.S. dollars by or certified by an independent Certified Public Accountant. Whenever the date that any payment or report is due under this Agreement falls on a Saturday, Sunday or other date on which banks in the State of Minnesota are authorized to be closed, that payment and report shall instead be due on the following day.

(e)  Record Keeping and Inspection.  Buyer shall keep full and accurate records containing all information reasonably required for the computation and verification of the Revenue Share payable hereunder, which records shall at all reasonable times during business hours be open for periodic inspection by Seller and the Receiver.  If any such inspection reveals an underpayment of the Revenue Share by more than five percent (5%) in any period of four consecutive quarters, then Buyer shall pay to Seller on demand (i) the Seller's estimated internal costs and any out-of-pocket expense incurred by Seller in conducting any inspection during that period, and (ii) interest on each underpayment during that period from the date when it was originally due until the date it is paid at an interest rate equal to the lower of eighteen percent (18%) per annum or the highest rate allowed by law.

(f)  Maintenance and Marketing Undertaking.  Beginning on the Closing Date, and continuing until the earlier of the termination of this Agreement or the expiration of all of the patents included in the Patent Portfolio, the Buyer shall:

RCL 3/14

(i)      actively maintain, and pay any required maintenance fees and other charges that are necessary or appropriate to keep in force, the patents that are included in the Patent Portfolio, and prosecute the patent applications included in the Patent Portfolio; and

(ii)     make its commercially reasonable best efforts to commercialize the intellectual property included in the Patent Portfolio, including entry into licenses and other arrangements to make commercially reasonable best efforts to maximize amounts received or receivable by Buyer that are subject to the Revenue Share.

3.      "As-Is" Transaction.  Buyer is purchasing the Patent Portfolio in an "AS-IS" condition and basis, with all faults, with no express or implied representations or warranties of any kind, including but not limited to the warranty of title, and subject to the rights of IPS under the License Agreement.  Buyer acknowledges for Buyer and its successors and assigns that Buyer has been given a reasonable opportunity to inspect and investigate the Patent Portfolio. Seller in no way shall be liable or responsible to Buyer for any claims or losses relating to the Patent Portfolio, and Buyer waives all such claims and losses, whether known or unknown, now existing or hereafter arising.

4.      Closing. (a) Assignment and Assumption Agreement and Closing Payment.  The sale and purchase under this transaction shall occur (the "Closing") on the first business day that is ten (10) days after the Receiver gives Buyer written notice that the U.S. District Court in the Receivership Case has entered the Order referred to in Section 5(a)(ii) below.  The date of the Closing is referred to herein as the "Closing Date."  At the Closing (i) Buyer shall deliver the Closing Payment to the Receiver, (ii) the Seller and Buyer shall sign and deliver to Buyer the Assignment and Assumption Agreement attached hereto as Exhibit B, and (iii) the Initial Payment being released from escrow to Seller.  Promptly after the Closing, the Buyer shall be entitled to file to record with the U.S. Patent and Trademark Office ("USPTO") an assignment to Buyer of the Patent Portfolio and Seller shall be entitled to file to record with the USPTO the Seller's security interest therein referred to below.

(b)      Security Agreement and Pledge Agreement.  At the Closing the Buyer shall also execute and deliver to Seller to secure Buyer's obligation to make the Deferred Payments (i) a Security Agreement, in form reasonably acceptable to Buyer, granting Buyer a security interest in all of the rights and property being assigned by Seller to Buyer at the Closing, and (ii) a Pledge Agreement in the form attached hereto as Exhibit C granting Seller a security interest in Buyer's Fidelity Investments account no. ███████049 (the "Investment Account"), which account Buyer shall cause to maintain at all times a balance of not less than $150,000 until all of the Deferred Payments have been made.  The Security Agreement and the Pledge Agreement, and the security interests granted under each of them, shall terminate upon the payment in full of the Deferred Payments.  Promptly after the last Deferred Payment has been made, the Seller shall execute and deliver to Buyer such documents as Buyer may reasonably request (i) for filing with the USPTO to record the termination of Buyer's security interest in the Patent Portfolio, and (ii) for filing with Fidelity Investments to terminate Buyer's security interest in the Investment Account.

4

5.    Conditions Precedent to Closing.  (a)  Closing Conditions. The Closing of this Agreement is subject to the conditions precedent that:

(i)    IPS fails to exercise in accordance with its terms the right of first refusal provided in Section 5 of the Settlement Agreement and Mutual Release dated December 18, 2007 between Seller and IPS; and

(ii)    the U.S. District Court in the Receivership Case enters an order approving this Agreement and authorizing the Receiver to close and consummate this Agreement (the "Order").

(b)    IPS Right of First Refusal.  As promptly and practical after the full execution of this Agreement, the Receiver shall deliver to IPS (i) a copy of this signed Agreement, (ii) a separate form of this Purchase Agreement that names IPS as the Buyer and is otherwise the same as this Agreement, except for deletion of the condition precedent referring to IPS, and (iii) a notice offering to enter into that Purchase Agreement with IPS if IPS executes and delivers the Purchase Agreement and pays the Initial Payment to the Receiver within forty five (45) days of such delivery, and stating that if IPS fails to do so it will constitute a failure by IPS to exercise its right of first refusal.  If IPS executes and delivers the Purchase Agreement and pays the Initial Payment to the Receiver within such 45 day period, the Receiver shall so notify the Buyer, return to the Buyer its Initial Payment and this Agreement shall terminate without further liability of the Buyer to the Seller or the Receiver, or of the Seller or the Receiver to the Buyer.

(c)    Application for Court Approval.  Within ten (10) days after the execution of this Agreement, the Receiver shall file a motion in the Receivership Court for entry of the Order approving the sale to Buyer or (if IPS exercises its right of first refusal) to IPS.  If the Receivership Court does not approve the sale to Buyer, or approves a sale to IPS, then the Receiver shall promptly refund the Initial Payment to Buyer without interest and this Agreement shall terminate without further liability of the Buyer to the Seller or the Receiver, or of the Seller or the Receiver to the Buyer.

6.    Documents.  Within forty-five (45) days of the Closing Date, Seller shall make available (and instruct Seller's legal counsel to make available) to Buyer, at locations within Seller's sole discretion, the patent prosecution files (if any), inventor's notebooks, files and miscellaneous materials (if any), in each case relating to the Patent Portfolio that are in the Receiver's or Seller's legal counsel's possession for inspection and copying as Buyer desires, and at Buyer's sole expense, thereby effecting delivery to Buyer to the extent possible of physical possession of the intellectual property constituting the Patent Portfolio.

7.    Indemnification and Defense.  Notwithstanding anything to the contrary herein, following the Closing of the sale of the Patent Portfolio to Buyer, Buyer shall indemnify, defend, and hold Seller, the Receivership, the Receiver, and the entities for which the Receiver has been appointed as receiver or trustee (the "Indemnified Parties"), harmless from all losses and expenses incurred after the Closing Date and arising from, in connection with, or based on any allegation, demand, claim, action, or proceeding by any third party alleging that this Agreement or any of its terms, or any of the assets, documents, or information transferred via this Agreement, infringes (directly or indirectly, contributorily, via inducement, or otherwise),

violates, unlawfully discloses, or misappropriates, any patent, trademark, copyright, trade secret, or other right of any person or entity, asserted by such third party in the same or a related action. This paragraph applies to allegations, demands, claims, actions, or proceedings whether now known or unknown, rightful or not, or existing or hereafter arising. To the extent any Indemnified Party remains in control of witnesses or other information relevant to the defense of a claim, it agrees to reasonably provide such information to Buyer upon Buyer's request and at Buyer's expense.

8.     Notices. All notices, requests, demands or other communications pursuant to this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient, sent to the recipient by reputable overnight courier service (charges prepaid), mailed to the recipient by certified or registered mail (return receipt requested and postage prepaid) or transmitted by facsimile or e-mail (with request for immediate confirmation of receipt in a manner customary for communications of such type and with physical delivery of the communication being made by one of the other means specified in this Section as promptly as practicable thereafter). Such notices, demands and other communications shall be addressed as follows:

If to the Buyer, to :

R. Ernest Demaray
190 Fawn Lane
Portola Valley, CA 94028

If to the Receiver or the Seller, to:

Douglas A. Kelley, Esq.
Kelley, Wolter & Scott, P.A.
2530 Centre Village Offices
431 South 7th Street
Minneapolis, MN 55415

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party (provided that notice of a change of address shall be effective only upon receipt thereof).

9.     Counterparts. This Agreement may be executed in counterparts and by different parties on different counterparts and by facsimile signatures with the same effect as if the signatures thereto were on the same instrument. This Agreement shall be effective and binding upon all parties hereto at such time as all parties have executed and delivered (either physically or electronically) a signed counterpart of this Agreement.

10.     Expenses. Each party shall pay for its own costs and expenses incurred by it or on its behalf in connection with the transactions contemplated hereby, including, without limitation, all fees and disbursements of attorneys, accountants, and financial consultants. Further, upon exchange of the Assignments and Purchase Price on the Closing Date, Seller shall

R&Q 6/14

have no obligations of any kind for any fees, costs, or other expenses, including past due amounts, related to the prosecution, maintenance, or other preservation of the Patent Portfolio and Buyer assumes all such obligations and responsibilities therefore.

11.   Entire Agreement. This Agreement, together with its Exhibits, represents the only agreement among the parties concerning the subject matter hereof and supersedes all prior agreements whether written or oral, relating thereto. No purported amendment, modification, or waiver of any provision hereof shall be binding unless set forth in a written document signed by all parties.

12.   Governing Law, Jurisdiction and Venue. This Agreement shall be deemed to be made and entered into in the State of Minnesota, which State the parties agree has a substantial relationship to the parties and to the underlying transaction. This Agreement shall in all respects be construed and enforced under the internal laws of the State of Minnesota. Any cause of action arising out of the execution or performance of this Agreement, or any alleged breach of this Agreement, shall be venued in a court of competent jurisdiction in the State of Minnesota, to which Buyer hereby irrevocably submits and consents to jurisdiction. Buyer agrees to accept service by mail and waive any defenses with respect to jurisdiction and venue that may otherwise be available, including but not limited to any argument that venue in such forum is not convenient.

13.   Jury Trial Waiver. EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OF IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. FURTHER, EACH PARTY HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS IN ANY WAY REPRESENTED, EXPRESSLY OR OTHERWISE, THAT IN THE EVENT OF SUCH LITIGATION IT WOULD NOT SEEK TO ENFORCE THIS PROVISION.

14.   Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and assigns.

15.   Recitals Incorporated. The Recitals set forth at the beginning of this Agreement constitute part of this Agreement and are specifically incorporated herein.

16.   No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by all of the parties hereto to express their mutual intention and no rule of strict construction will be applied against any party.

*[Signatures are on following page]*

R&Q 7/14

IN WITNESS WHEREOF, the parties hereto have executed this Purchase Agreement as of the date above written.

**SPRINGWORKS, LLC**                           **BUYER:**

By: _____                  _____
Douglas A. Kelley, Receiver                     R. Ernest Demaray (individually)

CASE 0:08-cv-05348-ADM-JSM   Document 2125-1   Filed 01/11/12   Page 10 of 32

11/10/2011

Exhibit A

# SpringWorks LLC - Docket Summary
## (details of pending/issued matters)

| Matter Number  43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00003 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 7/27/05 Appl. No. 11/191,643 **PENDING** | Response to Final OA due 10/11/2011 |
| 00017 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 3/16/02 Appl. No. 10/101,863 Patent No. 7,378,356 **ISSUED - 5/27/08** | **ISSUED - 4th year** maintenance fee due 11/29/2011 |
| 00019 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 9/16/05 Appl. No. 11/228,834 Patent No. 7,544,276 **ISSUED - 6/09/09** | **ISSUED - 4th year** maintenance fee due 12/10/2012 |
| 00020 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 9/16/05 Appl. No. 11/228,717 Patent No. 7,413,998 **ISSUED - 8/19/08** | **ISSUED - 4th year** maintenance fee due 2/21/2012 |
| 00021 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 10/01/04 Appl. No. 10/954,182 Patent No. 7,381,657 **ISSUED - 6/03/08** | **ISSUED - 4th year** maintenance fee due 12/6/2011 |
| 00004 | T. Pan, R. Demaray, Y. Chen, Y. Xie, R. Pethe | Mode size converter for a planar waveguide | US 4/06/05 Appl. No. 11/100,856 **ALLOWED** | **ALLOWED - Notice of** Allowance mailed 6/2/2011; Issue Fee due 9/2/2011 |
| 00015 | T. Pan, R. Demaray, Y. Chen, Y. Xie, R. Pethe | Mode size converter for a planar waveguide | US 03/16/02 Appl. No. 10/101,492 Patent No. 6,884,327 **ISSUED - 4/26/05** | **ISSUED - 8th year** maintenance fee due 10/28/2012 |
| 00005 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | US 5/20/04 Appl. No. 10/850,968 **PENDING** | Response to OA due 9/14/2011 |
| 00040 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | China 5/21/04 Appl. No. 200480020874.8 **ALLOWED** | **ALLOWED** - Registration fee and 8th year annuity due 9/14/2011 |

R22 9/14

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00041 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | EPO 5/21/04 Appl. No. 04751753.7 **PENDING** | Response to first Examination Report due 9/27/2011; next annuity due 5/31/2012 |
| 00042 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | Taiwan 5/21/04 Appl. No. 93114517 **ALLOWED** | **ALLOWED** - Sealing fee and 1st year annuity due 11/21/2011 |
| 00043 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides | PCT 5/21/04 Appl. No. PCT/US2004/014523 **COMPLETED** | |
| 00006 | R. Demaray, V. Milonopoulou | Low temperature zirconia based thermal barrier layer by PVD | US 11/08/02 Appl. No. 10/291,179 Patent No. 7,404,877 **ISSUED** - 7/29/08 | ISSUED - 4th year maintenance fee due 1/30/2012 |
| 00008 | R. Demaray, K. Wang, R. Mullapudi, D. Stadtler, H. Zhang, R. Pethe | Planar optical devices and methods for their manufacture | US 07/10/01 Appl. No. 09/903,050 Patent No. 6,506,289 **ISSUED** - 1/14/03 | ISSUED – 12th year maintenance fee due 7/14/2014 |
| 00009 | R. Demaray, K. Wang, R. Mullapudi, D. Stadtler, H. Zhang, R. Pethe | Planar optical devices and methods for their manufacture | US 11/14/00 Appl. No. 10/288,278 Patent No. 6,827,826 **ISSUED** - 12/07/04 | ISSUED - 8th year maintenance fee due 6/8/2012 |
| 00013 | R. Demaray, J. Shan, K. Wang, R. Mullapudi | Method of Producing amorphous silicon for hard mask and waveguide applications | US 01/19/01 Appl. No. 09/766,463 Patent No. 6,533,907 **ISSUED** - 3/18/03 | ISSUED – 12th year maintenance fee due 9/18/2014 |
| 00014 | R. Demaray, K. Wang, R. Mullapudi, Q. Zhu, H. Zhang, H. Ackler, J. Egermeier, R. Pethe | As-deposited planar optical waveguides with low scattering loss and methods for their manufacture | US 07/10/01 Appl. No. 09/903,081 Patent No. 7,469,558 **ISSUED** - 12/30/08 | ISSUED - 4th year maintenance fee due 7/2/2012 |
| 00022 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | US 8/27/03 Appl. No. 10/650,461 Patent No. 7,826,702 **ISSUED** - 11/2/10 | ISSUED - 4th year maintenance fee due 5/2/2014 |

R&D 10/14

| Matter Number | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| *43668* | | | | |
| 00023 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | Taiwan 8/27/03 Patent No. I274199 ISSUED - 2/21/07 | ISSUED -- Next annuity due 2/21/2012 |
| 00024 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | PCT 8/27/03 Appl. No. PCT/US2003/024809 COMPLETED | |
| 00025 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | US 2/26/04 Appl. No. 10/789,953 Patent No. 7,205,662 ISSUED - 4/17/07 | ISSUED - 8th year maintenance fee due 10/17/2014 |
| 00026 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | China - 2/26/04 Appl. No. 200480005515.5 ALLOWED | ALLOWED - Registration fee and 8th year annuity paid 8/12/2011; next annuity due 2/26/2012 Awaiting issued letters patent |
| 00027 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | EPO 2/26/04 Appl. No. 04715009.9 PENDING | Response to first Examination Report filed 3/8/2011; next annuity due 2/28/2012 Awaiting next action |
| 00028 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Korea - 2/26/04 Appl. No. 10-2005-7016055 Patent. No. 0691168 ISSUED | ISSUED - 5th year annuity due 2/28/2012 |
| 00029 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Singapore 2/26/04 Appl. No. WO 2004/077519 Patent No. 114328 ISSUED - 9/28/07 | ISSUED - 9th year annuity due 2/26/2012 |
| 00030 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Taiwan 5/21/04 Appl. No. 93114493 Patent No. I334194 ISSUED - 12/1/10 | ISSUED -- 2nd annuity due 11/30/2011 |
| 00031 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | PCT 2/26/04 Appl. No. PCT/US2004/005531 COMPLETED | |

DOCS-#3550876-v9

RZD 11/14
11-11-11-11

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00032 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | US 9/16/05 Appl. No. 11/228,805 Patent No. 7,262,131 ISSUED - 8/28/07 | ISSUED – 8th year maintenance fee due 3/2/2015 |
| 00033 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Film | Taiwan 2/27/04 Appl. No. 93105204 PENDING | Response to OA filed 5/24/2011 Awaiting next action |
| 00034 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | US 5/20/04 Appl. No. 10/851,542 Patent No. 7,238,628 ISSUED - 7/3/07 | ISSUED – 8th year maintenance fee due 1/5/2015 |
| 00035 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | China 1/20/06 Appl. No. 200480021078.6 PENDING | Appeal to Rejection Decision with Request for Re-Examination filed 5/18/2010 Awaiting next action |
| 00036 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | EPO 5/21/04 Appl. No. 04751754.5 PENDING | Response to first Examination Report filed; next annuity due 5/31/2012 |
| 00037 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | Taiwan 5/21/04 Appl. No. 93114518 Patent No. I338338 ISSUED – 3/1/11 | ISSUED – 3rd Annuity due 2/28/2013 |
| 00038 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | PCT 5/21/04 Appl. No. PCT/US2004/014524 COMPLETED | |
| 00039 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | US 3/22/07 Appl. No. 11/726,972 ALLOWED | ALLOWED – Issue fee and Publication fee due 11/8/2011 |
| 00044 | H. Zhang, R. Demaray, M. Shao | Low Temperature, High Rate Deposition | US 12/07/05 Appl. No. 11/297,057 PENDING | RCE filed 8/8/2011 Awaiting next action |
| 00049 | H. Zhang, R. Demaray | Low Temperature, High Rate Deposition | Taiwan 12/07/05 Appl. No. 94143175 ALLOWED | ALLOWED - Sealing fee and 1st year annuity due paid 7/1/2011 Awaiting patent certificate |

DEQ 12/14

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00045 | H. Zhang, R. Demaray | Deposition of LiCO2 | China 12/07/05 Appl. No. 200580042305.8 Patent No. ZL200580042305.8 ISSUED – 9/22/10 | ISSUED - 7th year annuity due 12/7/2011 |
| 00077 | H. Zhang, R. Demaray | Deposition of LiCO2 | China 5/11/10 Appl. No. 201010161517.0 PENDING | Response to 1st OA due 10/17/2011 |
| 00046 | H. Zhang, R. Demaray | Deposition of LiCO2 | EPO 12/07/05 Appl. No. 05853649.1 COMPLETED | COMPLETED |
| 00073 | H. Zhang, R. Demaray | Deposition of LiCO2 | France | Annuity due 12/31/2011 |
| 00074 | H. Zhang, R. Demaray | Deposition of LiCO2 | Germany | Annuity due 12/31/2011 |
| 00075 | H. Zhang, R. Demaray | Deposition of LiCO2 | Italy | Annuity due 12/31/2011 |
| 00076 | H. Zhang, R. Demaray | Deposition of LiCO2 | Great Britain | Annuity due 12/31/2011 |
| 00047 | H. Zhang, R. Demaray | Deposition of LiCO2 | Japan 6/06/07 Appl. No. 2007-545692 PENDING | Request for Examination filed 5/1/2008 Awaiting next action |
| 00048 | H. Zhang, R. Demaray | Deposition of LiCO2 | Korea 6/26/07 Appl. No. 10-2007-7014536 Patent No. 10-1021536 ISSUED – 3/4/11 | ISSUED - 4th year annuity Due = 3/4/2014 |
| 00050 | H. Zhang, R. Demaray | Deposition of LiCO2 | PCT 12/7/05 Appl. No. PCT/US2005/044781 COMPLETED | COMPLETED |
| 00053 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | US 9/02/05 Appl. No. 11/218,652 Patent No. 7,838,133 ISSUED – 11/23/10 | ISSUED - 4th year maintenance fee due = 5/23/2014 |
| 00054 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | China 8/24/06 Appl. No. 200680039671.2 PENDING | Proposed amendments for response to 1st OA forwarded to FC on 8/4/2011 |
| 00055 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | EPO 8/24/06 Appl. No. 06790009.2 PENDING | Next annuity due = 8/24/2012 Awaiting next action |

DOCS-#3550876-v9

| Matter Number 13668 | Inventors | Patent Title | Country / Filing Date / Serial- Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00056 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | Singapore 8/24/06 Appl. No. 2008017493 Patent No. 140421 **ISSUED – 8/31/10** | ISSUED - Next annuity due = 8/24/2012 |
| 00057 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | Taiwan 8/24/06 Appl. No. 95131196 **PENDING** | Request for Examination filed 8/24/2009 Awaiting next action |
| 00058 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | PCT 8/24/06 Appl. No. PCT/US2006/033315 **COMPLETED** | |
| 00061 | R. Demaray | Monolithic Sputter Target Backing Plate with Integrated Cooling Passages | PCT 8/02/06 Appl. No. PCT/US2006/030020 **COMPLETED** | |

DOCS-#3550876-v9

RSD 14/14 g.e.d.

11/10/2011

Exhibit B

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement is made as of _____, 20__ pursuant to the terms of a Purchase Agreement dated as of _____, 2011 (the "Purchase Agreement") between SpringWorks, LLC, a Delaware limited liability company ("Seller") and R. Ernest Demaray, an individual ("Buyer").

WHEREAS, Seller and Buyer is desirous of consummating the Purchase Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises set forth below, the parties agree as follows:

1. <u>Assignment</u>. Seller hereby sells and assigns to Buyer, without warranty or recourse, all of Seller's right, title and interest in (i) the patents and patent applications indentified on the attached Schedule A (the "Patent Portfolio"), including the right to sue for past, present and future infringements, if any, and to recover damages or profits arising from infringement of any such patents, whether occurring prior to or after this date, and (ii) the Amended and Restated License Agreement dated as of July 31, 2006 (the "License Agreement") with Infinite Power Solutions, Inc., in each case to have and to hold forever, to Buyer and its successors and assigns. Seller hereby constitutes and appoints Buyer and its successors and assigns as the attorney in fact of Seller with full power of substitution, to institute and prosecute, in the name of and for the benefit of Buyer, and at Buyer's expense, all proceedings which Buyer may deem desirable in connection with the Patent Portfolio and License Agreement. Seller agrees that, at any time and from time to time after the delivery hereof, Seller will, upon the reasonable request of Buyer and at Buyer's expense, take all action and execute and deliver all documents, instruments and conveyances of any kind that may be reasonably requested by Buyer to carry out the provisions of this Assignment and Assumption Agreement.

2. <u>Assumption of License</u>.  Buyer hereby assumes, and agrees to perform in accordance with its terms, the License Agreement.  Buyer agrees that Seller shall have no further rights or obligations under the License Agreement and agrees to defend an indemnify Seller with respect to any claims, demands or actions arising on or after the date hereof under or in connection with the License Agreement.

3. <u>General</u>.  This Assignment and Assumption Agreement is delivered pursuant to the Purchase Agreement and is subject in all respects to the terms of the Purchase Agreement.

*[Signatures are on following page]*

R Eal 15/31

IN WITNESS WHEREOF, Seller and Buyer have executed this Assignment and Assumption Agreement as of the date first written above.

**SPRINGWORKS, LLC**                  · **BUYER:**

By:_____          _____
      Douglas A. Kelley, Receiver                    R. Ernest Demaray (individually)

R9D 16/31

11/10/2011

Schedule A to Assignment and Assumption Agreement

## SpringWorks LLC - Docket Summary (details of pending/issued matters)

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00003 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 7/27/05 Appl. No. 11/191,643 PENDING | Response to Final OA due 10/11/2011 |
| 00017 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 3/16/02 Appl. No. 10/101,863 Patent No. 7,378,356 ISSUED - 5/27/08 | ISSUED - 4th year maintenance fee due 11/29/2011 |
| 00019 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 9/16/05 Appl. No. 11/228,834 Patent No. 7,544,276 ISSUED - 6/09/09 | ISSUED - 4th year maintenance fee due 12/10/2012 |
| 00020 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 9/16/05 Appl. No. 11/228,717 Patent No. 7,413,998 ISSUED - 8/19/08 | ISSUED - 4th year maintenance fee due 2/21/2012 |
| 00021 | H. Zhang, M. Narasimhan, R. Mullapudi, R. Demaray | Biased pulse DC reactive sputtering of oxide films | US 10/01/04 Appl. No. 10/954,182 Patent No. 7,381,657 ISSUED - 6/03/08 | ISSUED - 4th year maintenance fee due 12/6/2011 |
| 00004 | T. Pan, R. Demaray, Y. Chen, Y. Xie, R. Pethe | Mode size converter for a planar waveguide | US 4/06/05 Appl. No. 11/100,856 ALLOWED | ALLOWED - Notice of Allowance mailed 6/2/2011; Issue Fee due 9/2/2011 |
| 00015 | T. Pan, R. Demaray, Y. Chen, Y. Xie, R. Pethe | Mode size converter for a planar waveguide | US 03/16/02 Appl. No. 10/101,492 Patent No. 6,884,327 ISSUED - 4/26/05 | ISSUED - 8th year maintenance fee due 10/28/2012 |
| 00005 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | US 5/20/04 Appl. No. 10/850,968 PENDING | Response to OA due 9/14/2011 |
| 00040 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | China 5/21/04 Appl. No. 200480020874.8 ALLOWED | ALLOWED - Registration fee and 8th year annuity due 9/14/2011 |

DOCS-#3550876-v9

R4D 17/31

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00041 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | EPO 5/21/04 Appl. No. 04751753.7 **PENDING** | Response to first Examination Report due 9/27/2011; next annuity due 5/31/2012 |
| 00042 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides from a Metallic Target | Taiwan 5/21/04 Appl. No. 93114517 **ALLOWED** | **ALLOWED** - Sealing fee and 1st year annuity due 11/21/2011 |
| 00043 | R. Demaray, M. Narasimhan | Transparent Conductive Oxides | PCT 5/21/04 Appl. No. PCT/US2004/014523 **COMPLETED** | |
| 00006 | R. Demaray, V. Milonopoulou | Low temperature zirconia based thermal barrier layer by PVD | US 11/08/02 Appl. No. 10/291,179 Patent No. 7,404,877 **ISSUED - 7/29/08** | ISSUED - 4th year maintenance fee due 1/30/2012 |
| 00008 | R. Demaray, K. Wang, R. Mullapudi, D. Stadtler, H. Zhang, R. Pethe | Planar optical devices and methods for their manufacture | US 07/10/01 Appl. No. 09/903,050 Patent No. 6,506,289 **ISSUED - 1/14/03** | ISSUED - 12th year maintenance fee due 7/14/2014 |
| 00009 | R. Demaray, K. Wang, R. Mullapudi, D. Stadtler, H. Zhang, R. Pethe | Planar optical devices and methods for their manufacture | US 11/14/00 Appl. No. 10/288,278 Patent No. 6,827,826 **ISSUED - 12/07/04** | ISSUED - 8th year maintenance fee due 6/8/2012 |
| 00013 | R. Demaray, J. Shan, K. Wang, R. Mullapudi | Method of Producing amorphous silicon for hard mask and waveguide applications | US 01/19/01 Appl. No. 09/766,463 Patent No. 6,533,907 **ISSUED - 3/18/03** | ISSUED - 12th year maintenance fee due 9/18/2014 |
| 00014 | R. Demaray, K. Wang, R. Mullapudi, Q. Zhu, H. Zhang, H. Ackler, J. Egermeier, R. Pethe | As-deposited planar optical waveguides with low scattering loss and methods for their manufacture | US 07/10/01 Appl. No. 09/903,081 Patent No. 7,469,558 **ISSUED - 12/30/08** | ISSUED - 4th year maintenance fee due 7/2/2012 |
| 00022 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | US 3/27/03 Appl. No. 10/650,461 Patent No. 7,826,702 **ISSUED - 11/2/10** | ISSUED - 4th year maintenance fee due 5/2/2014 |
| 00023 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | Taiwan 8/27/03 Patent No. I274199 **ISSUED - 2/21/07** | ISSUED – Next annuity due 2/21/2012 |

RED 18/31

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00024 | D. Dawes | Optical Coupling into Highly Uniform Waveguides | PCT 8/27/03 Appl. No. PCT/US2003/024809 **COMPLETED** | |
| 00025 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | US 2/26/04 Appl. No. 10/789,953 Patent No. 7,205,662 **ISSUED - 4/17/07** | ISSUED - 8th year maintenance fee due 10/17/2014 |
| 00026 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | China - 2/26/04 Appl. No. 200480005515.5 **ALLOWED** | **ALLOWED** - Registration fee and 8th year annuity paid 8/12/2011; next annuity due 2/26/2012 Awaiting issued letters patent |
| 00027 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | EPO 2/26/04 Appl. No. 04715009.9 **PENDING** | Response to first Examination Report filed 3/8/2011; next annuity due 2/28/2012 Awaiting next action |
| 00028 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Korea - 2/26/04 Appl. No. 10-2005-7016055 Patent No. 0691168 **ISSUED** | ISSUED - 6th year annuity due 2/28/2012 |
| 00029 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Singapore 2/26/04 Appl. No. WO 2004/077519 Patent No. 114328 **ISSUED - 9/28/07** | ISSUED - 9th year annuity due 2/26/2012 |
| 00030 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | Taiwan 5/21/04 Appl. No. 93114493 Patent No. 1334194 **ISSUED - 12/1/10** | ISSUED - 2nd annuity due 11/30/2011 |
| 00031 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | PCT 2/26/04 Appl. No. PCT/US2004/005531 **COMPLETED** | |
| 00032 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Films | US 9/16/05 Appl. No. 11/228,805 Patent No. 7,262,131 **ISSUED - 8/28/07** | ISSUED - 8th year maintenance fee due 3/2/2015 |

3

RLD   19/31

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00033 | M. Narasimhan, P. Brooks, R. Demaray | Dielectric Barrier Layer Film | Taiwan 2/27/04 Appl. No. 93105204 **PENDING** | Response to OA filed 5/24/2011 Awaiting next action |
| 00034 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | US 5/20/04 Appl. No. 10/851,542 Patent No. 7,238,628 **ISSUED - 7/3/07** | ISSUED – 8th year maintenance fee due 1/5/2015 |
| 00035 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | China 1/20/06 Appl. No. 200480021078.6 **PENDING** | Appeal to Rejection Decision with Request for Re-Examination filed 5/18/2010 Awaiting next action |
| 00036 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | EPO 5/21/04 Appl. No. 04751754.5 **PENDING** | Response to first Examination Report filed; next annuity due 5/31/2012 |
| 00037 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | Taiwan 5/21/04 Appl. No. 93114518 Patent No. 1338338 **ISSUED – 3/1/11** | ISSUED – 3rd Annuity due 2/28/2013 |
| 00038 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | PCT 5/21/04 Appl. No. PCT/US2004/014524 **COMPLETED** | |
| 00039 | R. Demaray, H. Zhang, M. Narasimhan, V. Milonopoulou | Energy Conversion and Storage Devices by Physical Vapor Deposition of Titanium and Titanium Oxides and Sub-Oxides | US 3/22/07 Appl. No. 11/726,972 **ALLOWED** | ALLOWED – Issue fee and Publication fee due 11/8/2011 |
| 00044 | H. Zhang, R. Demaray, M. Shao | Low Temperature, High Rate Deposition | US 12/07/05 Appl. No. 11/297,057 **PENDING** | RCE filed 8/8/2011 Awaiting next action |

*RdD 20/31*

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00049 | H. Zhang, R. Demaray | Low Temperature, High Rate Deposition | Taiwan 12/07/05 Appl. No. 94143175 **ALLOWED** | **ALLOWED** - Sealing fee and 1st year annuity due paid 7/1/2011 Awaiting patent certificate |
| 00045 | H. Zhang, R. Demaray | Deposition of LiCO2 | China 12/07/05 Appl. No. 200580042305.8 Patent No. ZL200580042305.8 **ISSUED – 9/22/10** | **ISSUED** - 7th year annuity due 12/7/2011 |
| 00077 | H. Zhang, R. Demaray | Deposition of LiCO2 | China 5/11/10 Appl. No. 201010161517.0 **PENDING** | Response to 1st OA due 10/17/2011 |
| 00046 | H. Zhang, R. Demaray | Deposition of LiCO2 | EPO 12/07/05 Appl. No. 05853649.1 **COMPLETED** | **COMPLETED** |
| 00073 | H. Zhang, R. Demaray | Deposition of LiCO2 | France | Annuity due 12/31/2011 |
| 00074 | H. Zhang, R. Demaray | Deposition of LiCO2 | Germany | Annuity due 12/31/2011 |
| 00075 | H. Zhang, R. Demaray | Deposition of LiCO2 | Italy | Annuity due 12/31/2011 |
| 00076 | H. Zhang, R. Demaray | Deposition of LiCO2 | Great Britain | Annuity due 12/31/2011 |
| 00047 | H. Zhang, R. Demaray | Deposition of LiCO2 | Japan 6/06/07 Appl. No. 2007-545692 **PENDING** | Request for Examination filed 5/1/2008 Awaiting next action |
| 00048 | H. Zhang, R. Demaray | Deposition of LiCO2 | Korea 6/26/07 Appl. No. 10-2007-7014536 Patent No. 10-1021536 **ISSUED – 3/4/11** | **ISSUED** - 4th year annuity due = 3/4/2014 |
| 00050 | H. Zhang, R. Demaray | Deposition of LiCO2 | PCT 12/7/05 Appl. No. PCT/US2005/044781 COMPLETED | |
| 00053 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | US 9/02/05 Appl. No. 11/218,652 Patent No. 7,838,133 **ISSUED – 11/23/10** | ISSUED - 4th year maintenance fee due = 5/23/2014 |

RCD 21/31

| Matter Number 43668 | Inventors | Patent Title | Country / Filing Date / Serial-Patent No. / Pending-Allowed-Issued | Status |
|---|---|---|---|---|
| 00054 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | China 8/24/06 Appl. No. 200680039671.2 PENDING | Proposed amendments for response to 1st OA forwarded to FC on 8/4/2011 |
| 00055 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | EPO 8/24/06 Appl. No. 06790009.2 PENDING | Next annuity due = 8/24/2012  Awaiting next action |
| 00056 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | Singapore 8/24/06 Appl. No. 2008017493 Patent No. 140421 ISSUED – 8/31/10 | ISSUED – Next annuity due = 8/24/2012 |
| 00057 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | Taiwan 8/24/06 Appl. No. 95131196 PENDING | Request for Examination filed 8/24/2009  Awaiting next action |
| 00058 | H. Zhang, R. Demaray | Deposition of Perovskite and Other Compound Ceramic Films for Dielectric Applications | PCT 8/24/06 Appl.No. PCT/US2006/033315 COMPLETED | |
| 00061 | R. Demaray | Monolithic Sputter Target Backing Plate with Integrated Cooling Passages | PCT 8/02/06 Appl. No. PCT/US2006/030020 COMPLETED | |

RSD 22/31

11/10/2011

<u>Schedule B to Assignment and Assumption Agreement</u>

<u>Symmorphix License to Infinite Power Solutions (IPS)</u>

DOCS-#3550876-v9

Red 23/31

Exhibit C

<u>Pledge Agreement with Fidelity Investments</u>

Rew 24/31

# NEW ACCOUNT APPLICATION
# TO PLEDGE MUTUAL FUND SHARES

Use this form to pledge Fidelity Mutual Fund shares only. Certain types of registrations are ineligible to be placed in the pledged account (see Section 4).

**Complete all the sections. We require a signature guarantee in Section 7 for both the registered owners and the Lending Party's representative.**

The information you authorize on this form will supersede any trading instructions already on the existing account(s). If you have any questions, call us anytime at **800.544.6666** or visit us at **Fidelity.com.**

**Return the completed form to:**
**Fidelity Investments, PO Box 770001, Cincinnati, OH 45277-0039**

---

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT**

To help the government fight the funding of terrorism and money-laundering activities, federal law requires Fidelity to verify your identity by obtaining your name, date of birth, address, and a government-issued identification number before opening your account. In certain circumstances, Fidelity may obtain and verify this information with respect to any person(s) authorized to effect transactions in an account. For certain entities, such as trusts, estates, corporations, partnerships, or other organizations, identifying documentation is also required. Your account may be restricted and/or closed if Fidelity cannot verify this information. Fidelity will not be responsible for any losses or damages (including but not limited to lost opportunities) resulting from any failure to provide this information, or from any restriction placed upon, or closing of, your account.

---

## 1  ACCOUNT OWNER

**Full legal name** _____
First Name                     Middle Name                     Last Name

**Date of birth (mm/dd/yyyy)** _____    **E-mail address** _____

**Social Security number** _____    **or Taxpayer ID number** _____

**Permanent address** _____
(no P.O. boxes)    Street                                        City                     State        ZIP

**Mailing address** _____
(if different from above)    Street                                City                     State        ZIP

**Phone numbers**  Evening _____    Daytime _____    Ext. _____

**Country of citizenship**  U.S.  Other _____    **Country of tax residence**  U.S.  Other _____

---

**GOVERNMENT ID** (FOREIGN CITIZENS ONLY). Identification document must have a reference number and photo. Please attach a photocopy.

**Place of birth** _____
City                                   State/Province                     Country

**Immigration status**   Permanent resident   Non-permanent resident   Non-resident

**Check which type of document you are providing:**

 U.S. driver's license     DHS permanent resident alien card    Passport with U.S. visa     Employment Authorization Document

 Passport without U.S. visa*                                    Bank name required    *Account number required

 Foreign national identity document*                            Bank address required    Phone number required

**Document number and country of issuance** _____ (number from the document checked above)

---

005010301

RWD 25/31

New Account Application to Pledge Mutual Fund Shares  p. 2 of 7

## 1 ACCOUNT OWNER (CONTINUED)

Employment status    Employed    Not employed    Retired    Occupation _____
(if retired or not employed, indicate source of income)

Self-Employed: Check this box if you are self-employed and your company corporate address is the same as your legal home address.
Please initial here that you work out of your home. _____

Employer's name and address _____
Name               Street               City          State      ZIP

### ASSOCIATIONS

Check this box if you are associated with, or employed by, a stock exchange or a member firm of an exchange or FINRA, a municipal securities dealer, or by Fidelity. If you checked the box, obtain and attach the compliance officer's letter of approval ("407 letter") and indicate the name and address of the entity with which you are associated below. Failure to include an approval letter may delay the processing of your request. We must tell the associated entity you have applied for this account. An account approval letter is not required for Fidelity employees.

Check here if your association information is the same as your employer. (If you checked this box, you are not required to complete the information below.)

Associated entity name _____

Address _____    City _____    State _____    ZIP _____

Check this box if you are a control person associated with either (a) another member, (b) a member organization, or (c) an immediate family/household member of a control person, or are associated with a publicly traded company under SEC Rule 144 (this would include, but is not limited to, a director, 10% shareholder, policy-making officer, and members of the board of directors).

Trading symbol _____    Company _____

## 2 JOINT ACCOUNT OWNER

We assume the permanent address is the same unless otherwise noted

Check this box if a joint owner has a different address and you would like duplicate copies of the confirmation of the new account profile, confirmation of changes to the investment objectives, and the triannual account profile confirmation sent to that separate address.

Full legal name _____
First Name               Middle Name               Last Name

Date of birth (mm/dd/yyyy) _____    E-mail address _____

Social Security number _____    or Taxpayer ID number _____

Permanent address _____
(no P.O. boxes)   Street               City          State      ZIP

Mailing address _____
(if different from above)   Street               City          State      ZIP

Phone numbers  Evening _____    Daytime _____    Est. _____

Country of citizenship    U.S.    Other(s) _____    Country of tax residence    U.S.    Other _____

Employment status    Employed    Not employed    Retired    Occupation _____
(if retired or not employed, indicate source of income)

Self-Employed: Check this box if you are self-employed and your company corporate address is the same as your legal home address.
Please initial here that you work out of your home. _____

Employer's name and address _____
Name               Street               City          State      ZIP

005010302

26/31

New Account Application to Pledge Mutual Fund Shares p. 3 of 7

## 2  JOINT ACCOUNT OWNER (CONTINUED)

**GOVERNMENT ID**  (FOREIGN CITIZENS ONLY)  Identification document must have a reference number and photo. Please attach a photocopy.

Place of birth _____
City _____ State/Province _____ County _____

Immigration status : ___ Permanent resident ___ Non-permanent resident : ___ Non-resident

Check which type of document you are providing:

Employment
Authorization Document

___ U.S. driver's license   ___ DHS permanent resident alien card   ___ Passport with U.S. visa

___ Passport without U.S. visa*

___ Foreign national identity document*   *Bank name required         *Account number required

Document number and country of issuance _____
*Bank address required         *Phone number required
(Number from the document checked above)

### ASSOCIATIONS

: Check this box if you are associated with, or employed by, a stock exchange or a member firm of an exchange or FINRA, a municipal securities dealer, or by Fidelity. If you checked the box, obtain and attach the compliance officer's letter of approval ("407 letter") and indicate the name and address of the entity with which you are associated below. Failure to include an approval letter may delay the processing of your request. We must tell the associated entity you have applied for this account. An account approval letter is not required for Fidelity employees.

| Check here if your association information is the same as your employer. (If you checked this box, you are not required to complete the information below.)

Associated entity name _____

Address _____ City _____ State _____ ZIP _____

: Check this box if you are a control person associated with either (a) another member, (b) a member organization, or (c) an immediate family/household member of a control person, or are associated with a publicly traded company under SEC Rule 144 (this would include, but is not limited to, a director, 10% shareholder, policy-making officer, and members of the board of directors).

Trading symbol _____   Company _____

## 3  LENDING PARTY INFORMATION

Name of Lender

Lender Employer (Tax) Identification Number (EIN)

Lending Party Representative

Lending Party Representative's Title

Permanent Address   Street _____   City _____   State ____   ZIP ____
(no P.O. boxes)

Mailing Address   Street _____   City _____   State ____   ZIP ____
(if different from above)

Daytime Phone _____   Ext. ____

RED 27/31

New Account Application to Pledge Mutual Fund Shares  p. 4 of 7

## 4  INDICATE HOW YOU WILL FUND YOUR PLEDGE ACCOUNT

Fidelity mutual fund shares may be pledged in all registration types except retirement, HSA, custodial (UGMA/UTMA) and trust registrations. Indicate the account number(s) where the shares are held that you wish to pledge, the Fidelity fund name, and the number of shares to be pledged below. If pledging additional Fidelity fund positions, please attach a sheet of paper with the information indicated below.

| Fidelity Account Number(s) | Fund Name(s) | Number of Shares | Or Entire Mutual Fund Balance |
|---|---|---|---|
| | | | ☐ All |
| | | | ☐ All |
| | | | ☐ All |

## 5  FINANCIAL PROFILE (REQUIRED)

### YOUR INVESTMENT OBJECTIVE

You should choose your investments based on your objectives, time frame, and tolerance for market fluctuation. From short-term liquid investments that seek to preserve capital (accepting the lowest returns in exchange for stability) to longer-term investments that seek maximum growth (but can tolerate very wide fluctuations in market values), you can choose an approach that's best for you. Simply check the box below that most closely matches your investment objective. For joint accounts, please provide combined information.

**Check one profile. (Determine your profile using the information below.)**



SAMPLE PORTFOLIO MIX

Asset Class
☐ Short-Term
☐ Foreign Stocks
☐ U.S. Domestic Stocks
☐ Bonds

Short-Term — You seek to preserve your capital and can accept the lowest returns in exchange for price stability.
Conservative — You seek to minimize fluctuations in market values by taking an income-oriented approach with some potential for capital appreciation (minimum required for writing covered call options)
Balanced — You seek the potential for capital appreciation and some income and can withstand moderate fluctuations in market value.
Growth — You have a preference for growth and can withstand significant fluctuations in market value.
Aggressive Growth — You seek aggressive growth and can tolerate wide fluctuations in market values, especially over the short term.
Most Aggressive — You seek very aggressive growth and can tolerate very wide fluctuations in market values, especially over the short term (required for options strategies other than writing covered call options).

Generally, among asset classes, stocks may present more short-term risk and volatility than bonds or short-term instruments, but may provide greater potential return over the long term. Although bonds generally present less short-term risk and volatility than stocks, bonds do entail interest rate risk (as interest rates rise, bond prices usually fall), and issuer credit and the risk of default, or the risk that an issuer will be unable to make income or principal payments. Additionally, bonds and short-term investments entail greater inflation risk, or the risk that the return of an investment will not keep up with increases in the prices of goods and services, than stocks. Finally, foreign investments, especially those in emerging markets, involve greater risk and may offer greater potential return than U.S. investments.

**Check one box in each column.**

| ANNUAL INCOME (from all sources) | ESTIMATED NET WORTH (excluding residence) | ESTIMATED LIQUID NET WORTH | FEDERAL TAX BRACKET |
|---|---|---|---|
| Under $20,000 | Under $30,000 | Under $15,000 | ≤ 15% |
| $20,000–$50,000 | $30,000–$50,000 | $15,000–$50,000 | 25% |
| $50,001–$100,000 | $50,001–$100,000 | $50,001–$100,000 | ≥ 28% |
| Over $100,000 | $100,001–$500,000 | $100,001–$500,000 | |
| | Over $500,000 | Over $500,000 | |

005010304

DAD 28/31

New Account Application to Pledge Mutual Fund Shares  p. 5 of 7

## 6  TRANSACTIONS ALLOWED ON PLEDGED SHARES

To implement this pledge arrangement, I ("I" refers to all account owners), as the Account Owner(s), and the Lending Party hereby irrevocably direct and authorize Fidelity Brokerage Services LLC, Fidelity Distributors Corporation, Fidelity Service Company, and their affiliates ("Fidelity") to:

- Add the Lending Party's name, identified in Section 3, as fiduciary to the new account established with this application and send the Lending Party copies of all future statements issued with respect to this account.
- Use the Account Owner's Social Security/Taxpayer Identification number for IRS tax-reporting purposes.
- Make investment exchanges within the account or redeem shares from the account only in accordance with the receipt of the Lending Party's signature-guaranteed written instructions on the applicable Exchange, Release and Distribution Request for Pledged Shares form.
  I may not, without Lender's previous written consent, (a) give Fidelity instructions as to the collateral and as to the purchase of assets for and disposition of assets in the account, or (b) close the account. All interest and regular cash dividends on financial assets in the account will be reinvested in the account unless indicated below.

☐ **You may distribute to us (me) all interest and regular cash dividends on financial assets in the account until 10 days after Fidelity receives written notice from Lender that such distributions should not be made.**

## 7  AUTHORIZATION

I ("I" refers to all account owners) am the registered owner(s) named in Sections 1 and 2, and am requesting that Fidelity establish an account in accordance with this application and pledge the Fidelity mutual fund shares listed in Section 4 for the Lending Party named in Section 3.

By signing this application, I certify that:

- I acknowledge that I have been furnished with the Customer Agreement by Fidelity and that I have read, understood, and agree to be bound by its terms and conditions as are currently in effect and as may be amended from time to time. I am at least 18 years of age and of full legal age in the state in which I reside. I understand that, upon issuer's request in accordance with applicable rules and regulations, Fidelity will supply my name to issuers of any securities held in my account so I might receive any important information regarding them, unless I notify Fidelity in writing not to do so.
- I understand that all information provided in Sections 1, 2, 3, and 5 will apply to any new fund for which my shares may be exchanged.
- I understand that neither Fidelity funds nor Fidelity Distributors Corporation is a bank, fund shares are not backed or guaranteed by any bank or insured by the FDIC or any other government agency, and although the fund seeks to preserve the value of my investment at $1.00 per share, it is possible to lose money by investing in the fund.
- I ratify any instructions, including telephone instructions, given on this account. I agree that neither the Fidelity fund(s) nor Fidelity will be liable for any loss, cost, or expense for acting upon any instructions if they follow reasonable procedures designed to prevent unauthorized transactions. (If you do not want the ability to redeem and exchange by telephone, call Fidelity for instructions.) I consent to the use of recorded telephone conversations.
- I understand that for joint accounts "I" refers to all account owners, and each of the account owners agrees that any account owner and/or authorized individual has authority to act on this account without notice to the other account owners and/or authorized individuals. Fidelity Service Company, in its sole discretion, and for its protection, may require the written consent of all account owners and/or authorized individuals prior to acting upon the instructions of any account owner or authorized individual.
- **If I am a citizen or resident alien, as previously indicated, I certify under penalties of perjury that (1) the Social Security or Taxpayer Identification number provided above is correct (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding for failure to report all dividend and interest income, or (c) I have been notified by the IRS that I am no longer subject to backup withholding. (Please cross out item 2 if it does not apply to you.)**
- If I am a non-resident alien, I must submit IRS Form W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, with a distribution request form to claim tax treaty benefits, if applicable. (To obtain Form W-8BEN, please consult your tax advisor or go to the IRS Web site at http://www.irs.gov.)
- The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

005010305

New Account Application to Pledge Mutual Fund Shares p. 6 of 7

## 7 AUTHORIZATION (CONTINUED)

### Control Agreement between Account Owner and Lending Party

- In connection with financing arrangements between the account owner(s) in Sections 1 & 2 and the Lending Party in Section 3 (Lender), which is joining with us in signing this application below, we are [I am] asking Fidelity to transfer the mutual fund shares listed in Section 4 to the name of the Lender as fiduciary for the benefit of the account owner(s) in Sections 1 and 2 and we are [I am] asking Fidelity to enter into this agreement concerning the account (the new account established with the securities transferred to the account pursuant to this paragraph).

- In order to secure our [my] obligations to Lender pursuant to collateral security arrangements between Lender and us [me], we [I] have assigned to Lender and granted to Lender a security interest in and lien upon the account and of securities and other financial assets from time to time in the account, any cash balances credited to the account and in any and all proceeds of any assets or balances thereof, whether now or hereafter existing or arising (collectively, the account and all of such other assets, the "Collateral"). We [I] shall remain the owners [owner] of the account and the Collateral and Lender shall hold its interest solely as a secured party and pledge pursuant to the terms of the Collateral security arrangements between ourselves [myself] and Lender.

- Notwithstanding the foregoing or any separate agreement that we [I] may have with Lender, Lender shall be entitled, for purposes of this agreement, at any time to give Fidelity instructions, including entitlement orders within the meaning of Article 8 of the Massachusetts Uniform Commercial Code, as to the disposition or investment of any of the Collateral, or as to any other matters relating to the account or any of the Collateral, without our [my] further consent. Fidelity shall be fully entitled to rely upon such instructions or demands from the Lender even if such instructions or demands are contrary to any instructions or demands that we [I] may give to Fidelity. Fidelity shall have no duty to inquire or determine whether our [my] obligations to Lender are in default or whether Lender is entitled, under any separate agreement between us [me] and Lender, to give any such instructions. Fidelity may rely conclusively and will be protected in acting upon any writing or other documents that Fidelity believes to be genuine and properly presented and will have no responsibility to inquire into the dueness of any document's execution or the propriety or truth of its provisions. We [I] further agree to be responsible for Fidelity's customary charges and to indemnify Fidelity from and to hold Fidelity harmless against any loss, cost, or expense that Fidelity may sustain or incur in connection with the provisions of this agreement or in acting upon instructions that Fidelity believes in good faith to be instructions from Lender. Fidelity shall not be liable for any failure by ourselves [myself], Lender, or any other person to perform their obligations relating to the Collateral security agreements referred to above.

- Unless Fidelity has obtained Lender's prior written consent, Fidelity agrees not to exercise any right of setoff, or to assert any security interest or other lien, encumbrance, claim, or right that Fidelity may at any time have against or in the account or any of the Collateral. Notwithstanding anything to the contrary set forth herein, Fidelity may from time to time debit the account for (a) any of their contractual or customary charges or fees in maintaining the account, (b) payment owed to them or their affiliates for open trade commitments for purchases in and for the account and (c) negotiable instruments (i.e., checks and drafts) received by them as holder in due course, the proceeds of which are deposited into the account but which negotiable instruments are later returned to them or their affiliates as uncollectible, in each case to the extent that we [I] have not separately paid or reimbursed them therefor.

- All notices from Lender to Fidelity shall be delivered to the address and attention set forth above.

- Fidelity represents and warrants to Lender that the account agreement between Fidelity and us [me] relating to the establishment and general operation of the account is governed by the laws of the Commonwealth of Massachusetts. Fidelity covenants with Lender that Fidelity will not, without Lender's previous written consent, amend this account agreement so that it is governed by the law of another jurisdiction. In addition, Fidelity covenants with Lender that it will not enter into any agreement with any other person by which it is obligated to comply with instructions from such other person as to the disposition or other dealings with any of the Collateral or the effect of which is to give such other person control over the Collateral.

- This agreement shall control over any conflicting agreement between you and us [me], including agreements relating to or establishing the account. This agreement shall be governed by the internal law of the Commonwealth of Massachusetts and shall be construed as a sealed instrument under such law.

005010306

RCD 30/31

New Account Application to Pledge Mutual Fund Shares p. 7 of 7

**7** **AUTHORIZATION** (CONTINUED)

• If the account owner(s) agree to and accept the foregoing, please so indicate by executing and returning to us this completed application.

SIGNATURE OF OWNER/
AUTHORIZED PERSON                DATE (MM/DD/YYYY)        JOINT OWNER(S) SIGNATURE              DATE (MM/DD/YYYY)


SIGNATURE GUARANTEE                                       SIGNATURE GUARANTEE


I, as authorized by the Lending Party named in Section 3, request that Fidelity pledge the Fidelity mutual fund shares listed in Section 4. The signature guarantee must be signed by someone **other than** the authorized representative of the Lending Party.

AUTHORIZED REPRESENTATIVE
OF LENDING PARTY                 DATE (MM/DD/YYYY)

                                                          Print Name

                                                          Print Title

SIGNATURE GUARANTEE

Please have signatures guaranteed. A signature guarantee is a certification given by certain organizations that a signature is genuine, the signer is the appropriate person to endorse, and the signer has the legal capacity to sign. Fidelity requires a signature guarantee when it is essential to ensure the authenticity of the signature. A signature guarantee is a widely accepted way to protect customers and investment companies from the legal repercussions resulting from invalid or illegal endorsements. You should be able to obtain a signature guarantee from a bank, a broker, a dealer, a credit union (if authorized under state law), a securities exchange or association, a clearing agency, or a savings association. A medallion signature guarantee stamp may expedite the processing of your request. A notary public cannot provide a signature guarantee. We cannot accept a notarization in lieu of a signature guarantee.



*Fidelity* INVESTMENTS

Fidelity Brokerage Services LLC, Member NYSE, SIPC

Fidelity Investments
PO Box 770001, Cincinnati, OH 45277-0039

457376.4.0

1.740463.110
MF-PLEDGE-0111

1.740463.110                                             005010307

                                                         RO 31/31



# EXHIBIT B

**MINUTES OF ACTION**
**IN LIEU OF**
**MEETING OF BOARD OF DIRECTORS**
**OF**
**ANTROPY INCORPORATED**

The undersigned, being all of the members of the Board of Directors of ANTROPY INCORPORATED, a Delaware corporation (the "Company"), acting pursuant to the laws of the state of Delaware, do hereby adopt the following resolutions effective as of the 20th day of December 2009:

Resolutions Authorizing Contract

WHEREAS, the Company wishes to enter into a contract with Richard E. Demaray and DEMARAY MICRO, INC., a Washington company (the Developer). The Company would help support the Developer's research and development in the field of Solar Energy and related research fields. The Developer would own the Intellectual Property developed. The Company would be licensed to use all patents shall be able to use and sub-license any Intellectual Property, trade secrets and know how pertaining to Solar Energy that is developed. The Developer would be able to use or license the Intellectual Property in areas other than Solar Energy;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the President is hereby authorized and directed to execute the Research and Development Agreement attached hereto as Exhibit A, which is incorporated herein by reference; and

FURTHER RESOLVED, that the President of the Corporation is hereby authorized and directed to take such further actions he deems necessary or appropriate in connection with the Corporation's execution, delivery and performance of its obligations under the Research and Development agreement.

Resolutions Authorizing Contract

WHEREAS, the Company wishes to enter into a contract, with Richard E. Demaray and DEMARAY MICRO, INC., to obtain a limited, exclusive, sub-licensable, non-assignable, non-transferrable License under the Licensed Patents for solar energy;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the President is hereby authorized and directed to execute the Assignment Agreement attached hereto as Exhibit B, which is incorporated herein by reference; and

FURTHER RESOLVED, that the President of the Corporation is hereby authorized and directed to take such further actions he deems necessary or appropriate in connection with the Corporation's execution, delivery and performance of its obligations under the Assignment Agreement.

FURTHER RESOLVED, that these Minutes of Action may be executed in one or more counterparts, each of which shall be deemed part of the original document, but all of which shall constitute one and the same instrument.

Done effective as of the day and year first above written.

DIRECTORS:

Richard E. Demaray

_____
Christopher D. White

## EXHIBIT A

### REASEARCH AND DEVELOPMENT AGREEMENT

This Reasearch And Development Agreement ("Agreement") is made on December 20, 2009 ("Effective Date") by and between Richard E. Demaray/DEMARAY MICRO, INC., a Washington Corporation (the "Developer"), and ANTROPY INCORPORATED, a Delaware Corporation (the "Company").

**RECITALS:**

WHEREAS, the Company wishes to assist the Developer, with his efforts to conduct research and development in the field of Solar Energy and related research fields so that the Company may use the results of the Developer's research and development pertaining to solar energy.

WHEREAS, any intellectual property trade secrets and know how acquired as a result of this Agreement shall belong to the Developer, the Developer has agreed to grant the Company an exclusive license (the "License") to any of this intellectual property pertaining to solar energy and to train Company's personal as to how to use any trade secrets and know how related to solar energy. The Licensee shall be an exclusive license to such patent rights on the terms and conditions set forth in the Assignment Agreement (Exhibit B).

NOW THEREFORE, in consideration of the premises and the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree and covenant as follows.

**1.      DEFINITIONS**

"**Contract Materials**" means intellectual property in the form of patents that the Company shall have an exclusive license to use pertaining to solar energy (see Assignment Agreement (Exhibit B) and trade secrets and know how pertaining to solar energy.

"**Term**" means the period commencing on the Effective Date and, subject to earlier termination in accordance with this Agreement, expiring on the last to expire of the Licensed Patents.

"**Force Majeure**" means any event or circumstance outside a party's reasonable control which has not been caused or materially contributed to by that party, including act of God, lightning strikes, earthquakes, floods, storms, explosions, fires and any natural disaster, acts of war, acts of public enemies, terrorism, riots, civil commotion, malicious damage, sabotage, revolution or strikes, which results in either party being unable to observe or perform on time an obligation under this Agreement.

"**Licensed Patents**" means all of the following:

(a)      any patents, that pertain to solar energy, currently in any stage of development at the Effective Date of this Agreement that are issued at any future date; and

(b)      any future patents, that pertain to solar energy,  issued to the Licensor; and

(c)      any patents that issue from a continuation, continuation-in-part, divisional, substitute, reissue, re-examination or extension of any of the foregoing.

**2.      INTERPRETATION**

In this Agreement, unless the context otherwise requires:

(a)      headings are for convenience only and do not affect the interpretation of this Agreement;

(b)      words importing the singular include the plural and vice versa;

(c)      words importing a gender include any gender;

(d)      other parts of speech and grammatical forms of a word or phrase defined in this Agreement have a correlative meaning;

(e)      a reference to a part, clause, party, annexure, exhibit or schedule is a reference to a part and clause of, and a party, annexure, exhibit and schedule to, this Agreement and a reference to this Agreement includes any annexure, exhibit and schedule;

(f)      a reference to a document includes all amendments or supplements to, or replacements or novations of, that document;

(g)      a reference to a party to a document includes that party's successors and permitted assigns;

(h)      no provision of this Agreement will be construed adversely to a party solely on the ground that the party was responsible for the preparation of this Agreement or that provision;

(i)      this Agreement is executed in the English language and shall be deemed to comprise the language mutually chosen by the parties; and

(j)      the terms  "include" and "including" shall be deemed to be immediately followed by the phrase "without limitation."

3.      **RESEARCH AND DEVELOPMENT**

Subject to the terms and conditions of this Agreement, the Developer, shall conduct Research to solve problems in areas that would most likely benefit and in fact in most cases would be necessary for the Company. The projects to be worked on would be approved by the Board of Directors of the Company.

4.      **PERIODIC MEETINGS**

During the term of this Agreement, the Developer shall meet with representatives of the Company within five (5) days of a request by the Company for such meeting, to discuss the progress and results, as well as ongoing plans, or changes therein, concerning the Research Projects.

5.      **INTELLECTUAL PROPERTY**

Subject to the terms and conditions of this Agreement, the Developer, while conducting Research will in the natural course of things develop intellectual property. If this intellectual property is in the field of solar energy and deemed worthy the Developer will apply for patents.  These Patents will be the property of the Developer and be licensed exclusively to the Company, for the use in Solar Energy. Intellectual property that is outside the field of solar energy the Developer may or may not apply for patents at his sole discretion.  Any trade secrets and know how discovered may be used by the Company for solar energy projects.  Any trade secrets and know how may be used for non-solar energy uses by the Developer and anyone he contracts with, provide proper procedures are taken to protect their secrecy.

6.      **ASSISTANCE TO DEVELOPER**

Subject to the terms and conditions of this Agreement, the Company shall assist the Developer, in his efforts to conduct research and to train Company personnel as to how to use any trade secrets and know how that has been developed with the Research projects.  The assistance shall be in the form supplying materials (see section 1.4), paying for patent applications in the Solar Energy field, and by allowing a flexible work schedule regarding the Developer's responsibly as President of ANTROPY INCORPORATED. Developer accepts the foregoing engagement with the Company.

7.      **SUPPLY OF MATERIALS**

The company will allow the developer the use of all its:  (i) capital goods needed or desirable basis, including (but not limited to) laboratories, engineering and equipment; (ii) materials to be consumed in the research and development Projects; and (iii) Developer shall have the assistance of Company employees.

8.      **TRAINING**

The Developer to the Company, shall train company personnel how to effectively use Contract Materials (see sec 2.3).

9.      **TERM**

The Contract shall be for one year automatically renewable for four additional years. (the "*Term*").

10.    **FEE**

The Company shall pay the Developer One Hundred U.S. Dollars ($100.00) per month (the "Fee").  Developer agrees that the foregoing Fee is fixed, and is not subject to increase.

11.    **DEVELOPER WARRANTIES**

11.1.    **Authorization.**  The Developer represents and warrants that it has full power and authority: (i) to enter into this Agreement; (ii) to perform all of its obligations under this Agreement.  The Developer further represents and warrants that it has taken all corporate action necessary to authorize the preceding.

11.2.    **No Third Party Interest.**  The Developer represents and warrants that: (i) no third party has any claim, right, title or interest in any Contract Materials; (ii) no third party requested the Developer to prepare any of the Contract Materials on behalf of such third party; and (iii) the Developer has not mortgaged or otherwise encumbered or permitted the encumbrance of any portion of or rights in any Contract Materials, granted sold, assigned or licensed any rights in any Contract Materials, nor entered into any option or other agreement respecting any such right in any Contract Materials.  The Developer represents and warrants that if any persons other than the Developer's employees participated in the preparation of any Contract Materials, such persons did so solely for hire on behalf of the Developer, such persons have assigned irrevocably to the Developer all rights to the work they performed for the Developer, and such persons do not have any right, title, claim or interest in or to any part of or all of the Contract Materials.

11.3.    **No Infringement.**  The Developer represents and warrants that upon delivery of the Contract Materials to the Company, the Company will be the sole owner of all Contract Materials free and clear of all claims, liens or encumbrances.  The Developer represents and warrants that the Contract Materials are not in the public domain and do not infringe any trademark, servicemark, tradename, copyright or patent, or to the Developer's best knowledge, any other proprietary or trade secret right of any third party.

12.    **RESTRICTIVE COVENANTS**

12.1.    **Confidentiality Acknowledgments.**  The Developer acknowledges that: (i) the Business Concept, Client Survey Forms, Management Practices Report, Strategic Business Analysis Report, Knowledge Base, Survey Data, Training Materials and all other Contract Materials, their programming, application, development, technical specifications and use, including but not limited to the terms of this Agreement, are highly confidential and constitute trade secrets of the Company within the meaning of the Illinois Trade Secrets Act, and are protectable as trade secrets (the "Trade Secrets"); (ii) the Company has a proprietary interest in the Trade Secrets; (iii) the Company has invested and will continue to invest substantial amounts of time, money and effort to develop and market the Trade Secrets; (iv) the Company has implemented procedures to maintain the confidentiality of the Trade secrets; (v) the Company's competitors would obtain unfair economic and competitive advantages if the Trade Secrets were divulged; (vi) the Company would suffer irreparable and continuing injury if the Trade Secrets were disclosed; and (vii) the Trade Secrets form an integral part of the Company's business.  The fact that any Contract Materials are marked with a copyright notice shall not reduce, impair or affect the Trade Secret status of the item so marked, and instead shall serve solely as notice of the Company's copyrights therein.

12.2.    **Confidentiality Duties.**  In recognition of the importance and sensitivity of the Trade Secrets, the Developer agrees that it: (i) shall hold the Trade Secrets in trust solely for the benefit and use of the Company; (ii) shall not directly or indirectly sell, alienate, transfer, assign, disclose or divulge the Trade Secrets to any person or entity without the Company's prior, written permission; (iii) shall not directly or indirectly use the Trade Secrets in or for the benefit of any individual, business, profession, partnership, corporation, joint venture or other endeavor, other than as the Company specifically authorizes in writing and in advance; and (iv) shall not directly or indirectly disclose any terms of this Agreement.

12.3.   **Duty to Disclose.**  The Developer immediately shall notify the Company of any information which comes to its attention which does or might indicate that there has been any loss of confidentiality concerning any Trade Secret.  In such event the Company, in its sole discretion, shall have the right to file litigation to prevent such spread.  The Developer shall cooperate fully with any such proceeding.

12.4.   **Purchaser Title Protection.**  The Developer covenants that it shall not attack, compromise, file suit against or in any manner attempt to vitiate or dispute or commit or fail to take any action which could vitiate or constitute a dispute of any of the Company's rights, titles or interests in any Contract Materials.  The Developer shall not attempt to develop any Competitive Product based on any Trade Secrets, or through reverse engineering, decompiling, disassembly or any other method.

12.5.   **Infringement Cooperation.**  If at any time any infringement action is brought concerning any Contract Materials whether by or against the Company, Developer shall cooperate in any such infringement action, at the Company's expense, and shall assist the Company as the Company then directs.

12.6.   **Indemnification.**  The Developer shall defend, indemnify and hold harmless the Company and its successors, assigns and affiliates (collectively the "**Indemnitees**"), on demand, from any liabilities and expenses, including but not limited to attorneys' and accountants' fees, investigation costs, disbursements, settlement amounts, expert fees, lost patent rights, lost profits, fines or penalties which any Indemnitees incur in connection with, and settlement of or resulting from any claims, actions, suits or proceedings (whether civil, criminal, administrative or investigative, including all associated appeals) which involve or threaten any Indemnitees, as parties or otherwise, that are in any way based upon Developer's or breach of any of its representations or warranties, or failure to satisfy any of its obligations or covenants in this Agreement.

13.   **MISCELLANEOUS**

13.1. **Termination of Agreement.**

(a)  **Causes.**  This Agreement shall terminate upon the occurrence of any of the following events:  (i) the parties execute any instrument that specifically terminates this Agreement; (ii) the expiration of thirty (30) days following the filing of a petition in bankruptcy by or against Developer, if such petition is not dismissed during such thirty (30) day period; (iii) the voluntary or involuntary dissolution of Developer; or (iv) the Company transmits a termination notice to the Developer due to (A) a breach by the Developer of this Agreement (in which case such termination shall be effective fifteen (15) days from the date of such notice), or (B) the Company's dissatisfaction with the Developer's performance under this Agreement (in which case such termination shall be effective thirty (30) days from the date of such notice), or (C) the Developer no longer employs any of the Key Employees on a full-time basis, in which case termination of this Agreement shall be at the Company's option, within thirty (30) days of the Company providing termination notice to Developer.  Nothing contained in this Section shall affect or impair any rights or obligations which arose prior to or at the time of the termination of this Agreement, or which may arise due to any event which causes this Agreement to terminate.

13.2.   **No Assignment.**  The Developer may not assign any of its rights, duties or obligations under this Agreement.

13.3.   **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Company, its successors and assigns and the Developer and its permitted successors.  This Agreement supersedes any prior understandings, written agreements or oral arrangements between the parties which concerns the subject matter of this Agreement.  The terms of this Agreement shall govern if there is any conflict between this Agreement and: (i) any purchase order or invoice which the parties may exchange; and (ii) any other written instrument which concerns or affects the subject matter of this Agreement.

13.4.   **Complete Understanding.**  This Agreement constitutes the complete understanding between the parties.  No alteration or modification of any of this Agreement's provisions shall be valid unless made in a written instrument which both parties sign.

13.5. **Choice of Law and Jurisdiction.**

(a)   This Agreement shall be governed by the laws of Delaware excluding the rules on the choice of law.

    (b)    Each party irrevocably submits to the jurisdiction of the courts of Delaware.

    **13.6.**    **Governing Language and Currency.**  The English language version of this Agreement shall be the governing and binding version of this Agreement, irrespective of any other language this  Agreement may be translated into or performed under. All payments required under and monetary amounts identified in this Agreement shall be United States of America Dollars.

    **13.7.**    **Severability.**  If a court of competent jurisdiction holds that any one or more of this Agreement's provisions are invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any of this Agreement's other provisions, and this Agreement shall be construed as if it had never contained such invalid, illegal or unenforceable provisions.

    **13.8.**    **Waiver.**  A party's attempted waiver, consent or authorization of any kind, whether required pursuant to the terms of this Agreement or granted pursuant to any breach or default under this Agreement, shall not be effective or binding upon such party unless the same is in a written instrument which such party has signed.  Any such waiver, consent or authorization will be valid solely to the extent specifically set forth in such written instrument.  No failure or delay on the part of either party to this Agreement to exercise any right, remedy, power or privilege shall preclude or limit any other or further exercise of such right or the exercise of any other right, remedy, power or privilege with respect to the same or any other matter.

**14.**    **NOTICE**

    All notices required or permitted to be given hereunder shall be in writing and shall be valid and sufficient if sent by express mail, postage prepaid, addressed as follows or to such other address or person as a party may notify the other in accordance with this clause:

    If to Developer:    Richard E.Demaray/DEMARAY MICRO, INC.
                          190 Fawn Lane
                          Portolla Valley, CA 94028

    If to the Company:    ANTROPY INCORPORATED
                          9 East Loockerman Street, Suite 3A
                          Dover, DE 19901

**15.**    **GENERAL PROVISIONS**

    **15.1.**    The terms and conditions of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective permitted successors and assigns.

    **15.2.**    This Agreement shall not be deemed to confer any rights or remedies upon any Person not a party to this Agreement.

    **15.3.**    This Agreement may not be amended except by an instrument in writing signed by a duly authorized officer or representative of each of the parties hereto.

    **15.4.**    This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date hereof in writing and signed by a proper and duly authorized official of the party to be bound thereby.

                    **Executed as an agreement:**

ANTROPY INCORPORATED

By                                     

[Name and Title]                                    Date


DEMARAY MIRCO, INC.

By _Richard E Demaray_    _Dec 29, 2009_
[Name and Title]                                    Date


_Richard E Demaray_    _Dec. 29, 2009_
Richard E. Demaray                                  Date

<u>**EXHIBIT B**</u>

**ASSIGNMENT AGREEMENT**

This Patent License Agreement ("Agreement") is made on December 20, 2009 ("Effective Date") by and between Richard E. Demaray/DEMARAY MICRO, INC., a Washington Corporation ("Licensor"), and ANTROPY INCORPORATED, a Delaware Corporation ("Licensee").

**RECITALS:**

WHEREAS, the Licensee wishes to obtain an exclusive license to certain patent rights of Licensor.

WHEREAS, the Licensor has agreed to grant the Licensee an exclusive license to such patent rights on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the premises and the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree and covenant as follows:

1.      **DEFINITIONS AND INTERPRETATION**

    1.1.      **Definitions**

           "**Control**" means, with respect to any entity, beneficial ownership of fifty percent (50%) or more of issued shares in such entity, or otherwise the right to control a majority of voting rights in such entity, or otherwise the power to direct or cause the direction of the management policies of such entity.

           "**Event of Default**" means, with respect to any party to this Agreement, whether or not within the control of such party:

    (a)      "**Proceedings**" a party filing for bankruptcy, filing a petition seeking any reorganization, arrangement, composition or similar relief under any law regarding insolvency or relief for debtors, or making an assignment for the benefit of creditors;

    (b)      "**Receiver**" a party having a receiver, trustee, administrator or similar official appointed or steps being taken for such appointment, or any involuntary petition or proceeding under bankruptcy or insolvency laws being instituted against such party and not stayed, enjoined or discharged within sixty (60) days;

    (c)      "**Insolvency**" a party becoming insolvent or generally failing to pay, or admitting in writing its inability to pay its debts as they become due;

    (d)      "**Loan Notices**" a party receiving notice from, or a party giving notice to, any of its financial lenders that such party is, or is in danger of being, in default under any loan repayment obligation;

    (e)      "**Arrangements with Creditors**" a party to this Agreement entering into or resolving to enter into any arrangement, composition or compromise with, or assignment for the benefit of, its creditors or any class of them;

    (f)      "**Winding-up**" an application or order being made for the winding-up, dissolution or liquidation of a party or a resolution is passed or any steps being taken to pass a resolution for the winding-up, dissolution or liquidation of such a party, other than for the purpose of a merger or restructuring;

    (g)      "**Ceasing Business**" a party ceasing, or threatening to cease, active operation of its business, ceasing to market or utilize the Licensed Patents, or adopting a resolution for discontinuance or dissolution of its business;

    (h)      "**Audit Opinion**" an auditor issuing an unfavorable going concern opinion relating to such party;

    (i)      "**Market Capitalization**" such party's market capitalization level being less than fifty percent (50%) of its market capitalization as of the Effective Date;

    (j)      "**Credit Rating**" there being an adverse change in such party's credit rating;

    (k)      "**Rejection**" Licensor rejecting this Agreement under Section 365(n)(1)(A) (or any successor provision) of the United States Bankruptcy Code;

    (l)      "**Investigation**" any government or administrative authority with oversight over such party initiating an investigation into the affairs of such party related to its activities under this Agreement; or

    (m)      "**Control**" a party or parties undergoing a change in control.

        "**Field of Activity**" means active and passive solar energy.

"**Force Majeure**" means any event or circumstance outside a party's reasonable control which has not been caused or materially contributed to by that party, including act of God, lightning strikes, earthquakes, floods, storms, explosions, fires and any natural disaster, acts of war, acts of public enemies, terrorism, riots, civil commotion, malicious damage, sabotage, revolution or strikes, which results in either party being unable to observe or perform on time an obligation under this Agreement.

"**Licensed Patents**" means all of the following:

(a)        any patents, that pertains to solar energy, currently in any stage of development at the Effective Date of this Agreement that are issued at any future date; and

(b)        any future patents, that pertain to solar energy,  issued to the Licensor; and

(c)        any patents that issue from a continuation, continuation-in-part, divisional, substitute, reissue, re-examination or extension of any of the foregoing.

"**Person**" means any natural person, corporation, company, partnership, limited partnership, limited liability company, firm, association, trust, government, governmental agency, or any other entity, whether acting in an individual, fiduciary or other capacity.

"**Sub-license**" means any understanding with a third party (irrespective of the licensee holding an interest in such third party) in writing or otherwise under which access to the Licensed Patents is provided by the licensee.

"**Term**" means the period commencing on the Effective Date and, subject to earlier termination in accordance with this Agreement, expiring on the last to expire of the Licensed Patents.

"**Territory**" means the [United States].

**1.2.        Interpretation**

In this Agreement, unless the context otherwise requires:

(a)        headings are for convenience only and do not affect the interpretation of this Agreement;

(b)        words importing the singular include the plural and vice versa;

(c)        words importing a gender include any gender;

(d)        other parts of speech and grammatical forms of a word or phrase defined in this Agreement have a correlative meaning;

(e)        a reference to a part, clause, party, annexure, exhibit or schedule is a reference to a part and clause of, and a party, annexure, exhibit and schedule to, this Agreement and a reference to this Agreement includes any annexure, exhibit and schedule;

(f)        a reference to a document includes all amendments or supplements to, or replacements or novations of, that document;

(g)        a reference to a party to a document includes that party's successors and permitted assigns;

(h)        no provision of this Agreement will be construed adversely to a party solely on the ground that the party was responsible for the preparation of this Agreement or that provision;

(i)        this Agreement is executed in the English language and shall be deemed to comprise the language mutually chosen by the parties; and

(j)        the terms "include" and "including" shall be deemed to be immediately followed by the phrase "without limitation."

**2.        GRANT OF LICENSE**

Licensor hereby grants Licensee a limited, exclusive, sub-licensable, non-assignable, non-transferable perpetual License under the Licensed Patents for solar energy.

**3.        UPFRONT PAYMENT AND ACQUISITION OF EQUITY**

Upon this Agreement entering into effect, the Licensee shall pay to the Licensor a non-refundable fee of $1 (in cash or in kind) per year and all costs associated with filing for, maintaining and prosecuting said patents.

**4.        PROSECUTION AND MAINTENANCE OF RIGHTS**

4.1.    Licensor has the sole right to file, extend, prosecute and maintain (including conduct opposition proceedings) any patent applications that are a subject of this Agreement, and the sole right to determine whether to file, extend, prosecute and maintain (including conduct opposition proceedings) any such patent applications. If the Licensor elects not prosecute or maintain a patent the licensee may elect to prosecute or maintain said patent.

5.     **REPRESENTATIONS AND WARRANTIES**

5.1.    Each party represents and warrants to the other that:

(a)     it has the power to enter into and perform its obligations under this Agreement;

(b)     it has taken all steps necessary to properly execute this Agreement;

(c)     it is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation;

(d)     neither the execution of this Agreement nor its performance hereunder conflicts with any applicable law, rule or regulation or any other agreement to which it is a party; and

(e)     during the Term, it will not enter into any agreement, arrangement or understanding that conflicts with its obligations under this Agreement.

5.2.    The Licensor represents and warrants to the Licensee that:

(a)     it is the exclusive owner of all right, title and interest in the Licensed Patents;

(b)     it has the full right, power and authority to grant the rights and licenses granted to the Licensee under this Agreement;

5.3.    The Licensee represents and warrants to the Licensor that:

(a)     except as expressly warranted by the Licensor under this Agreement, it has relied on its own investigations with respect to the rights granted to it under this Agreement;

(b)     it will maintain its books and conduct its operations in accordance with applicable law during the term of the Agreement;

(c)     it will implement and maintain proper quality control and assurance procedures during the term of the Agreement; and

(d)     it will provide up-dated business plans, financial records, product/process use records and evaluations regarding same, and sales records to Licensor within 30 days of the end of every calendar year, and provide Licensor access to such records throughout the year upon request, during the term of the Agreement.

6.     **LIMITATION OF LIABILITY/EXCLUSION OF LIABILITY**

6.1.    Except as expressly provided in this Agreement, neither party makes any warranties or representations of any kind, express or implied, oral or written, including without limitation, the warranties of merchantability, fitness for a particular purpose, title or non-infringement, or warranties arising from usage of trade or course of conduct.

6.2.    Except as expressly provided in this Agreement, to the extent permitted by law, the Licensor is not liable for any loss or damage however caused (including, but not limited to, by the negligence of the Licensor) suffered by the Licensee in connection with or arising from the exercise of rights under this Agreement.

7.     **TERM AND TERMINATION**

7.1.    This Agreement shall continue for the Term.

7.2.    If any Licensed Patent expires or ceases to be in force, this does not constitute grounds for termination of this Agreement, so long as any Licensed Patent remains in force in any part of the Territory.

7.3.    Except as otherwise provided, and subject to notice and a 30 day period to cure, the Licensor may terminate this Agreement by notice to the Licensee if:

(a)     the Licensor gives the Licensee notice that it has breached the Agreement, and the breach is not rectified within 30 days after such notification, or is not capable of being rectified within 30 days after notification; or

(b)     the Licensee attempts to assign, or purports to assign, any of its rights under this Agreement, or there is a change in Control of the Licensee, without the Licensor's prior written consent; or

(c)     any representation or warranty given by the Licensee is, or proves to be, untrue; or

(d)     if all the Licensed Patents expire or cease to be in force; or

(e)     an Event of Default occurs in respect of Licensee.

7.4.     If a Force Majeure prevents or delays either party from performing any obligation under this Agreement (other than payment of amounts due), provided that the affected party uses its reasonable endeavors to mitigate the effects of the Force Majeure, that obligation is suspended as long as the Force Majeure continues.

7.5.     If the Force Majeure continues for a period of 3 months or more, the other party may (without affecting the accrued rights and obligations of each party as at that date) terminate this Agreement immediately by notice to the other party.

7.6.     The Licensor may terminate this Agreement by notice in writing if the Licensee challenges, questions or in any way impairs, or assists a person to challenge, question or in any way impair:

(a)     any interest which the Licensor has in a patent or patent application comprised in any Licensed Patent;

(b)     the validity of any Licensed Patent; or

(c)     the success of any Licensed Patent.

7.7.     On termination or expiry of this Agreement, except as provided in this clause, all licenses to the Licensee immediately terminate.

7.8.     Unless the license was terminated by the Licensor for cause, the Licensee may sell Licensed Products in its possession at the expiry or earlier termination of this Agreement for a period of no more than three months after the expiry or termination date.

8.     SURVIVAL

(a)     The representations and warranties contained in this Agreement survive the expiration or earlier termination of this Agreement.

(b)     The obligation upon the Licensee to maintain the secrecy of the terms of this Agreement survives this Agreement. This obligation is not limited to the Territory.

(c)     Each indemnity arising in respect of this Agreement survives the performance of obligations arising out of or under this Agreement and the expiry or termination of this Agreement.

(d)     Termination or expiry of this Agreement shall be without prejudice to the rights and remedies of the parties arising before the date of termination or expiry.

9.     CHOICE OF LAW AND JURISDICTION

(a)     This Agreement shall be governed by the laws of Delaware excluding the rules on the choice of law.

(b)     Each party irrevocably submits to the jurisdiction of the courts of Delaware.

10.     ASSIGNMENT & ACQUISITION

10.1.     The Licensee may not, without the prior written consent of the Licensor (which consent may be granted or withheld in Licensor's sole discretion), assign, subcontract, or otherwise transfer (or purport to assign, subcontract, or otherwise transfer) this Agreement or any of rights or obligations under this Agreement to any other person or entity, whether by operation of law or otherwise.  Licensee may not act as a foundry for another person or entity.  Any conduct in violation of the foregoing shall terminate the license.

10.2.     The Licensee may not, without the prior written consent of the Licensor (which consent may be granted or withheld in Licensor's sole discretion), retain any right under the Licensed Patents in the event that another person or entity acquires Licensee or a controlling interest in Licensee.

11.     NOTICE

All notices required or permitted to be given hereunder shall be in writing and shall be valid and sufficient if sent by express mail; postage prepaid, addressed as follows or to such other address or person as a party may notify the other in accordance with this clause:

If to Licensor:     Richard E.Demaray/DEMARAY MICRO, INC.
                    190 Fawn Lane
                    Portolla Valley, CA 94028

If to Licensee:      ANTROPY INCORPORATED
                     9 East Loockerman Street, Suite 3A
                     Dover, DE 19901

## 12   GENERAL PROVISIONS

    12.1.    The terms and conditions of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective permitted successors and assigns.

    12.2.    This Agreement shall not be deemed to confer any rights or remedies upon any Person not a party to this Agreement.

    12.3.    This Agreement may not be amended except by an instrument in writing signed by a duly authorized officer or representative of each of the parties hereto.

    12.4.    This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to such subject matter other than as expressly provided herein or as duly set forth on or subsequent to the date hereof in writing and signed by a proper and duly authorized official of the party to be bound thereby.

**[SIGNATURES ON NEXT PAGE]**

**Executed as an agreement:**

ANTROPY INCORPORATED

By _Richard E Demaray_          Dec 29, 2009

[Name and Title]                                    Date


DEMARAY MIRCO, INC.

By _Richard E Demaray_          Dec. 29 2009

[Name and Title]                                    Date


_Richard E Demaray_          Dec 29 2009

Richard E. Demaray                                    Date



# EXHIBIT C

**MINUTES OF ACTION**
**IN LIEU OF**
**MEETING OF BOARD OF DIRECTORS**
**OF**
**ANTROPY INCORPORATED**

The undersigned, being all of the members of the Board of Directors of ANTROPY INCORPORATED, a Delaware corporation (the "Corporation"), acting pursuant to the laws of the state of Delaware, do hereby adopt the following resolutions effective as of the 17th day of December 2009:

Resolutions Electing Officers

WHEREAS, the Bylaws of the Corporation permit the Board of Directors, from time to time, to elect officers of the Corporation;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the following individuals are elected as all of the officers of the Corporation to the offices set forth after their names below, and such individuals shall hold such offices until their successors are duly elected and qualified or until the earlier of their death, resignation or removal from office:

| NAME | OFFICE |
|------|--------|
| Richard E. Demaray | President and CEO |
| Christopher D. White | Vice President Treasurer and Secretary |

Resolutions Authorizing Issuance of Shares

WHEREAS, the Corporation has received an offer from Richard Demaray to acquire 2,600,000 common shares of the Corporation (the "shares"); and

NOW THEREFORE, IT IS HEREBY

RESOLVED, that in consideration of the payment in cash, to or on behalf of, the Corporation of $260.00 or $.0001 per share, the sufficiency of which is hereby expressly acknowledged, the Corporation is authorized and shall issue to Richard Demaray 2,600,000 common shares of the Corporation (the "shares"); and

Resolutions Authorizing Issuance of Shares

WHEREAS, the Corporation has received an offer from Christopher D. White to acquire 2,400,000 common shares of the Corporation (the "shares"); and

NOW THEREFORE, IT IS HEREBY

RESOLVED, that in consideration of the payment in cash, to or on behalf of, the Corporation of $240.00 or $.0001 per share, the sufficiency of which is hereby expressly acknowledged, the Corporation is authorized and shall issue to Christopher D. White 2,400,000 common shares of the Corporation (the "shares").

### Resolutions Authorizing Adoption of Trade Name

WHEREAS, the Corporation desires to adopt the trade name of "Antropy Solar" in order to conduct business under a name other than its legal name;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the Corporation is hereby authorized to adopt the trade name "Antropy Solar" in order to conduct business under a name other than its legal name; and

FURTHER RESOLVED, that the President is hereby authorized and directed to execute a Registration of Trade Names Certificate and to cause such Registration of Trade Names Certificate to be filed with the Kent County Prothonotary where the principle place of business is located.

### Resolution Authorizing Adoption of
### Amended and Restated Articles of incorporation

WHEREAS, it is in the best interest of the corporation to amend and fully restate the Corporation's Articles of Incorporation;

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the Articles of Incorporation of the Corporation, and all amendments thereto, if any, shall be and hereby are amended, restated and superseded by the Amended and Restated Articles of Incorporation attached herto as Exhibit A, which is incorporated herein by reference; and

FURTHER RESOLVED, that the President of this Corporation is hereby authorized and directed, for and on behalf of the Corporation, to (i) execute Articles of Amendment attesting to the adoption of the foregoing resolution adoption Amended and Restated Articles of Incorporation, (ii) cause such Articles of Amendment to be filed in the office of the Delaware Secretary of State, and (iii) pay any fees and take any other actions necessary to effect such Articles of Amendment; and

FURTHER RESOLVED, that the officers of the Corporation are, and each of them is, authorized to execute such other documents and take any other actions as they deem necessary or appropriate in connection with the adoption of the attached Amended and Restated Articles of Incorporation; and

FURTHER RESOLVED, that these Minutes of Action may be executed in one or more counterparts, each of which shall be deemed part of the original document, but all of which shall constitute one and the same instrument.

Done effective as of the day and year first above written.

DIRECTORS:                                    SHAREHOLDERS:

Richard E. Demaray                            Richard E. Demaray

Christopher D. White                          Christopher D. White

## EXHIBIT A

## AMENDED AND RESTATED
## ARTICLES OF INCORPORATION
## OF
## ANTROPY INCORPORATED

### ARTICLE 1.

### NAME

The name of the Corporation is ANTROPY INCORPORATED.

### ARTICLE 2.

### REGISTERED OFFICE

The address of the registered office of the Corporation is 9 East Loockerman Street, Suite 3A, Dover, Delaware 19901.

### ARTICLE 3.

### PURPOSES AND TERM

The Corporation shall have general business purposes and shall have perpetual existence.

### ARTICLE 4.

### SHARES

The shares of capital stock of the Corporation shall be subject to the following:

(a)     The Corporation is authorized to issue Ten Million (10,000,000) shares of capital stock, to be held, sold, and paid for at such times and in such manner as the Board of Directors may from time to time determine, in accordance with the laws of the State of Delaware. All shares of the Corporation shall be without par value, except that such shares shall be deemed to have a par value of $.0001 per share solely for the purpose of a statute or regulation imposing a tax or fee based upon the capitalization of a corporation, and a par value fixed by the Board of Directors for the purpose of a statute or regulation requiring the shares of a corporation to have a par value.

(b)     Unless otherwise established by the Board of Directors, all shares of the Corporation are common shares entitled to vote and shall be of one class and one series having equal rights and preferences in all matters. Unless otherwise provided in these

Articles, the Bylaws of the Corporation, or the terms of the shares, a common shareholder has (1) vote for each share held.

(c)     The Board of Directors shall have the power to establish more than one class or series of shares and to fix the relative rights and preferences of any such different classes or series.

(d)     The shareholder of the Corporation shall not have preemptive rights, unless with respect to some or all of the authorized and unissued shares, the Board of Directors grants preemptive rights.

(e)     Cumulative voting for directors is not permitted.

(f)     Notwithstanding the powers granted to the Board of Directors expressed above or otherwise provided by law, at any time following the filings of an election to be treated as an S corporation under the Internal Revenue Code, as amended from time to time, and prior to the revocation or termination of the S corporation election without the prior express written consent of the holders of a majority of the voting power of the shares entitled to vote. Any such action taken without such consent shall be null and void and shall not affect the beneficial ownership of the shares.

## ARTICLE 5.

### DIRECTORS' ACTION

Any action, other than an action requiring shareholder approval, may be taken by written action signed, or consented to by authenticated electronic communication, by the numbers that would be required to take the action at a meeting at which all directors were present.

## ARTICLE 6.

### SHAREHOLDERS ACTION

Any action which may be taken at a meeting of the shareholders may be taken without a meeting by written action signed, or consented to by authenticated electronic communication, by shareholders having voting power equal to the voting power that would be required to take the same action at a meeting of the shareholders at which all shareholders are present.

## ARTICLE 7.

### DIRECTORS' LIABILITY

A director of the Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director;

provided, however, that this Article 7 shall not eliminate or limit the liability of a director to the extent provided by applicable law (i) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (iii) for any transaction from which the director derived an improper personal benefit, or (iv) for liability for any act or omission occurring prior to the effective date of this Article 7. If Delaware law is hereafter amended to authorize the further elimination or limitation of the liability of directors, then the liability of a director of the Corporation, in addition to the limitation on personal liability provided herein, shall be limited to the fullest extent permitted by the amended Delaware law. Any repeal or modification of this Article 7 by the shareholders of the Corporation shall be prospective only and shall not adversely affect any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE 8.

## AMENDMENT OF ARTICLES

The shareholder vote required for adoption of an amendment to these Articles of Incorporation shall be the affirmative vote of the holders of a majority of the voting power of the shares present and entitled to vote at a shareholders' meeting.

## ARTICLE 9.

## FUNDAMENTAL CHANGES

In any of the following types of actions or transactions with respect to which the law requires a vote of the outstanding shares of the Corporation, the affirmative vote of two-thirds (2/3) of the shares entitled to vote shall be required to authorize the following action or transaction:

(a)     A merger with any other corporation or corporations, other than a merger or consolidation which would result in the voting securities of the corporation outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 50% of the total voting power represented by the voting securities of the Corporation or such surviving entity outstanding immediately after such merger or consolidation;

(b)     An exchange of one or more classes or series of the shares of the Corporation for the shares of one or more classes or series of one or more other corporations, other than an exchange which would result in the voting securities of the Corporation outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into) voting securities at least 50% of the total voting power represented by the

voting securities of the Corporation outstanding immediately after such exchange;

(c)     The sale, lease, transfer, or other disposition of all, or substantially all, of the Corporation's property and assets, including its goodwill, not in the usual and regular course of business;

(d)     The voluntary dissolution of the Corporation."



# EXHIBIT D

ACTION OF INCORPORATOR
OF
ANTROPY INCORPORATED

The undersigned, being the sole Incorporator of the above-referenced corporation, pursuant to the authority vested in the Incorporator by the Delaware General Corporation Law, does hereby approve and adopt the following resolutions:

ADOPTION OF BYLAWS:

RESOLVED, that the Bylaws of this corporation in the form attached hereto as Exhibit A, are adopted as the Bylaws of this corporation.

ELECTION OF DIRECTORS:

RESOLVED, the following persons are elected as the initial directors of this corporation:

Richard E. Demaray

Christopher D. White

Richard E. Demaray

DATED: December 15, 2009

<u>EXHIBIT A</u>

**BYLAWS**
**OF**
**ANTROPY INCORPORATED**

**ARTICLE I**
**SHAREHOLDERS**

**Section 1. <u>Annual Meeting</u>.** An annual meeting shall be held once each calendar year for the purpose of electing directors and for the transaction of such other business as may properly come before the meeting. The annual meeting shall be held at the time and place designated by the Board of Directors from time to time.

**Section 2. <u>Special Meetings</u>.** Special meetings of the shareholders may be requested by the President, the Board of Directors, or the holders of a majority of the outstanding voting shares.

**Section 3. <u>Notice</u>.** Written notice of all shareholder meetings shall be provided under this section or as otherwise required by law. The Notice shall state the place, date, and hour of meeting, and if for a special meeting, the purpose of the meeting. Such notice shall be mailed to all shareholders of record at the address shown on the corporate books, at least 10 days prior to the meeting. Such notice shall be deemed effective when deposited in ordinary U.S. mail, properly addressed, with postage prepaid.

**Section 4. <u>Place of Meeting</u>.** Shareholders meetings shall be held at the corporation's principal place of business unless otherwise stated in the notice.

**Section 5. <u>Quorum</u>.** A majority of the outstanding voting shares, whether represented in person or by proxy, shall constitute a quorum at a shareholders meeting. In the absence of a quorum, a majority of the represented shares may adjourn the meeting to another time without further notice. If a quorum is represented at an adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally scheduled. The shareholders present at a meeting represented by a quorum may continue to transact business until adjournment, even if the withdrawal of some shareholders results in representation of less than a quorum.

**Section 6. <u>Informal Action</u>.** Any action required to be taken, or which may be taken, at a shareholders meeting, may be taken without a meeting and without prior notice if a consent in writing, setting forth the action so taken, is signed by the shareholders who own all of the shares entitled to vote with respect to the subject matter of the vote.

## ARTICLE III
## OFFICERS

**Section 1. Number of Officers.** The officers of the corporation shall be a President, one or more Vice-Presidents (as determined by the Board of Directors), a Secretary, and a Treasurer. Two or more offices may be held by one person.

**Section 2. Election and Term of Office.** The officers shall be elected bi-annually by the Board of Directors at the first meeting of the Board of Directors following the annual meeting of the shareholders. Each officer shall serve a two year term or until a successor has been elected and qualified.

**Section 3. Removal or Vacancy.** The Board of Directors shall have the power to remove an officer or agent of the corporation. Any vacancy that occurs for any reason may be filled by the Board of Directors.

## ARTICLE IV
## CORPORATE SEAL, EXECUTION OF INSTRUMENTS

The corporation shall not have a corporate seal. All instruments that are executed on behalf of the corporation which are acknowledged and which affect an interest in real estate shall be executed by the President or any Vice-President and the Secretary or Treasurer. All other instruments executed by the corporation, including a release of mortgage or lien, may be executed by the President or any Vice-President. Notwithstanding the preceding provisions of this section, any written instrument may be executed by any officer(s) or agent(s) that are specifically designated by resolution of the Board of Directors.

## ARTICLE V
## AMENDMENT TO BYLAWS

The bylaws may be amended, altered, or repealed by the Board of Directors or the shareholders by a two-thirds majority of a quorum vote at any regular or special meeting; provided however, that the shareholders may from time to time specify particular provisions of the bylaws which shall not be amended or repealed by the Board of Directors.

## ARTICLE VI
## INDEMNIFICATION

Any director or officer who is involved in litigation by reason of his or her position as a director or officer of this corporation shall be indemnified and held harmless by the corporation to the fullest extent authorized by law as it now exists or may subsequently be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights).



# EXHIBIT E

March 15, 2012

**To**: Mr. Douglas A. Kelley,
Partner & President
Kelley, Wolter & Scott, P.A.,
dkelley@kelleywolter.com

**Subject**: *Offer to Purchase Symmorphix Patents Currently Assigned to Springworks LLC.*

Dear Sir,

I respectfully submit this offer to purchase certain assets of Springworks LLC, a Delaware corporation and a wholly-owned subsidiary of Petters Group Worldwide, LLC ("Springworks"), which assets are identified on Exhibit A hereto (the "Patents"). I request your support as the receiver to authorize and confirm that the Patents, listed below and currently assigned to Springworks, be sold and transferred to Antropy Inc., a Delaware corporation ("Antropy"), pursuant to an Intellectual Property Asset Purchase Agreement. I am the founder, owner and President of Antropy. Neither Antropy nor any of its directors, officers or stockholders – including me – are affiliated or associated in any way with Thomas J. Petters, Springworks, or with any other entity owned or controlled by Thomas J. Petters.

**Background:** The Patents resulted from my work for Symmorphix Inc., a Delaware corporation ("Symmorphix"), which operated in Santa Clara, Sunnyvale and Santa Rosa, California from the time when I cofounded Symmorphix with several others in 1998 until Symmorphix's assets were taken by Springworks in 2007. Springworks acquired a majority ownership in Symmorphix in 2004, and took possession of the Patents in 2007 via what they termed a "Voluntary Surrender Agreement." The Voluntary Surrender Agreement was authorized and executed by Petters and Springworks representatives as majority owner of Symmorphix and the rights transferred to another entity in which Springworks had an equity interest.

Antropy Incorporated
DWT 16742162v1 0000099-010073

March 15, 2012

The Patents, filed by Symmorphix and currently assigned to Springworks includes the 32 Patents related to vacuum thin film technology, selected from 57 related SI matters subject to prosecution by Haynes and Boone, LLP of San Jose CA with continuing support of the receiver. As a co-founder of Symmorphix in November 1998 and its CTO, I am an inventor of the Patents, having originated, reduced to practice, authored, filed and prosecuted all the subject Patents. I designed and supervised fabrication of the scanning magnetron physical vapor deposition (PVD) vacuum thin film production equipment. I helped conceive the SI thin film products and devices enabled in the Patents, some of which were successful and some of which were not.

I have worked without success for the last four years to interest companies and investors in acquiring the Patents. But the need for custom thin film equipment and a lack of a  product with sufficiently short time to revenue has, in my view, been a significant impediment to attracting interest in acquiring the Patents. The custom magnetron PVD equipment, specific  to the Patents claims, that is required to develop and produce commercial products enabled by the Patents typically costs \$2M to \$5M or more to build. But to build it requires three to five times that amount to develop and design, since the patented systems are not available as standard OEM equipment. In addition, OEM lithography, plasma dry etch, furnace anneal, as well as a suite of metrology tools, all of similar cost, are required to perform patterning steps and activation of phosphors, as called out in many of the granted claims. The tool cost again is required to install and implement the deposition equipment in a building with suitable utilities including a clean room with class 10 or better HEPA clean room air purification, gowning and production, owing to the fact that thin film products are subject to failure by the finest of foreign material contamination. More direct cost is required to staff and ramp production. But dwarfing these costs, the market development and product qualification and testing cost to bring a thin film product to market can be again several times the total of the direct and indirect costs. The sum startup cost  for a new product with a new

2

March 15, 2012

technology and new manufacturing equipment is the major barrier to utilization for which   the Patents have proven to be of little interest to others.

In addition, it is a further bell weather of difficulty to come, that half of the Patents are still pending and may not be allowed without significant modification to current claims and further prosecution of the applications. The continuing cost to support the prosecution and fees of several kinds are a substantial burden for whoever is in possession of the portfolio. Also, the allowed Patents are wasting assets. The first "Pulsed DC…" application has a priority date of June of 2002. It is now ten years later. The time value of the allowed half of the selected portion of the portfolio has diminished by half, not only in the grant duration, but also due to the pace of competing technology.

**The Offer:** Antropy is pleased to offer cash in the amount of $225,000.00 for the Patents.  In addition, Antropy is also willing to include 5% of its outstanding common stock as part of its offer. This percentage is equal to the royalty paid for more than 2000 patents due to the largest incumbent (Phillips Lumiled & Licensing Affiliates) in the area of solid state lighting, the area of Antropy business. Equity participation provides the receiver and beneficiaries' participation in the distribution of receipts from licenses and royalties, as well as an equity stake in Antropy going forward.

Clearly, substantial additional investment and work will be necessary to generate funds to support the continuing cost of patent prosecution, to develop manufacturing equipment and facilities and to demonstrate products of sufficient value having the benefit of the legacy Patents as well as new patents to build a profitable going business. Antropy believes it is in the best interest of the receivership and of Antropy to agree upon a sale of the Patents on the terms set forth herein.

Antropy Incorporated
DWT 16742162v1 0000099-010073

March 15, 2012

Please advise me as to how to proceed. I will be glad to help with questions and other diligence regarding this offer and the associated agreement.

Kind Regards,

Ernest Demaray



R. Ernest Demaray, Ph.D
President, Antropy Inc.
Portola Valley, CA
ed@antropy.us.com
+1 650 283 7765

## EXHIBIT A

## The Patents:

1.  Appl. No. 11/191,643 **PENDING**
2.  Patent No. 7,378,356
3.  Patent No. 7,544,276
4.  Patent No. 7,413,998
5.  Patent No. 7,381,657
6.  Appl. No. 11/100,856 **PENDING**
7.  Patent No. 6,884,327
8.  Patent No. 6,506,289
9.  Patent No. 6,827,826
10. Patent No. 6,533,907
11. Patent No. 7,469,558
12. Appl. No. 10/650,461 **PENDING**
13. Patent No. 1274199
14. Patent No. 7,205,662
15. Appl. No. 200480005515.5  **PENDING**
16. Appl. No. 04715009.9 **PENDING**

17. Patent. No. 0691168
18. Patent No. 114328
19. Appl. No. 93114493 **PENDING**
20. Patent No. 7,262,131
21. Patent No. 7,238,628
22. Appl. No.200480021078.6 **PENDING**
23. Appl. No. 04751754.5 **PENDING**
24. Appl. No. 93114518 **PENDING**
25. Appl. No. 11/726,972 **PENDING**
26. Appl. No. 11/297,057 **PENDING**
27. Appl. No. 94143175 **PENDING**
28. Appl. No. 200580042305.8 **PENDING**
29. Appl. No. 201010161517.0 **PENDING**
30. Appl. No. 05853649.1 **ISSUED**
31. Appl. No. 2007-545692 **PENDING**
32. Appl. No. 10-2007-7014536 **PENDING**

4



# EXHIBIT F

7/16/12 9:07 PM



Chris White <chris.white@convergent-tech.net>

# Email @ Antropy for David Orgill

**Ernest Demaray** <ernest.demaray@convergent-tech.net>    Thu, Jul 28, 2011 at 1:43 PM
To: Chris White <chris.white@convergent-tech.net>

Hi Chris,

How is your summer. Not much is going on. I tried another offer with a license percentage instead of equity. But I need to show license potential.

I'd like to get an email address for David Orgill, something like   do@antropy.us.com .  Dave was the President of Litrex, an inkjet printing equipment company. He is looking for something to do and he has a good client that is interested in one of the plastic coating applications in the SI portfolio, but doesn't want to own the patents or build a system but would like to have a license of some kind.  It is an example of what could be done with the IP. I'd like to see what Dave can do with this client to endorse the Antropy offer to the receiver. . How hard is it to add another user to the address?

As far as I know, there is no change with the IP situation or the receiver.


Ernest

--
Ernest Demaray, Ph.D.
Convergent Technology Inc
ernest.demaray@convergent-tech.net
650-283-7765 M
650-529-9027 O



# EXHIBIT G

From: Ernest Demaray <ed@antropy.us.com>
Subject: **Update**
Date: May 15, 2012 1:23:06 PM PDT
To: Chris White <cwhite11@mac.com>
Cc: Melissa <melissa.demaray@gmail.com>

Hi Chris

Thanks for your note and the screenplay. Just took a look, nice start. You did mention you were working on it, so good going with WME!
There is a tremendous amount to work with there for a series. I'll interrupt the Civil War - I'm reading Foote's three volume series - and see
how you treat your dad's part. Breaking Bad comes to mind, particularly since I'm a Chemist and wonder what I'd have done in that guy's place.

My project is going forward, but it is much more than I imagined. I own the patents and the licenses but don't have the clout or time to work to extract legacy value just yet. I'm affiliated with NASA AIMS Laboratory and have written several DOE and ARPAe grant proposals
around milestones that would develop my new provisional inventions. I also have several reps in contract for comission to help sell R&D POs
and licenses. I'm working on building and working simulations for optical couplers for LEDs, Laser diodes and also for a solar revceiver, just the
LED coupler working in reverse and have several companies at different stages of evaluation. I retained Hanes & Boone - Dr. Gary Edwards to
represent me and also prosecute the IP as he did previously for Symmorphix, Springworks, the reciever and now myself again. Gary know
more about the contracts than anyone, myself included and it is a pleasure to have him on my side again.

There was a high level of scrutiny and I had, several times, to certify that I had no contact with anyone associated with any activity of the receiver, etc.
But now I just need to turn on revenue and complete the terms of the contract which runs for three years from February 24.

I think you still have an Antropy web site up. I may not use Antropy, since I had to buy the assets myself. The patents are assigned to me at the USPTO.
A fact I find a little unnerving, but also kind of exciting. It might be good to take down the Antorpy web site for now. That would be a help in the near term.

In June and July, I will need some of the help we discussed putting up a current web site, so would be glad for help in kind. I can even provide a contract
which would provide a commission when we do have a PO or license payment, or warrants for stock if It turns out I need to form an equity entity as I will
under some scenarios.

Do keep me up to date on your publishing career and also say hi to your dad. I think about him quite a bit - probably he can hear me sometimes.

Cheers,

Ernest



# EXHIBIT H

Dear Ernest,

I believe that I have gotten to know you well since we met at my Father's cabin, and I have greatly enjoyed working side by side with you.  You and my Father have been close friends for many years, and he and I have both greatly valued your friendship, your partnership and trusted professional alliance, and we consider you to be a man of integrity.

While you are the inventor and have put your life and soul into this, together, the three of us, as partners, have built this corporation.  You may well be the man who has solved the world's energy problems, but with out each of our contributions you would not be in a position to realize the rewards from your genius. Without each of our contributions, there would be nothing. When one enters into a business relationship, an expectation of open, honest and ethical behavior and communication is integral to the foundation of the business.

It is essential for me to state to you, Ernest, that I am troubled by your recent actions.  I believe that you have misunderstood or discounted several key issues pertinent to the decisions you have made, and I am deeply concerned that we are at a juncture where, if we are not careful, it could be detrimental to our corporation and yourself.

I feel that there have been many promises that you haven't been keeping up with. Besides having had a clear verbal understanding of our business partnership, we have a contractual agreement. As the legal documents show, I am Vice President, Director, and 48% owner of Antropy. You signed the corporate documents to this effect on December 29th, 2009 at the same time that you signed a Research and Development and Assignment Agreement that gives all rights to the solar technology to Antropy. To change this would require an action by the board of Antropy, which hasn't happened. You and I are the only board members of Antropy. I am concerned that by entering into contractual obligations, and not recognizing my ownership and that the patents are an asset of the corporations, you could put yourself at great risk.

My concern arises from your last email in which you said, "I may not use Antropy, since I had to buy the assets myself". This is concerning on many levels.

You have made reference to two reasons for buying the patents in your name instead of Antropy's. First, that the corporation didn't have the financial means to take advantage of the opportunity. Secondly, you stated, "There was a high level of scrutiny and I had, several times, to certify that I had no contact with anyone associated with any activity of the receiver, etc.".

First, to address the funding issue, you killed the final, sellable, version of the PPM before a single sales consultant or potential investor ever saw it. I finished the revised PPM on February 17th and before it was ever seen, on February 19th, you called it off. Besides that, we had agreed that I would put $150,000 to $200,000 into Antropy, matching your investment. The money was available to purchase the patents.

On the second issue, contrary to assertions made to the receiver you were associated with individuals to connected to the Petter's fraud:
  • At the time of the purchase you, my Father and I were equity partners in CTC, which holds a license to the patents.
  • At the time of the purchase you and I were equity partners in Antropy.

- You, my Father, and I worked together for many years towards the acquisition of the patents. I have 510 emails with you that corroborate that. Many of these emails include my Father and show that he was a key strategist in acquiring the patents.
- The initial offer to purchase the patents was made by Antropy.

Purchasing the patents in your name rather than into Antropy does not change the connections you had with individuals associated with the Petter's fraud. The receiver may perceive that your assertions were false.

The laws are very clear as to the fiduciary responsibilities of a corporation's officers and board members, which includes; acting in the interest of the company rather than the member's personal interest and making decisions to protect the assets of the corporation.

As an Officer and Director you have a legal duty not to usurp a corporate opportunity. By purchasing the patents in your own name you have breached your fiduciary duty. The purchase of the patents was, without question, an opportunity that Antropy was actively pursuing. In fact, you started out negotiating the purchase of the patents on behalf of Antropy.

It's also a breach of fiduciary duties to divert corporate assets. The provisional patents are property of Antropy. Because you were acting in your corporate capacity as the President, CEO, and Director of Antropy in the discovery of the invention, authorship of the patents and the creation of the bench demo, regardless of whether or not you used personal funds to acquire equipment and materials, are property of the company.

To not assign the patents to Antropy would be to usurp a corporate opportunity and breach your fiduciary duties to Antropy. To not assign the provisional patents to Antropy would be to divert corporate assets.

I will be happy to provide you with copies of any of the documents that I have referenced above.

My hope is to be able resolve these issues and move forward working together for the good of Antropy. I believe it is in everyone's best interest. There may need to be some accommodations with respect to certain agreements that you may have made that I am unaware of. But we need to get past this speed bump and together begin to rebuild our relationship and our corporation for the benefit of all in a positive and collaborative manner. I suggest we get together as soon as our schedules permit.

Sincerely,



Chris



EXHIBIT I



April 12, 2013

VIA U.S. MAIL

**RULE 408 SETTLEMENT**
**COMMUNICATION**

Gary J. Edwards, Esq.
Yan Zhang, Esq.
Haynes and Boone
2033 Gateway Place, Suite 300
San Jose, CA 95110

Re:   **Dr. R. Ernest Demaray and Antropy Incorporated**

Dear Messrs. Edwards and Zhang:

We represent Christopher D. White, 48% owner of Antropy Incorporated ("Antropy"). We
understand that your firm represents Dr. R. Ernest Demaray, who owns the other 52% of
Antropy. If you do not represent Demaray, please let us know as soon as possible.

We write to discuss three serious issues arising from Demaray's treatment of Antropy and White.

First, we believe that Demaray breached his fiduciary duties to Antropy and White by usurping a
corporate opportunity. From March to October 2011, Antropy negotiated to buy certain patents
from a court-appointed receiver for SpringWorks, LLC (the "Patent Portfolio"). Demaray was in
charge of negotiating for Antropy, and White believed that Demaray was doing so in good faith.
He was not. In late October 2011, Demaray asked the receiver to change the "Buyer" in the
purchase agreement from Antropy to Demaray personally. Demaray did not discuss this change
with White or give him an opportunity to object. In fact, Demaray did not reveal the change to
White until May 2012 – four months *after* Demaray purchased the Patent Portfolio. White was
outraged at Demaray's conduct. Shortly thereafter, he wrote to Demaray and alleged that
Demaray's conduct breached fiduciary duties to Antropy and White. Demaray did not respond.

Second, Demaray may also be in the process of breaching an exclusive license agreement he
granted to Antropy in 2009 that covers patents relating to solar energy.

Third, Demaray is destroying evidence relevant to his breach of fiduciary duties. This
constitutes spoliation and may lead to sanctions if this matter results in litigation.

We address these issues in more detail below.

Attorneys & Advisors / Fredrikson & Byron, P.A.
main  612.492.7000 / 200 South Sixth Street, Suite 4000
fax  612.492.7077 / Minneapolis, Minnesota
www.fredlaw.com / 55402-1425

MEMBER OF THE WORLD SERVICES GROUP / OFFICES
A Worldwide Network of Professional Service Providers / Minneapolis / Bismarck / Des Moines / London / Monterrey, Mexico / Shanghai

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 2

## I.    Demaray Breached His Fiduciary Duties to Antropy and White

Demaray breached his duty of loyalty to Antropy and White by purchasing the Patent Portfolio
in his own name.  Antropy is a Delaware corporation.  Under Delaware law, a claim for breach
of fiduciary duty has two main elements: (1) a fiduciary duty existed and (2) the defendant
breached that duty.  *In re Mobilactive Media, LLC*, 2013 Del. Ch. LEXIS 26 at *69 (Del. Ch.,
Jan. 25, 2013).  At the core of the fiduciary duty is the notion of loyalty – the equitable
requirement that, with respect to the property subject to the duty, a fiduciary always must act in a
good faith effort to advance the interests of his beneficiary.  *Id.* at *70.  As a result, it "forbids
one joint adventurer from acquiring solely for himself any profit or secret advantage in
connection with the common enterprise."  *Id.* (quoting *J. Leo Johnson, Inc. v. Carmer*, 156 A.2d
499 (Del. 1959)).

The doctrine of corporate opportunity represents but one species of the broad fiduciary duties.
*Id.*  The elements of misappropriation of corporate opportunity are: (1) the opportunity is within
the corporation's line of business; (2) the corporation has an interest or expectancy in the
opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking
the opportunity for his own, the fiduciary is placed in a position inimical to his duties to the
corporation.  *Id.* at *70-71.  The evidence here shows that Demaray owed White and Antropy a
duty of loyalty and breached that duty by taking the opportunity to buy the Patents for himself.

### A.    Demaray Owed White and Antropy a Duty of Loyalty

At all relevant times, Demaray owed White and Antropy a duty of loyalty because Demaray
owns 52% of Antropy, while White owns the other 48%.  We recognize that Demaray has
previously disputed White's ownership, but the evidence establishing White's standing is clear.

On December 29, 2009, Demaray emailed White a series of corporate documents, each bearing
Demaray's signature.  *See, e.g.*, Exhibit A.  The first relevant document is entitled "Action of
Incorporator of Antropy Incorporated."  Exhibit B.  In it, Demaray indicated that he and White
were "elected as the initial directors" of Antropy.  *Id.*  The next document, entitled "Minutes of
Action in Lieu of Meeting of Board of Directors of Antropy Incorporated" (the "Minutes") stated
that the Board adopted "the following resolutions effective as of the 17th day of December
2009."  Exhibit C, p. 1.  It then indicated that Demaray and White elected Demaray as "President
and CEO" and White as "Vice President, Treasurer, and Secretary."  *Id.*

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 3

Under a section entitled "Resolutions Authorizing Issuance of Shares," the Minutes stated:

WHEREAS, the Corporation has received an offer from Christopher D. White to acquire 2,400,000 common shares of the Corporation (the "shares"); and

NOW THEREFORE, IT IS HEREBY

RESOLVED, that in consideration of the payment in cash, to or on behalf of, the Corporation of $240.00 or $.0001 per share, the sufficiency of which is hereby expressly acknowledged, the Corporation is authorized and shall issue to Christopher D. White 2,400,000 common shares of the Corporation (the "shares").

Demaray and White signed the Minutes as Directors *and* Shareholders:

DIRECTORS:                                SHAREHOLDERS:

Richard E. Demaray                        Richard E. Demaray

Christopher D. White                      Christopher D. White

*Id.*, pp. 2-3 (highlighting added). White paid for his shares in October 2010 by transferring money into Antropy's bank account. Exhibit D. Thus, White owns 48% of Antropy pursuant to the terms in the Minutes.

Beyond money, White put "sweat equity" into Antropy from 2009 to 2012 to help get the company off the ground. Specifically, he helped Demaray develop Antropy's business plan, draft private placement memoranda, and solicit funding from investors. White's connection to Antropy during the relevant period is undeniable. For example, Antropy's bank account used White's home address in Bellevue, Washington as the company's mailing address. *Id.* In addition, White still has over 500 emails in which he discussed Antropy business with Demaray.

We understand that Demaray has asserted to third parties that White's ownership interest was contingent on his successfully raising money for Antropy. This contention, however, lacks any evidentiary basis. The Minutes reflect White's ownership interest, and the only contingency identified in that document is a payment of $240. White performed that obligation. Indeed, the

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 4

Minutes state that 2,400,000 shares *shall* issue to White upon payment of his $240 investment.
Exhibit C, p. 2. We have not located any other contingencies.

Contrary to Demaray's assertion, other documents are consistent with the agreement set forth in
the Minutes. For example, an Antropy Private Placement Memorandum ("PPM"), dated
November 5, 2010, contains a table entitled "Capitalization" that identified White as 48% owner:

### CAPITALIZATION

| | Total Shares Issued And Outstanding | | | | |
| | Before Offering | | | After Offering | |
| | # Shares | % | | # Shares | % |
|---|---|---|---|---|---|
| Dr. R. E. Demaray | 2,600,000 | 52% | | 2,600,000 | 29.80% |
| ▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓ | 48% | | 1,825,000 | 20.92% |
| Shareholders with less than 5% | | | | 575,000 | 6.59% |
| Incentives | | | | 600,000 | 6.88% |
| New Share Holders | | | | 3,125,000 | 35.82% |
| | 5,000,000 | 100.0% | | 8,725,000 | 100.0% |

Exhibit E, p. 15 (highlighting added). The figures shown in the PPM are identical to what
Demaray and White agreed to as Directors and Shareholders a year earlier in the Minutes.

There is no support for Demaray's assertion that he was Antropy's sole owner. It appears that
Demaray simply decided in 2011 that he no longer needed a partner and began acting as though
White had no ownership interest. The corporate documents establish otherwise. White owns
48% of the company. Thus, Demaray owed White and Antropy fiduciary duties.

    **B.**    **Demaray Breached His Duties to Antropy and White by Usurping a
Corporate Opportunity.**

Demaray breached his fiduciary duties to Antropy and White by usurping a corporate
opportunity that rightly belonged to Antropy. His decision to buy the Patent Portfolio in his own
name without first giving his fellow board member and shareholder notice constitutes a breach of
the duty of loyalty.

    **1.**    **The "Line of Business" and "Interest or Expectancy" Elements.**

We address the first and second elements for misappropriation together, because the same
evidence establishes both. From the beginning, Antropy's entire purpose was to buy the Patent
Portfolio. Indeed, the *first line* in the Executive Summary for the November 2010 PPM stated as
follows: "Antropy Incorporated is seeking funding in order to purchase a portfolio of patents."

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 5

Exhibit E, p. 6. The PPM continued by stating that "[o]nce purchased, Antropy will monetize and further develop the technologies protected by these patents." *Id.* The PPM gave no other reason for raising funds. Rather, it noted that the "investor's entire investment amount will be returned to the investor if Antropy is unable to make the purchase…." *Id.*, p. 7.

In the "Risk Factors" section of the PPM, Antropy confirmed that buying the Patent Portfolio was not only the company's goal, it was critical to the company's existence:

> Antropy is an early stage company with no operating or financial history. Antropy will attempt to obtain the portfolio of patents from receivership. Without the portfolio of patents, Antropy will be unable to accomplish their business model and the Company would [be] ineffective.

*Id.*, p. 19. There was no ambiguity; Antropy needed the Patent Portfolio to survive.

In light of this evidence, Demaray cannot reasonably claim that the opportunity to buy the Patent Portfolio was outside Antropy's line of business or that Antropy lacked an interest or expectancy in that opportunity. The original offer to buy the Patent Portfolio in March 2011 went from Antropy to the receiver. Exhibit F. Antropy remained the "Buyer" in drafts of the purchase agreement until late October 2011, when Demaray secretly switched to buying the Patent Portfolio in his own name. Exhibits G-H. Thus, the first two elements are met.

## 2. The Financial Ability Element.

In Delaware, the standard for showing whether the "corporation is financially able to exploit the opportunity" differs depending on whether the defendant actually disclosed the opportunity. *See Mobilactive Media*, 2013 Del. Ch. LEXIS 26, *77-80 (discussing *Yiannatsis v. Stephanis ex rel. Sterianou*, 653 A.2d 275 (Del. 1995)). For example, in *Yiannatsis*, the Delaware Supreme Court concluded that a breach of fiduciary duty based on usurpation had occurred *without* the need to consider the company's financial condition. *Yiannatsis*, 653 A.2d at 279. The *Mobilactive Media* Court cited *Yiannatsis* and concluded that "the same result should obtain" where one shareholder fails to disclose an opportunity to a co-owner. 2013 Del. Ch. LEXIS 26, *77-80. While the *Mobilactive Media* Court pointed out that there was, in fact, *prima facie* evidence showing that the plaintiff had been in position to fund the purchases, it concluded the relevant discussion by returning to the logic of *Yiannatsis*: "If Defendants are permitted to justify their conduct on a theory of corporate inability to exploit the opportunity, there will be a temptation by potential usurpers to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity for profit will be open to them personally." *Id.* at *80.

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 6

That is precisely the situation here. We expect Demaray will give a laundry list of reasons why he claims he needed to buy the Patent Portfolio in his own name instead of through Antropy. Those arguments are moot, however, because Demaray undeniably changed the "Buyer" in the purchase agreement from Antropy to himself *without giving notice to White*, his fellow board member and shareholder. Under *Yiannatsis* and *Mobilactive Media*, that act alone constitutes a breach of fiduciary duties. Demaray cannot defend himself by arguing that disclosure would have been futile.

In any case, there is *prima facie* evidence of financial capability here, just as in *Mobilactive Media*. First and most telling are statements by Brad Haddy, a lawyer representing Antropy, to Michael Phelps, the receiver's representative. In a June 2011 email, Haddy explained that Demaray would pay the cash portions of the purchase offer, while Antropy would "exploit" the value of the technology. Exhibit I, pp. 4-5. Haddy specifically stated that "Dr. Demaray anticipates income for Antropy to come from several different sources: licensing, royalties, and product marketing in various areas including energy conversion, transfer and storage." *Id.* He continued by stating that "Antropy anticipates doing a private equity offering after it has obtained the IP" and "[w]ith the immediate revenue stream and strategic partnerships, Dr. Demaray does not anticipate the need for further financing." *Id.* In other words, Demaray planned to fund the up-front portion of the purchase himself, but use Antropy funds to pay the back-end portion. There was no suggestion that Antropy lacked financial capability to perform. In fact, we understand that Demaray is using this exact model through a new entity that he formed without White: Demaray, LLC. There is no reason Antropy would have been unable to carry out that original plan.

Second, Antropy had access to funds. In addition to the $300,000 that Demaray actually paid under the Purchase Agreement, White repeatedly offered to invest as much as $200,000 more into Antropy to help finance the purchase. Exhibits F and J-L. If needed, White's mother will testify that she had $200,000 available that she was willing to lend him to get the deal done. Money was not a problem.

Third, even leaving aside White's ability to contribute more to Antropy, the company had numerous opportunities to raise money that Demaray defeated for one reason or another. For example, in 2010, Antropy had a signed letter of intent ("LOI") from Global Resources for Environmental Energy Needs, Inc. ("GREEN") to invest $50M in Antropy. Exhibit M. Demaray balked at the deal, however, and it was revised in a second LOI to reduce GREEN's investment to $2M. Exhibit N. While Demaray signed the second LOI, he ultimately let that deal fall through as well.

Likewise, Demaray obstructed White's efforts to raise money. White prepared two PPMs that could have raised far more than the $300,000 that Demaray ultimately paid to buy the Patent Portfolio. Antropy had several investor leads by early 2011, but Demaray lacked patience and

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 7

scuttled each PPM before giving them any chance to succeed. In fact, he canceled the second PPM just days after White finished drafting it and before White could approach any investors with the documents. As the Delaware Court suggested might happen in *Mobilactive Media,* Demaray refrained from exerting his strongest efforts on behalf of Antropy because doing so meant sharing the rewards with White. After undermining any attempt to bring money into Antropy, Demaray now asserts that the company was incapable of raising funds. The evidence shows the opposite.

Demaray has also previously contended that Antropy could not buy the Patent Portfolio because White's father was involved in the Petters scandal that resulted in the Patent Portfolio being available for purchase. This is revisionist history. As discussed above, the negotiations from March to October 2011 involved Antropy as the "Buyer." *See* Exhibits F-I. We've examined the district court record for *United States v. Thomas J. Petters, et al.,* Case No. 0:08-cv-05348-ADM-JSM (D. Minn.) and found nothing suggesting that the receiver was unwilling to deal with Antropy. To the contrary, the only potential holdups ever identified were easily surmountable.

On October 27, 2011, counsel for the receiver, Richard McNeil, sent an email to Haddy. Exhibit H, pp. 2-3. In the email, McNeil asked Haddy to confirm that the Antropy named in the purchase agreement was a Delaware company, as a paralegal had located a California company with the same name. *Id.* In addition, McNeil pointed out that the Delaware company was overdue in filing its 2010 franchise tax report and stated that "someone should do that, if the Delaware entity is the one we are going to use." *Id.* Haddy wrote back and proposed a switch: "For ease, can we just make Dr. Demaray the purchaser?" *Id.*, p. 2.

That was all it took. McNeil responded two hours later by stating, simply: "Per your e-mail below, I have revised the Purchase Agreement to make Dr. Demaray, rather than Antropy [sic] Incorporated, the Buyer and eliminate the personal Guaranty, which of course is not necessary with Dr. Demaray as the Buyer." *Id.*, pp. 1-2 and 6. The receiver never indicated he was unwilling to go forward with Antropy as the Buyer. And the idea of switching from using Antropy as the Buyer to using Demaray came from Haddy, not the receiver. This evidence suggests that Demaray could have closed the deal through Antropy, but he saw an opening and took the opportunity for himself.

### 3.   The Conflict with the Company Element.

By taking the opportunity from Antropy, Demaray now stands in a position inimical to his duties to the company. Demaray prevented Antropy from obtaining the very assets it was created to buy. The November 2010 PPM, for example, recognized that without the Patent Portfolio, Antropy will not be able to accomplish its business model and will be "ineffective." Exhibit E, p. 19. And that is how it has played out. Demaray abandoned Antropy to start Demaray, LLC as a new entity to license the Patents.

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 8


While bad faith is not a separate requirement under Delaware law, it is nonetheless worth pointing out statements by Demaray that show his actions did not result from a misunderstanding or mistake. On April 27, 2011, Demaray wrote to Haddy and affirmatively declared that he intended to keep White in the dark. Exhibit Q. In the email, Demaray falsely claimed that he was "the only stockholder and the sole proprietor of Antropy." Id. In addition, he stated the following:

- "Chris is in no way involved. Nor do I anticipate involving him in any way.

- Chris has no knowledge of my having retained you as council [sic] or of our present activity.

- I have no intention of engaging him in any way...."[1]

Demaray succeeded in his scheme to cut his fellow board member and minority shareholder out of the loop. Despite changing the purchase agreement in October 2011, Demaray did not inform White of the change until May 2012. Exhibit R. By then, it was too late. The district court had already approved the sale to Demaray four months earlier, in January 2012.

---

[1]    Lest Demaray claim that his communications with Haddy are privileged and protected from White, there are several fatal flaws in that argument. First, Haddy represented Antropy during the relevant time period. He worked with White on drafting two PPMs and represented Antropy in negotiating with the receiver in mid-2011. Exhibits E and P-Q. Second, even if it were proper for Haddy to drop Antropy as a client in October 2011 and represent Demaray in the same transaction *against* Antropy's interests, the emails between Demaray and Haddy were sent to and from Demaray's Antropy email address. The Antropy email accounts were set up using Google Apps, and the "sign-in" page gave Demaray clear legal notice that the account administrator had access to Demaray's data. White is the account administrator for Antropy in his position as Vice President. As a result, Demaray had no reasonable expectation that he could protect discussions over company email about a scheme to misappropriate a corporate opportunity and squeeze out a minority shareholder. Third, the privilege has no application to legal advice in "aid of a fraudulent scheme or criminal activity," such as defrauding a minority shareholder. See Fausek v. White, et al., 965 F.2d 126, 129 (6th Cir. 1992) (affirming decision that privilege did not apply to discussions between majority shareholder and lawyer regarding scheme to "squeeze out" minority shareholders).

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 9

### 4.  Damages for Usurping a Corporate Opportunity.

Demaray's purchase of the Patent Portfolio meets each element of Delaware's test for misappropriation of a corporate opportunity.  Under Delaware law, where a defendant breaches the duty of loyalty, "the infringing party must disgorge all profits and equity from the usurpation."  *Mobilactive Media*, 2013 Del. Ch. LEXIS 26, at *81.  Thus, the remedy for Demaray's breach is to disgorge all profits back into Antropy, where he is entitled to only 52% of the profits instead of 100%.

### II.  Demaray May Have Breached His Exclusive License to Antropy

Beyond breaching the duty of loyalty, we are concerned that Demaray may also be in the process of breaching his license agreement with Antropy.  In December 2009, Demaray entered into multiple agreements with the company.  Exhibits A, S, and T.  In one such agreement, entitled "Assignment Agreement," Demaray granted Antropy an exclusive license to "Licensed Patents."  Exhibit T, p. 2.  The Assignment Agreement defines Licensed Patents broadly to include any patents that pertain to solar energy that issue to Demaray after December 2009.  *Id.*  Demaray signed the Assignment Agreement individually, on behalf of an entity named Demaray Micro, Inc., and on behalf of Antropy.  *Id.*, p. 6.

We are aware that Demaray recently filed a patent application relating to solar energy.  It appears that it is not yet published.  If a patent issues from that application, however, it will be subject to Antropy's exclusive license.  In addition, any patent relating to solar energy that has or will issue to Demaray after December 2009 is also covered by the exclusive license.

We point this out to you, Demaray's patent counsel, in case he neglected to mention that he granted a prior exclusive license to Antropy.  We are aware that Demaray is actively trying to license his rights to other entities.  He should be aware that he cannot license the rights to any patents covered by the exclusive license without breaching the Assignment Agreement with Antropy.  If we are unable to resolve this matter, we intend to record the Assignment Agreement with the PTO for any patents that fall within the scope of the exclusive license.

### III.  Demaray is Spoliating Evidence and Must Stop Immediately

You should also be aware that Demaray is destroying evidence relevant to his breach of loyalty.  In August 2012, White sent Demaray a letter raising many of the issues identified above.  Exhibit U.  In fact, White specifically claimed that Demaray's actions constituted a breach of fiduciary duties because Demaray usurped Antropy's corporate opportunity.  *Id.*  Thus, Demaray was on notice of potential claims against him several months ago.

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 10

"It is well established that the duty to preserve evidence arises when a party reasonably
anticipates litigation." *Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am.
Sec., LLC,* 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010). Thus, the duty to preserve material
evidence arises not only during litigation but also extends to that period before litigation "when a
party should have known that the evidence may be relevant to future litigation." *Kronisch v.
United States,* 150 F.3d 112, 126 (2d Cir. 1998); *see also Zubulake v. UBS Warburg LLC
("Zubulake IV"),* 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("The obligation to preserve evidence
arises when the party has notice that the evidence is relevant to litigation or when a party should
have known that the evidence may be relevant to future litigation.").

As Antropy's email administrator, White has access to emails sent to and from Demaray's
Antropy email address. He recently discovered that Demaray has deleted highly relevant emails,
presumably under the mistaken belief that White would never learn of the cover up. This is
completely improper and may result in sanctions against Demaray if this case ends up in court.

**We demand that Demaray immediately stop deleting any Antropy emails or other
potentially relevant documents and preserve all such evidence until we are able to make a
copy of his computer's hard-drive.** If this matter progresses to litigation, we will seek
appropriate sanctions for past spoliation and will aggressively pursue any indication of further
spoliation now that we have made you are aware of the issue.

## IV. White is Seeking a Business Solution

These are serious issues, and as shown above, we believe White has a very strong case against
Demaray. The remedy is also severe. Under Delaware law, Antropy is entitled to disgorgement
of all profits Demaray has made from the Patent Portfolio. That said, White would prefer a
business solution over litigation. He recognizes that litigation is expensive and not in anyone's
best interest here. White hopes he can resolve this matter with Demaray without jeopardizing the
purchase agreement with the receiver or scaring off Demaray's new investors.

In the interest of resolving this matter with appropriate discretion, we propose that White and
Demaray meet, with counsel present, to discuss terms for a settlement. That way, we can try to
negotiate a business solution that allows both White and Demaray to maximize the value of the
patent rights.

If Demaray is not willing to meet with White or discuss a settlement, White will take appropriate
legal action. We ask that you contact us by May 3, 2013 to keep matters moving.

We look forward to hearing from you soon.

Gary J. Edwards, Esq.
Yan Zhang, Esq.
April 12, 2013
Page 11

Very truly yours,

Grant D. Fairbairn
*Attorney at Law*
**Direct Dial:** 612.492.7255
**Email:** gfairbairn@fredlaw.com
Enclosures

GDF/dcm/068769.0001/5370651


cc:   Dr. R. Ernest Demaray (w/ enclosures)
       Thomas S. Fraser, Esq. (w/o enclosures)
       Christopher D. White (w/o enclosures)